DAVID B. GOLUBCHIK (State Bar No. 185520)
CARMELA T. PAGAY (State Bar No. 195603)
JOSEPH M. ROTHBERG (State Bar No. 286363)
LEVENE, NEALE, BENDER, YOO & GOLUBCHIK L.L.P.
2818 La Cienega Avenue
Los Angeles, CA 90034
Telephone: (310) 229-1234
Facsimile: (310) 229-1244
Email: DBG@LNBYG.COM; CTP@LNBYG.COM; JMR@LNBYG.COM

Proposed Attorneys for Debtors and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**SANTA ANA DIVISION**

| | |
|---|---|
| In re<br><br>ANDREW STUPIN and JULIE STUPIN,<br><br>    Debtors and Debtors in Possession. | Case No. 8:26-bk-11202-SC<br><br>Chapter 11<br><br>Adv. Case No.: |
| WESTERN ALLIANCE BANK, an Arizona Corporation,<br><br>    Plaintiff,<br><br>vs.<br><br>CANTOR GROUP V, LLC, a Delaware Limited Liability Company, GERALD J. MARCIL, an individual, and ANDREW STUPIN, an individual,<br><br>    Defendants. | **NOTICE OF REMOVAL OF STATE COURT ACTION**<br><br>[Los Angeles Superior Court Case No. 25STCV24263, the Hon. Cherol J. Nellon Presiding]<br><br>[Referred to Judicial Referee, Hon. Candace Cooper (Ret.), JAMS]<br><br>[No Hearing Required] |

1

**TO THE CLERK OF THE UNITED STATES BANKRUPTCY COURT, CENTRAL DISTRICT OF CALIFORNIA:**

PLEASE TAKE NOTICE that Andrew Stupin and Julie Stupin, debtors and debtors in possession (the "Debtors") in the above-entitled case commenced under Chapter 11 of the Bankruptcy Code (the "Bankruptcy Case"), hereby remove the following portions of the case captioned *Western Alliance Bank v. Cantor Group V, LLC.* currently pending before Los Angeles Superior Court, Case No. 25STCV24263 (the "State Court Action") pursuant to 28 U.S.C. § 1452, FRBP 9027, and LBR 9027-1.

**I.      Background And The Basis For Removal**

28 U.S.C. § 1452 provides as follows:

> A party may remove any claim or cause of action in a civil action . . . to the district court for the district where such civil action is pending, *if such district court has jurisdiction of such claim or cause of action under section 1334* of this title.

*Id.* § 1452(a) (emphasis added).

28 U.S.C. § 1334, in turn, provides that the district court has "original but not exclusive jurisdiction of all civil proceedings arising under [the Bankruptcy Code], or arising in or related to cases under [the Bankruptcy Code]." *Id.* § 1334(b).

The Bankruptcy Case was commenced on April 17, 2026. The State Court Action was commenced on August 18, 2025. Substnatively, the State Court Action was initiated by Plaintiff Western Alliance Bank ("Plaintiff" or "WAB") to recover on loans it made to Cantor Group V, LLC ("Cantor V" or the "Borrower"). Cantor V has been alleged to have been controlled by Mahender Makhijani ("Makhijani"), an individual who is subject to a Criminal Complaint

pending in the United States District Court for the Central District of California, Case No. 8:26-mj-00387-DUTY.

Mr. Stupin seeks to remove the following portions of the State Court Action to Bankruptcy Court (collectively referred to hereinafter as the "Removed Claims"):

1.  Plaintiff WAB's claims for Breach of Guaranty and for Declaratory Relief against Andrew Stupin;

2.  Plaintiff's claim for claims for Breach of Guaranty and for Declaratory Relief against co-defendant Gerald J. Marcil ("Marcil").

To be clear, the portions of the State Court Action not being removed are any claims Plaintiff WAB may have against co-Defendant Cantor V.  At present, there are no counter-claims pending in the State Court Action.

The Removed Claims qualify for removal under 28 U.S.C. § 1452 as being related to the Bankruptcy Case, because the Removed Claims all revolve around whether Plaintiff WAB may seek to enforce certain guarantees of monetary obligations against the Debtors and Marcil as guarantors for loans made to Cantor V.

Furthermore, as set forth below, WAB has filed a proof of claim in excess of $173,000,000 against Debtors' Estate, claim no. 5.  The Removed Claims are also core as set forth in 28 U.S.C. § 157(b)(2)(B) as concerning an allowance or disallowance of claims against Debtors' Estate.  Given the size of this claim, the adjudication of WAB's claim is central to the entire Chapter 11 proceedings in this action.

**II.    Removal Is The Most Appropriate Course Of Action Under The Circumstances**

Aside from the statutory authority to remove, there are also many facts which demonstrate that removal is not only justice here, but the most appropriate course of action given the circumstances.

3

### A.   Debtor Mr. Stupin and Co-Defendant Mr. Marcil's Identical Defenses Should Be Heard By The Same Tribunal

Debtor Andrew Stupin and co-Defendant Marcil were only passive minority investors and guarantors for the Borrower.  Neither Mr. Stupin nor Mr. Marcil ever had any managerial role with the Borrower.  Their defenses to WAB are extremely similar, if not completely identical.  Because Mr. Stupin and Mr. Marcil share these arguments against WAB's attempt to hold them responsible for Borrower's fraudulent conduct, it is imperative that their defenses are heard before the same Court so as to not prejudice Mr. Stupin or risk conflicting rulings.  Mr. Stupin and Mr. Marcil are identically situated regarding the following arguments, *inter alia*, against the enforcement of the guarantees:

**First**, the Debtors and Marcil Defendants share the argument that their guarantees to WAB were not effective, because WAB was loaning funds outside of the confines of its own loan agreements with Cantor V Group, LLC.  More specifically, WAB was approving otherwise ineligible receivables and advancing funds against them; WAB failed to *first* receive complete collateral loan document packages prior to lending funds.  Thus, the guarantees were never properly activated.

**Second**, the Debtors and the Marcil Defendants share the arguments that they should not be held liable as guarantors pursuant to the holding in *Sumitomo Bank of California v. Iwasaki* (1968) 70 Cal.2d 81 ("*Sumitomo Bank*"), which held that the failure to disclose a material change to the loan being guaranteed can relieve a surety of liability.  The argument, in sum, is as follows: there are ample authorities under the law which demonstrate that the Plaintiff's conduct at issue here (failing to adhere to loan requirements prior to disbursing funds) constituted gross negligence in advancing funds without complete information about the supposed collateral pledged.  Plaintiff's gross negligence changed the nature of the loans that were guaranteed by Mr. Stupin and Mr. Marcil.  By operation of law,

the guarantees signed by Mr. Stupin were therefore discharged by Plaintiff WAB's material increase of the risk to the Debtor/guarantors by disbursing funds to Cantor V when there was not the first position secured collateral interests on which WAB could foreclose.  This materially increased the risks of guaranteeing the obligation because there naturally would not be as much equity available for Plaintiff to recover upon, which would increase the potential liability due under any guarantee obligation.  In short, if WAB were properly in first position prior to disbursing funds, then WAB could foreclose on more properties and recover more of the money that it had disbursed under its loans to Cantor V, rather than trying to recover the money from the guarantors, Mr. Stupin and Mr. Marcil.

Plaintiff WAB disbursed these funds anyway, without doing any diligence ahead of time, without confirming it was in first position under the underlying collateralized loans, and without notifying the Debtor Mr. Stupin or co-Defendant Mr. Marcil of the same.  This implicates the holding in *Sumitomo Bank.*  Under the facts here, Plaintiff WAB failed to advise Mr. Stupin and Mr. Marcil that WAB  had substantially changed the risk profile of the guaranteed loans by not accepting the valid security contracted for under those loans.  Thus, the holding in *Sumitomo Bank* would apply, and therefore, WAB cannot enforce the guarantees against Mr. Stupin or Mr. Marcil.

**Third**, Mr. Stupin and Mr. Marcil share the defense that the "Additional Guarantee Obligations" set forth in Section 1(b)(i) of the Amended and Restated Commercial Guarantees that they each signed on or about October 28, 2024, were also never triggered.  That is because, by the text of the agreement, the Additional Guarantee Obligations require that there is a *sine qua non*, causal action to trigger them.  Here, and by their own admission, WAB will not be able to show such a causal relationship because WAB was advancing funds on ineligible receivables, and the doctored title documents that they allegedly received from Mr. Makhijani and/or his associates were received *after* WAB advanced funds to Cantor V.  This

destroys the causal relationship here because WAB could not have been relying on doctored documents when advancing funds to Cantor V, if WAB had already advanced the money *before* receiving such documents.  While Mr. Stupin does not believe that any of his guarantee has been triggered because of the failures by WAB to obtain documents showing it was loaning against eligible receivables and because of the *Sumitomo* holding, set forth above, at minimum, Mr. Stupin is not obligated on the "Additional Guarantee Oblivions."  This is an argument both Mr. Stupin and Mr. Marcil will advance.  It makes sense to have one single Court analyze them and decide.

WAB has presently indicated that it intends to continue to prosecute the State Court Action against Mr. Marcil even while the State Court Action against Mr. Stupin remains stayed due to the instant bankruptcy.  WAB filed an opposition in the State Court Action as recently as June 24, 2026.  Because the defenses shared by both Mr. Stupin and Mr. Marcil remain nearly if not absolutely identical, there is a very real risk of prejudice against Mr. Stupin by allowing the State Court Action to continue against Mr. Marcil in Mr. Stupin's absence.

**B.**   **WAB has Submitted Creditor's Claim No. 5 Which is In Excess of $173 Million; That Claim's Resolution Is Central To This Bankruptcy Case**

WAB has submitted a claim to the Debtors' bankruptcy estate (Claim No. 5) in the amount of approximately $173,021,165.87.  WAB has also been named to the Committee of Unsecured Creditors in this case.  WAB is clearly ready and able to fully litigate its claim before this Court, whether WAB's claim be resolved either by claim objection, adversary proceeding, or by other contested matter before the Court.

///

///

**C.      The Recent Appointment Of A Judicial Referee Supports Removal**

The Hon. Judge Cherol J. Nellon, presiding over the State Court Action, recently granted WAB's Motion to refer the matter to a private Referee, and has appointed the Hon. Candace Cooper (Ret.) (the "Referee") as a general judicial referee under Cal. Code Civ. Proc. §638.  Because of the bankruptcy stay as to Debtors, only Cantor V and Mr. Marcil were referred to the Referee in the Court's order.  As of the filing of this Notice, Debtors understand that the Referee has yet to commence work in the referred proceedings.  However, should WAB seek relief from stay to pursue Mr. Stupin, it is also highly likely that WAB will also seek to have Mr. Stupin's portion of the State Court Action also heard before the Referee.  In such an instance, the Debtors must pay a portion of fees and costs for the Referee.  This presents a real risk that further erosion of estate assets will occur as the State Court Action continues.

**D.      This Court Is Presiding Over The Vast Majority Of Cases Stemming From Mr. Makhijani's Actions; Judicial Economy Would Be Best Served By Removal**

There are significant economies of scale that may be realized if this case is also heard before this Court.  The fallout from Mr. Makhijani's actions has been serious, significant, and far reaching.  It has spawned a host of litigation and other bankruptcy filings, most of which are already pending before this Court.  These cases pending before this Court which are related to Mr. Makhijani's wrongdoing include the instant case, plus:

1. *In re Raymond Group, LLC*, no. 8:26-bk-10834-SC

2. *In re Ramanujan Group LLC*, no. 8:26-bk-10832-SC;

3. *In re Ramanujan Group MOM LLC*, 8:26-bk-10888-SC;

4. *In re Ynez Shops LLC*, no. 8:26-bk-10693-SC;

5. *In re Pro Temecula Town Center, LLC*, no. 8:26-bk-10694-SC;

7

6. *In re Cantor Group III, LLC*, no. 8:26-bk-10416-SC;

7. *In re Chino Central Group, LLC*, no. 8:26-bk-10925-SC;

8. *In re Cantor Group, LLC*, no. 8:26-bk-11708-SC;

9. *In re SDRES Partners LLC*, no. 8:26-bk-11744-SC;

10. *In re Skolem Group, LLC*, 8:26-bk-11915-SC.

Additional bankruptcy cases which are pending in the Central District relating to the fallout from Mr. Makhijani's actions include:

1. *In re Rancho Colton Group, LLC* 8:25-bk-13633-MH

2. *In re Hilbert Group LLC* 8:26-bk-10578-MH;

3. *In re Plaza Continental Group LLC*, no. 8:26-bk-10986-MH;

4. *In re Conejo Riverside Group, LLC*, 8: 26-bk-11647-MH; and

5. *In re Global Premier Regency Palms Oxnard*, 8:25-bk-10329-RC.

Of course, this does not also include the other proceeding which Mr. Stupin has removed to this Court, which is the adversary proceeding *Zions Bancorporation, N.A. v. Andrew Stupin et al.*, Case no. 8:26-ap-01060-SC (the "Zions Adversary").  The Zions Adversary involves many of the same issues that the instant case brought by WAB does, and was removed for similar reasons (common issues and defenses concerning Mr. Stupin and Mr. Marcil, the appointment of a referee, and the desire to seek economic and quick resolution to two of the largest claims upon Debtor's Estate).[1]  In short, it would make the most sense, from the standpoint of judicial economy, to have this Court hear the instant case.

///

///

---

[1] Zions Bancorporation has a Motion to Remand Pending in the Zions Adversary, set to be heard by this Court on July 15, 2026.

8

**E.    The Receiver In The WAB Case Will Not Be Impacted By Removal**

Finally, it bears note that Mr. Stupin, Mr. Marcil, and WAB previously stipulated to the appointment a receiver over Cantor V.  The Court appointed Chris Neilson, of Trigild, as the receiver (the "Receiver").  The Receiver remains active at this time and, Mr. Stupin believes, is working to marshal the assets of Cantor V Group LLC.**2**  The Receiver, at present, was only appointed over assets belonging to Cantor V Group, LLC, and not the Debtor Stupin.  Thus, it does not appear that the removal will, at this time, affect the Receiver's ability to continue to pursue and administer the assets of Cantor V Group, LLC.

## III.   Conclusion

For all of the foregoing reasons, the Debtors submit the instant Notice of Removal of the Removed Claims from the State Court Action.

The Debtors consent to the bankruptcy court's entry of final judgment or order.

DATED:  June 25, 2026

LEVENE, NEALE, BENDER, YOO & GOLUBCHIK L.L.P

By:  _____
DAVID B. GOLUBCHIK
CARMELA T. PAGAY
JOSEPH M. ROTHBERG
Proposed Attorneys for Debtors and Debtors in Possession Andrew and Julie Stupin

---

**2**  There is a dispute between the Receiver and three of the entities which had properties which were allegedly pledged as collateral by Cantor V Group LLC to WAB, but which pledges were unauthorized.  Those three entities are Cedar Group, LLC, Century Group, LLC, and Pioneer Group, LLC.  Those entities have obtained counsel and are currently in discussions with the Receiver to resolve the disputes concerning the assets that were wrongly pledged by Cantor V Group, LLC.

9

Craig Solomon Ganz, Cal. Bar No. 217254
Michael S. Myers, Cal. Bar No. 305011
Elliot G. Johnson, Cal. Bar No. 317303
Mitchell L. Turbenson, Cal. Bar No. 346024
**BALLARD SPAHR LLP**
2029 Century Park East, Suite 1400
Los Angeles, CA 90067-2915
Email:  ganzc@ballardspahr.com
Email:  myersm@ballardspahr.com
Email: johnsoneg@ballardspahr.com
Email: turbensonm@ballardspahr.com
Telephone:  424.204.4400
Facsimile:  424.204.4350

*Attorneys for Plaintiff WESTERN
ALLIANCE BANK*

Electronically FILED by
Superior Court of California,
County of Los Angeles
8/18/2025 4:19 PM
David W. Slayton,
Executive Officer/Clerk of Court,
By Y. Ayala, Deputy Clerk

Ballard Spahr LLP
2029 Century Park East, Suite 1400
Los Angeles, CA  90067-2915
Telephone: 424.204.4400

# SUPERIOR COURT OF THE STATE OF CALIFORNIA

## FOR THE COUNTY OF LOS ANGELES

| | |
|---|---|
| WESTERN ALLIANCE BANK, an Arizona Corporation,<br><br>Plaintiff,<br><br>v.<br><br>CANTOR GROUP V, LLC, a Delaware Limited Liability Company, GERALD J. MARCIL, an individual, and ANDREW STUPIN, an individual,<br><br>Defendants. | CASE NO. 25STCV24263<br><br>**VERIFIED COMPLAINT**<br><br>(1) Breach of Contract (Against Cantor Group V, LLC)<br>(2) Breach of Guaranty Agreements (Against Gerald J. Marcil and Andrew Stupin)<br>(3) Appointment of Receiver (Against Cantor Group V, LLC)<br>(4) Specific Performance/Turnover (Against Cantor Group V, LLC)<br>(5) Declaratory Relief (Against Defendants)<br>(6) Fraudulent Concealment (Against Cantor Group V, LLC)<br>(7) Negligent Misrepresentation (Against Cantor Group V, LLC) |

1
VERIFIED COMPLAINT

Ballard Spahr LLP
2029 Century Park East, Suite 1400
Los Angeles, CA 90067-2915
Telephone: 424.204.4400

Plaintiff Western Alliance Bank ("<u>WAB</u>" or "<u>Plaintiff</u>" or "<u>Lender</u>") by and through counsel undersigned, and for its Complaint against Defendants Cantor Group V, LLC ("<u>Borrower</u>"), Gerald J. Marcil ("<u>Marcil</u>"), and Andrew Stupin ("<u>Stupin</u>" and together with Marcil, individually and collectively, the "<u>Guarantors</u>") hereby alleges as follows:

1. This action arises from a $100,000,000 warehouse revolving credit facility extended by WAB to Borrower on October 28, 2024 (the "<u>Loan</u>"). A warehouse facility lets a lender advance funds so the borrower can originate or buy mortgage loans, hold them temporarily as inventory, and repay the advances from sale or payoff of those loans—then re-borrow against a borrowing base made up only of eligible loans. The pledged loans and their cash proceeds are the collateral, and availability depends on each pledged loan being backed by a valid, perfected first-priority lien.

2. The Loan is governed by a Second Amended & Restated Business Loan and Security Agreement, as amended on July 18, 2025 (the "<u>BLSA</u>" or "<u>Loan Agreement</u>"), a Promissory Note, and other loan documents, and is absolutely and unconditionally guaranteed by both Guarantors. A true and correct copy of the BLSA is attached hereto as **Exhibit 1**. Under the July 18, 2025 amendment, the facility was converted to a term loan with a maturity date of May 16, 2026. The outstanding balance of the loan is $98,643,500.

3. Under the BLSA, Borrower promised that every pledged mortgage loan would be backed by a valid, perfected ***first-priority*** lien.

4. That promise was false and was represented to WAB by fraudulent means. After closing, WAB's independent analysis showed many of the pledged loans were junior to older, still-of-record deeds of trust. Borrower failed to disclose this material fact.

5. To compound matters, WAB's analysis showed that several underlying properties were already in foreclosure. Borrower failed to disclose this material fact.

6. Not only did Borrower fail to disclose numerous material facts, Borrower engaged in a fraudulent scheme to create fake title policies by omitting those senior liens. Borrower then furnished these doctored policies to WAB while purporting to insure that the loans that acted as WAB's collateral were in first position.

1

VERIFIED COMPLAINT

7.    At the same time, Borrower drained funds from accounts that acted as additional/required collateral for the loans.

8.    Specifically, Borrower violated core cash-management and reporting covenants: it failed the July 2025 $2,000,000 Operating Account test (averaging roughly $515,479), failed to establish and use the required WAB Capital Account, and failed to deliver the June 30, 2025 quarterly financial statements, Borrowing Base Certificate, and loan tape—on top of missed First Amendment post-closing items.

9.    As of August 18, 2025, Borrower held only $1,009.47 in the WAB Operating Account despite a required monthly average amount of $2,000,000.

10.    These facts reflect multiple Events of Default—including breach of warranty and misrepresentation and failures to perform. Certain acts and omissions of the Borrower outright eliminated the collateral of WAB.  Other acts and omissions of the Borrower placed WAB's collateral at immediate risk of dissipation and loss.

11.    The Loan Documents authorize acceleration and appointment of a receiver "without notice," and expressly carve receivership and other provisional remedies out of judicial reference to allow expedited, including ex parte, relief.

12.    WAB therefore seeks money damages, enforcement of the Guaranties, and immediate appointment of a receiver (with temporary restraining order and preliminary injunction) to seize and control of cash and collateral, stop diversion and waste, and preserve the estate pending judgment.

## PARTIES, JURISDICTION, AND VENUE

13.    Plaintiff WAB is an Arizona corporation authorized to do business in the State of California and transacts business in Los Angeles County.

14.    Borrower is a Delaware limited liability company that transacts business in the State of California and transacts business in Los Angeles County.

15.    Defendant Marcil is an individual who, upon information and belief, resides in the State of California.

Ballard Spahr LLP
2029 Century Park East, Suite 1400
Los Angeles, CA  90067-2915
Telephone: 424.204.4400

2
VERIFIED COMPLAINT

Ballard Spahr LLP
2029 Century Park East, Suite 1400
Los Angeles, CA 90067-2915
Telephone: 424.204.4400

16.     Defendant Stupin is an individual who, upon information and belief, resides in the State of California.

17.     The amount in controversy exceeds $35,000, and this is an unlimited civil case within the subject-matter jurisdiction of the Superior Court of California

18.     Venue is proper in the Superior Court of California, County of Los Angeles, because one or more parcels of the real property securing the Loan are situated in this County.

19.     Venue is also proper in this County because a substantial part of the obligations and performance under the Loan Documents occurred or were to occur in Los Angeles County, and Defendants transact business in this County. *See* Cal. Code Civ. Proc. §§ 395(a), 395.5.

20.     The Loan Documents contain forum-selection and judicial-reference provisions that expressly contemplate California state-court jurisdiction and carve out receivership and other provisional remedies for determination by the trial court, further supporting jurisdiction and venue in this Court.

21.     This action is not subject to the provisions of Civil Code §§ 2981 et seq. (Rees–Levering Act) or §§ 1801 et seq. (Unruh Act).

22.     In addition to the Events of Default and contractual receivership provisions alleged below, WAB shows the following facts supporting ex parte appointment of a receiver pursuant to Code of Civil Procedure § 564 and California Rules of Court, rule 3.1176:

23.     WAB's collateral consists of pledged mortgage loans and their cash proceeds. These assets are highly liquid and subject to immediate diversion, dissipation, or commingling. As described below, Borrower has already furnished doctored title policies omitting senior encumbrances, pledged ineligible loans, failed to maintain required cash balances, and failed to establish and use the WAB Capital Account as required. These facts show that Borrower is actively concealing material information, failing core cash-management duties, and diverting proceeds. During the time required for noticed motion

VERIFIED COMPLAINT

practice, WAB's collateral and cash proceeds are at imminent risk of being dissipated or transferred beyond the reach of this Court, causing irreparable injury.

24.     Upon information and belief, the Borrower, Cantor Group V, LLC, is the entity in possession and control of the pledged mortgage loans, related proceeds, and collateral accounts. Upon information and belief, the members of Cantor Group V, LLC include:

- Ioannis Xilikakis, Member

- Andrew Stupin, Member

- Gerald Marcil, Member

- Deba Shyam, Member and Manager

25.     These managers may be contacted through Borrower's counsel in this action.

26.     The property subject to receivership (including, but not limited to, Collateral Loans) has an aggregate face value exceeding $100,000,000. A receiver is necessary to take possession of and administer the Collateral Loans and cash proceeds to prevent further diversion and dissipation. Appointment of a receiver will not stop or seriously interfere with Borrower's legitimate business operations, because Borrower has already defaulted and materially impaired the collateral; rather, receivership will preserve the estate for all stakeholders by ensuring compliance with the BLSA's cash-management and collateral-protection covenants.

27.     To the extent any of the above information is incomplete, WAB has exercised diligence in attempting to confirm facts regarding Borrower's possession, management, and use of the collateral, including by review of public records, Borrower's loan-level reporting, and communications with Borrower. WAB will supplement with additional details as they are confirmed.

## THE BLSA AND COLLATERAL

28.     On October 28, 2024, Borrower executed the BLSA and related documents for a $100,000,000 revolving facility.

Ballard Spahr LLP
2029 Century Park East, Suite 1400
Los Angeles, CA  90067-2915
Telephone: 424.204.4400

4
VERIFIED COMPLAINT

29. On July 18, 2025, the BLSA was amended by the First Amendment to Second Amended and Restated Loan Documents and Limited Waiver. Under the July 18, 2025 amendment, the facility was converted to a term loan with a maturity date of May 16, 2026. The outstanding balance of the loan is $98,643,500.

30. The BLSA provides Borrower with a warehouse revolving line of credit. WAB advances money so Borrower can make or buy mortgage loans ("Collateral Loans"), which Borrower pledges to WAB. Borrower can draw, repay, and draw again, but only within the contract limits and only for that purpose.

31. In other words, before being converted into a term loan, the BLSA permitted Borrower to draw, repay, and re-borrow against a Borrowing Base comprised of "Eligible" pledged Collateral Loans. Each draw requires a current Borrowing Base Certificate with supporting loan-level information. (BLSA § 4.5.3; Schedule 6.7). As a term loan, no further draws are permitted. However, a Borrowing Base calculation is still performed to ensure there is adequate collateral coverage pursuant to the terms of the BLSA.

32. A pledged Collateral Loan is "Eligible" only if Borrower delivers a complete Collateral Loan Document Package—including a recordable/allonge and assignment—and WAB's lien on the underlying real property is valid, first-priority, and perfected. These are continuing duties (BLSA §§ 4.6.1(a), (c), (e)–(g); 5.3.1; 5.3.3; 5.3.10).

33. Specifically, Borrower made specific representations as of the date Collateral Loans were pledged, including:

- **Section 5.3.1**: "Subject to Permitted Exceptions (as defined below), the Mortgage *creates a first lien or a first priority ownership interest in an estate in fee simple estate in real property securing the related Collateral Note*." (emphasis added)

- **Section 5.3.3**: "The Collateral Loan is covered by an American Land Title Association or California Land Title Association mortgage title insurance policy, or such other generally acceptable form of policy or insurance pursuant to insurance policies, and the issuer thereof is qualified to do business in the jurisdiction where the Underlying Collateral is located, and *which insures the holder of such Collateral Loan, its successors and assigns, as to the first priority lien of the Collateral Mortgage* in the original principal amount of the Collateral Loan and against any loss by reason of the invalidity or unenforceability of the lien resulting from the provisions of the Collateral Mortgage. . . . The title policy does not

5

VERIFIED COMPLAINT

Ballard Spahr LLP
2029 Century Park East, Suite 1400
Los Angeles, CA  90067-2915
Telephone: 424.204.4400

contain any special exceptions (other than the standard exclusions) for zoning and uses . . . ." (emphasis added);

- **Section 5.3.10**: "The related Mortgage *is a valid, subsisting, enforceable and perfected first lien* on the Underlying Collateral, subject only to Permitted Exceptions . . . . *The Mortgage and the Collateral Loan Note do not contain any evidence of any security interest or other interest or right thereto. Such lien is free and clear of all adverse claims, liens and encumbrances having priority over the first lien of the Mortgage* subject only to (1) the lien of non-delinquent current real property taxes and assessments not yet due and payable, (2) covenants, conditions and restrictions, rights of way, easements and other matters of the public record as of the date of recording which are acceptable to mortgage lending institutions generally and specifically referred to in the lender's title insurance policy and either (A) which are referred to or otherwise considered in the appraisal made in connection with the origination of the Collateral Loan, or (B) which do not adversely affect the appraised value of the Underlying Collateral as set forth in such appraisal and (3) other matters to which like properties are commonly subject which do not materially interfere with the benefits of the security intended to be provided by the Mortgage or the use, enjoyment, value or marketability of the related Underlying Collateral (collectively, "Permitted Exceptions"). *Any security agreement, chattel mortgage or equivalent document related to and delivered in connection with the Collateral Loan establishes and creates a valid, subsisting, enforceable and perfected first lien and first priority security interest on the property described therein.*" (emphasis added).

- **Section 5.3.23**: "The Borrower or its trustee *is the sole legal, beneficial and equitable owner and holder of the Collateral Loan and the indebtedness evidenced by the Collateral Loan Note*. . . . The Borrower has good, and marketable title to *and is the sole owner thereof has full right and authority to pledge and assign the Collateral Loan to the Lender free and clear of any encumbrance, equity, lien, pledge, charge, claim (including, but not limited to, any preference or fraudulent transfer claim) or security interest*." (emphasis added)

34. If outstanding advances to Borrower exceed either the Credit Limit or the Borrowing Base, Borrower must pay the excess (or difference between the outstanding advances and the Credit Limit or Borrowing Base) within ten (10) business days after demand. (BLSA § 4.1.1(a)).

35. Despite these obligations and warranties, Borrower pledged multiple Collateral Loans that were not in first-lien position. (*See* BLSA Schedule 10B). And as described below, Borrower has engaged in an egregious and fraudulent attempt to hide older, still-of-record senior deeds of trust and foreclosure activity by furnishing "final" title

Ballard Spahr LLP
2029 Century Park East, Suite 1400
Los Angeles, CA  90067-2915
Telephone: 424.204.4400

6

VERIFIED COMPLAINT

policies or purported policies that omit those senior encumbrances yet purport to insure Borrower's lien as first priority, and by pledging loans lacking recorded security instruments—thereby inflating the Borrowing Base and misrepresenting eligibility.

## BORROWER'S FRAUDULENT DOCTORING OF TITLE POLICIES

36.     Because a pledged loan is "Eligible" only if WAB's lien on the underlying real property is valid, first-priority, and perfected, Borrower began providing WAB with doctored title policies purporting to show that WAB's lien on the real property underlying certain pledged loans was first priority. As set forth in the paragraphs below, Borrower's fraudulent behavior was wide spread and systematic, spanning numerous properties that comprised WAB's collateral.

**Fraudulent Title Report for Collateral Loan No. 26**

37.     On October 15, 2024, Borrower's employee Jaspreet Singh Sethi provided to WAB a purported Stewart Title Guaranty Company Title Policy No. M-2923-14382 dated October 1, 2024 related to Collateral Loan No. 26, which involves property located at 2522 S. Grove Ave., Ontario, CA with property owner Conejo Riverside Group LLC.

38.     The purported title policy shows WAB's lien on the real property underlying the property as first priority:

11.  Deed of Trust to secure an indebtedness in the amount shown below, and any other obligations secured thereby:
Amount :        $16,500,000.00
Trustor :       Conejo Riverside Group, LLC, a California limited liability company
Trustee :       Cantor Group IV LLC, a Delaware limited liability company
Beneficiary :   Cantor Group IV LLC, a Delaware limited liability company
Recorded :      October 1, 2024 as Instrument No 2024-0235089 of Official Records

39.     However, a title search run by WAB after entering into the First Amendment to the BLSA shows a deed of trust for Preferred Bank for $10,400,000 dated July 11, 2017 recorded July 17, 2017 in the first priority position.

Ballard Spahr LLP
2029 Century Park East, Suite 1400
Los Angeles, CA  90067-2915
Telephone: 424.204.4400

7

Ballard Spahr LLP
2029 Century Park East, Suite 1400
Los Angeles, CA  90067-2915
Telephone: 424.204.4400

## EXCEPTIONS:

**MORTGAGES, LIENS AND OTHER MATTERS AFFECTING TITLE:**

DEED OF TRUST, ASSIGNMENT OF RENTS, SECURITY AGREEMENT AND FIXTURE FILING
DEBTOR:      Conejo Riverside Group LLC, a California limited liability company
CREDITOR:   Preferred Bank
TRUSTEE:     Lawyers Title Company
DATED:            July 11, 2017
RECORDED:      July 17, 2017
RECORDED IN:   Instrument Number 2017-0288429
AMOUNT:       $10,400,000.00

Absolute Assignment of Leases and Rents recorded July 17, 2017 in Instrument Number 2017-0288430.

Memorandum of Fifth Extension Agreement and Amendment to Loan Documents recorded November 22, 2023 in Instrument Number 2023-0289903.

Subordination, Non Disturbance and Attornment Agreement recorded December 19, 2023 in Instrument Number 2023-0312122.

Memorandum of Third Amendment to Deed of Trust recorded April 11, 2025 in Instrument Number 2025-0079011.

40.    The purported title policy furnished by Borrower had no reference to the Preferred Bank deed of trust despite the fact the title policy provided by the Borrower should have been identical to the Title Policy provided directly from Stewart Title Guaranty Company.

41.    Following the title searches that were completed post-amendment, WAB then received a copy of Title Policy No. M-2923-14382 directly from Stewart Title Guaranty Company which showed a deed of trust for Preferred Bank for $10,400,000 dated July 11, 2017 recorded July 17, 2017 in the first priority position.

**Fraudulent Title Report for Collateral Loan No. 32**

42.    As another example, on September 26, 2024, Borrower's employee Jaspreet Singh Sethi provided to WAB a purported Stewart Title Guaranty Company Title Policy No. M-2923-14032 dated March 28, 2024 related to Collateral Loan No. 32, which involves

VERIFIED COMPLAINT

Ballard Spahr LLP
2029 Century Park East, Suite 1400
Los Angeles, CA 90067-2915
Telephone: 424.204.4400

property located at 23750 Alessandro Blvd, Building G, H, I, Moreno Valley, CA with property owner Alessandro Group, LLC.

43. The purported title policy shows WAB's lien on the real property underlying the property as first priority:

**CLTA STANDARD COVERAGE POLICY**
**SCHEDULE B – PART II**
ISSUED BY
STEWART TITLE GUARANTY COMPANY

Current owner of leasehold and any other matters affecting the interest of the lessee are not set forth herein.

17. Deed of Trust to secure an indebtedness in the amount shown below, and any other obligations secured thereby:
Amount : $7,750,000.00
Trustor : Alessandro Group LLC, a California limited liability company
Trustee : Cantor Group IV LLC, a Delaware limited liability company
Beneficiary : Cantor Group IV LLC, a Delaware limited liability company
Recorded : March 28, 2024 as Instrument No 2024-0091129 of Official Records

18. Rights or claims of tenants in possession whether or not shown by the Public Records.

19. Rights or claims of parties in possession whether or not shown by the Public Records.

(End of Exceptions)

44. However, a title search run by WAB after entering into the First Amendment to the BLSA shows a deed of trust for Nano Banc for $9,720,000.00 recorded on September 9, 2019 in the first priority position.

45. The purported title policy furnished by Borrower had no reference to the Nano Banc deed of trust despite the fact the title policy provided by the Borrower should have been identical to the Title Policy provided directly from Stewart Title Guaranty Company.

46. Following the title searches that were completed post-amendment, WAB then received a copy of Title Policy No. M-2923-14032 directly from Stewart Title Guaranty Company which showed a deed of trust for Nano Banc for $9,720,000.00 recorded on September 9, 2019 in the first priority position:

9
VERIFIED COMPLAINT

CLTA STANDARD COVERAGE POLICY
SCHEDULE B – PART II

ISSUED BY
STEWART TITLE GUARANTY COMPANY

Current owner of leasehold and any other matters affecting the interest of the lessee are not set forth herein.

17.  Deed of Trust to secure an indebtedness in the amount shown below, and any other obligations secured thereby:
Amount : $9,720,000.00
Trustor : Alessandro Group LLC, a California limited liability company
Trustee : Nano Banc
Beneficiary : Nano Banc
Recorded : September 9, 2019, as Instrument No. 2019-0350046, of Official Records.

Affects the Land and other property.

18.  Rights or claims of tenants in possession whether or not shown by the Public Records.

19.  Rights or claims of parties in possession whether or not shown by the Public Records.

20.  Deed of Trust to secure an indebtedness in the amount shown below, and any other obligations secured thereby:
Amount :    $7,750,000.00
Dated:    January 3, 2024
Trustor :    Alessandro Group LLC, a California limited liability company
Trustee :    Cantor Group IV LLC, a Delaware limited liability company
Beneficiary :    Cantor Group IV LLC, a Delaware limited liability company
Recorded :    March 28, 2024 as Instrument No 2024-0091129 of Official Records

**Fraudulent Title Report for Collateral Loan No. 33**

47.    As another example, on September 26, 2024, Borrower's employee Jaspreet Singh Sethi provided to WAB a purported Stewart Title Guaranty Company Title Policy No. M-2923-14438 dated April 3, 2024 related to Collateral Loan No. 33, which involves property located at 23750 Alessandro Blvd, Building A, B, O, N, Moreno Valley, CA with property owner Alessandro Group, LLC.

48.    The purported title policy shows WAB's lien on the real property underlying the property as first priority:

17.  Deed of Trust to secure an indebtedness in the amount shown below, and any other obligations secured thereby:
Amount: $6,500,000.00
Trustor: Alessandro Group LLC, a California limited liability company
Trustee: Cantor Group IV LLC, a Delaware limited liability company
Beneficiary: Cantor Group IV LLC, a Delaware limited liability company
Recorded: April 03, 2024, as Instrument No. 2024-0096539, of Official Records.

Ballard Spahr LLP
2029 Century Park East, Suite 1400
Los Angeles, CA 90067-2915
Telephone: 424.204.4400

10
VERIFIED COMPLAINT

49. However, a title search run by WAB after entering into the First Amendment to the BLSA shows a deed of trust for Nano Banc for $9,720,000.00 dated August 29, 2019 recorded September 9, 2019:

### EXCEPTIONS:

**MORTGAGES, LIENS AND OTHER MATTERS AFFECTING TITLE:**

DEED OF TRUST
DEBTOR:     Alessandra Group LLC, a California limited liability company
CREDITOR:  Nano Banc
BENEFICIARY:     Nano Banc
DATED:               August 29, 2019
RECORDED:        September 9, 2019
RECORDED IN:    Instrument Number 2019-0350046
AMOUNT:         $9,720,000.00

Modification Agreement recorded December 11, 2024 in Instrument Number 2024-0377764.

Substitution of Trustee naming First American Title Insurance Company as new Trustee, recorded May 20, 2025 in Instrument Number 2025-0152501.

Notice of Default and Election to Sell under Deed of Trust recorded May 20, 2025 in Instrument Number 2025-0152502.

50. The purported title policy furnished by Borrower had no reference to the Nano Banc deed of trust despite the fact the title policy provided by the Borrower should have been identical to the Title Policy provided directly from Stewart Title Guaranty Company.

51. Following the title searches that were completed post-amendment, WAB then received a copy of Title Policy No. M-2923-14438 directly from Stewart Title Guaranty Company which showed a deed of trust for Nano Banc for $9,720,000.00 dated August 29, 2019 and recorded September 9, 2019 in the first priority position.

52. Of significant concern is that there was a "Notice of Default and Election to Sell under Deed of Trust" recorded on May 20, 2025.

**Fraudulent Title Report for Collateral Loan No. 35**

53. As another example, on October 15, 2024, Borrower's employee Jaspreet Singh Sethi provided to WAB a purported Stewart Title Guaranty Company Title Policy No.

Ballard Spahr LLP
2029 Century Park East, Suite 1400
Los Angeles, CA  90067-2915
Telephone: 424.204.4400

11
VERIFIED COMPLAINT

M-2923-14378 dated April 3, 2024 related to Collateral Loan No. 35, which involves property located at 2460 S. Grove Ave, Ontario, CA with property owner Conejo Riverside Group LLC.

54. The purported title policy shows WAB's lien on the real property underlying the property as first priority:

15. Deed of Trust to secure an indebtedness in the amount shown below, and any other obligations secured thereby:
Amount : $ 2,900,000.00
Trustor : Conejo Riverside Group, LLC, A California Limited Liability Company
Trustee : Cantor Group IV LLC, a Delaware limited liability company

Beneficiary : Cantor Group IV LLC, a Delaware limited liability company
Recorded : April 3, 2024 as Instrument No. 2024-0074068 of Official Records.

The beneficial interest of Cantor Group IV LLC, a Delaware limited liability company has been assigned of record to Cantor Group V LLC, a Delaware limited liability company by that certain document recorded April 3, 2024 by Instrument No. 2024-0074666 of Official Records.

55. However, a title search run by WAB after entering into the First Amendment to the BLSA shows a deed of trust for Preferred Bank for $10,400,000.00 dated July 11, 2017 and recorded July 17, 2017:

**EXCEPTIONS:**

**MORTGAGES, LIENS AND OTHER MATTERS AFFECTING TITLE:**

DEED OF TRUST, ASSIGNMENT OF RENTS, SECURITY AGREEMENT AND FIXTURE FILING
DEBTOR:      Conejo Riverside Group LLC, a California limited liability company
CREDITOR:   Preferred Bank
TRUSTEE:     Lawyers Title Company
DATED:              July 11, 2017
RECORDED:       July 17, 2017
RECORDED IN:   Instrument Number 2017-0288429
AMOUNT:       $10,400,000.00

Ballard Spahr LLP
2029 Century Park East, Suite 1400
Los Angeles, CA 90067-2915
Telephone: 424.204.4400

Absolute Assignment of Leases and Rents recorded July 17, 2017 in Instrument Number 2017-0288430.

Memorandum of Fifth Extension Agreement and Amendment to Loan Documents recorded November 22, 2023 in Instrument Number 2023-0289903.

Subordination, Non Disturbance and Attornment Agreement recorded December 19, 2023 in Instrument Number 2023-0312122.

Memorandum of Third Amendment to Deed of Trust recorded April 11, 2025 in Instrument Number 2025-0079011.

56.     The purported title policy furnished by Borrower had no reference to the Preferred Bank deed of trust despite the fact the title policy provided by the Borrower should have been identical to the Title Policy provided directly from Stewart Title Guaranty Company.

57.     Following the title searches that were completed post-amendment, WAB then received a copy of Title Policy No. M-2923-14378 directly from Stewart Title Guaranty Company which showed a deed of trust for Preferred Bank for $10,400,000.00 dated July 11, 2017 and recorded July 17, 2017 in the first priority position.

**Fraudulent Title Report for Collateral Loan No. 37**

58.     As another example, on April 3, 2025, Borrower's employee Jaspreet Singh Sethi provided to WAB a purported Chicago Title Insurance Company Title Policy No. FBSC2500654 dated March 21, 2025 related to Collateral Loan No. 37, which involves property located at 28207 Newhall Ranch Road, Valencia, CA with property owner Galois Group LLC.

59.     The purported title policy shows WAB's lien on the real property underlying the property as first priority and references no other deeds of trust.

60.     However, a title search run by WAB after entering into the First Amendment to the BLSA shows *two* deeds of trust for Preferred Bank. The first of which is for $48,930,000.00 dated February 28, 2017 and recorded on March 8, 2017. The second is for $1,500,000.00 dated December 4, 2023 and recorded December 8, 2023.

Ballard Spahr LLP
2029 Century Park East, Suite 1400
Los Angeles, CA 90067-2915
Telephone: 424.204.4400

Ballard Spahr LLP
2029 Century Park East, Suite 1400
Los Angeles, CA  90067-2915
Telephone: 424.204.4400

**EXCEPTIONS:**

**MORTGAGES, LIENS AND OTHER MATTERS AFFECTING TITLE:**

DEED OF TRUST, ASSIGNMENT OF RENTS, SECURITY AGREEMENT AND FIXTURE
FILING
DEBTOR:      Galois Group LLC, a California limited liability company
CREDITOR:  Preferred Bank, a California banking corporation
BENEFICIARY:      Commonwealth Land Title Company
DATED:              February 28, 2017
RECORDED:        March 8, 2017
RECORDED IN:    Instrument Number 20170265806
AMOUNT:        $48,930,000.00

Memorandum of Modification of Deed of Trust, Extension Agreement and Amendment to Loan
Documents, dated November 15, 2018 and recorded Decmeber 19, 2018 in Instrument Number
20181286946.

Memorandum of Modification of Deed of Trust, Extension Agreement and Amendment to Loan
Documents, dated November 6, 2023 and recorded November 30, 2023 in Instrument Number
20230828723.

Memorandum of Third Amendment to Loan Documents dated September 4, 2024 and recorded
October 24, 2024 in Instrument Number 20240729771.

DEED OF TRUST, ASSIGNMENT OF RENTS, SECURITY AGREEMENT AND FIXTURE
FILING
DEBTOR:      Galois Group LLC, a California limited liability company
CREDITOR:  Preferred Bank, a California banking corporation
BENEFICIARY:      Commonwealth Land Title Company
DATED:              December 4, 2023
RECORDED:        December 8, 2023
RECORDED IN:    Instrument Number 20230857736
AMOUNT:        $1,500,000.00

Memorandum of Amendment to Loan Documents dated September 4, 2024 and recorded
October 24, 2024 in Instrument Number 20240729772.

61.      The purported title policy furnished by Borrower had no reference to the Preferred Bank deeds of trust despite the fact the title policy provided by the Borrower should have been identical to the Title Policy provided directly from Chicago Title Insurance Company.

14

62.     Following the title searches that were completed post-amendment, WAB then received a copy of Title Policy No. FBSC2500654 directly from Chicago Title Insurance Company which showed *two* deeds of trust for Preferred Bank. The first of which is for $48,930,000.00 dated February 28, 2017 and recorded on March 8, 2017. The second is for $1,500,000.00 dated December 4, 2023 and recorded December 8, 2023.

**Fraudulent Title Report for Collateral Loan No. 38**

63.     As another example, on April 3, 2025, Borrower's employee Jaspreet Singh Sethi provided to WAB a purported Chicago Title Insurance Company Title Policy No. FBSC2500661 dated March 21, 2025 related to Collateral Loan No. 38, which involves property located at 28251 Newhall Ranch Road, Valencia, CA with property owner Galois Group LLC.

64.     The purported title policy shows WAB's lien on the real property underlying the property as first priority and references no other deeds of trust.

65.     However, a title search run by WAB after entering into the First Amendment to the BLSA shows *two* deeds of trust for Preferred Bank. The first of which is for $48,930,000.00 dated February 28, 2017 and recorded on March 8, 2017. The second is for $1,500,000.00 dated December 4, 2023 and recorded December 8, 2023.

Ballard Spahr LLP
2029 Century Park East, Suite 1400
Los Angeles, CA 90067-2915
Telephone: 424.204.4400

15
VERIFIED COMPLAINT

Ballard Spahr LLP
2029 Century Park East, Suite 1400
Los Angeles, CA  90067-2915
Telephone: 424.204.4400

## EXCEPTIONS:

**MORTGAGES, LIENS AND OTHER MATTERS AFFECTING TITLE:**

DEED OF TRUST, ASSIGNMENT OF RENTS, SECURITY AGREEMENT AND FIXTURE FILING
DEBTOR:        Galois Group LLC, a California limited liability company
CREDITOR:   Preferred Bank, a California banking corporation
BENEFICIARY:        Commonwealth Land Title Company
DATED:                February 28, 2017
RECORDED:        March 8, 2017
RECORDED IN:   Instrument Number 20170265806
AMOUNT:        $48,930,000.00

Memorandum of Modification of Deed of Trust, Extension Agreement and Amendment to Loan Documents dated November 15, 2018 and recorded December 19, 2018 in Instrument Number 20181286946.

Memorandum of Modification of Deed of Trust, Extension Agreement and Amendment to Loan Documents dated November 6, 2023 and recorded November 30, 2023 in Instrument Number 20230828723.

Memorandum of Third Amendment to Loan Documents dated September 4, 2024 and recorded October 24, 2024 in Instrument Number 20240729771.

DEED OF TRUST, ASSIGNMENT OF RENTS, SECURITY AGREEMENT AND FIXTURE FILING
DEBTOR:        Galois Group LLC, a California limited liability company
CREDITOR:   Preferred Bank, a California banking corporation
BENEFICIARY:        Commonwealth Land Title Company
DATED:                December 4, 2023
RECORDED:        December 8, 2023
RECORDED IN:   Instrument Number 20230857736
AMOUNT:        $1,500,000.00

Memorandum of Amendment to Loan Documents dated September 4, 2024 and recorded October 24, 2024 in Instrument Number 20240729772.

UCC FINANCING STATEMENT
DEBTOR:        KCNS Santa Clarita LLC
SECURED PARTY:  Western Equipment Finance
RECORDED:        September 27, 2022
RECORDED IN:   Instrument Number 20220939085

VERIFIED COMPLAINT

66. The purported title policy furnished by Borrower had no reference to the Preferred Bank deeds of trust despite the fact the title policy provided by the Borrower should have been identical to the Title Policy provided directly from Chicago Title Insurance Company.

67. Following the title searches that were completed post-amendment, WAB then received a copy of Title Policy No. FBSC2500661 directly from Chicago Title Insurance Company which showed *two* deeds of trust for Preferred Bank. The first of which is for $48,930,000.00 dated February 28, 2017 and recorded on March 8, 2017. The second is for $1,500,000.00 dated December 4, 2023 and recorded December 8, 2023.

**Fraudulent Title Report for Collateral Loan No. 39**

68. As another example, on April 3, 2025, Borrower's employee Jaspreet Singh Sethi provided to WAB a purported Chicago Title Insurance Company Title Policy No. FBSC2500642 dated March 21, 2025 related to Collateral Loan No. 39, which involves property located at 28301 Newhall Ranch Road, Valencia, CA with property owner Galois Group LLC.

69. The purported title policy shows WAB's lien on the real property underlying the property as first priority and references no other deeds of trust.

70. However, a title search run by WAB after entering into the First Amendment to the BLSA shows *two* deeds of trust for Preferred Bank. The first of which is for $48,930,000.00 dated February 28, 2017 and recorded on March 8, 2017. The second is for $1,500,000.00 dated December 4, 2023 and recorded December 8, 2023.

Ballard Spahr LLP
2029 Century Park East, Suite 1400
Los Angeles, CA 90067-2915
Telephone: 424.204.4400

17
VERIFIED COMPLAINT

Ballard Spahr LLP
2029 Century Park East, Suite 1400
Los Angeles, CA 90067-2915
Telephone: 424.204.4400

**EXCEPTIONS:**

**MORTGAGES, LIENS AND OTHER MATTERS AFFECTING TITLE:**

DEED OF TRUST, ASSIGNMENT OF RENTS, SECURITY AGREEMENT AND FIXTURE

FILING
DEBTOR:       Galois Group LLC, a California limited liability company
CREDITOR:   Preferred Bank, a California banking corporation
BENEFICIARY:       Commonwealth Land Title Company
DATED:                February 28, 2017
RECORDED:         March 8, 2017
RECORDED IN:    Instrument Number 20170265806
AMOUNT:        $48,930,000.00

Memorandum of Modification of Deed of Trust, Extension Agreement and Amendment to Loan Documents dated November 15, 2018 and recorded December 19, 2018 in Instrument Number 20181286946.

Memorandum of Modification of Deed of Trust, Extension Agreement and Amendment to Loan Documents dated November 6, 2023 and recorded November 30, 2023 in Instrument Number 20230828723.

Memorandum of Third Amendment to Loan Documents dated September 4, 2024 and recorded October 24, 2024 in Instrument Number 20240729771.

DEED OF TRUST, ASSIGNMENT OF RENTS, SECURITY AGREEMENT AND FIXTURE FILING
DEBTOR:       Galois Group LLC, a California limited liability company
CREDITOR:   Preferred Bank, a California banking corporation
BENEFICIARY:       Commonwealth Land Title Company
DATED:                December 4, 2023
RECORDED:         December 8, 2023
RECORDED IN:    Instrument Number 20230857736
AMOUNT:        $1,500,000.00

Memorandum of Amendment to Loan Documents dated September 4, 2024 and recorded October 24, 2024 in Instrument Number 20240729772.

71.    The purported title policy furnished by Borrower had no reference to the Preferred Bank deeds of trust despite the fact the title policy provided by the Borrower should have been identical to the Title Policy provided directly from Chicago Title Insurance Company.

18

VERIFIED COMPLAINT

72.     Following the title searches that were completed post-amendment, WAB then received a copy of Title Policy No. FBSC2500642 directly from Chicago Title Insurance Company which showed *two* deeds of trust for Preferred Bank. The first of which is for $48,930,000.00 dated February 28, 2017 and recorded on March 8, 2017. The second is for $1,500,000.00 dated December 4, 2023 and recorded December 8, 2023.

**Fraudulent Title Report for Collateral Loan No. 43**

73.     As another example, on April 3, 2025, Borrower's employee Jaspreet Singh Sethi provided to WAB a purported Chicago Title Insurance Company Title Policy No. FBSC2500646 dated March 21, 2025 related to Collateral Loan No. 43, which involves property located at 3700 Inland Empire Blvd, Ontario, CA with property owner Plaza Continental, LLC.

74.     The purported title policy shows WAB's lien on the real property underlying the property as first priority and references no other deeds of trust.

75.     However, a title search run by WAB after entering into the First Amendment to the BLSA shows *two* deeds of trust. The first deed of trust is for Preferred Bank for $25,900,000.00 dated March 30, 2022 and recorded on April 7, 2022. The second deed of trust is for Nano Banc for $4,333,151.35 dated November 10, 2022 and recorded January 13, 2023.

Ballard Spahr LLP
2029 Century Park East, Suite 1400
Los Angeles, CA  90067-2915
Telephone: 424.204.4400

19

VERIFIED COMPLAINT

Ballard Spahr LLP
2029 Century Park East, Suite 1400
Los Angeles, CA  90067-2915
Telephone: 424.204.4400

**EXCEPTIONS:**

**MORTGAGES, LIENS AND OTHER MATTERS AFFECTING TITLE:**

DEED OF TRUST, ASSIGNMENT OF RENTS ,SECURITY AGREEMENT AND FIXTURE FILING
DEBTOR:      Plaza Continental Group LLC, a California limited liability company
CREDITOR:  Preferred Bank, a California banking corporation
BENEFICIARY:     Stewart Title fo California Inc.
DATED:            March 30, 2022
RECORDED:        April 7, 2022
RECORDED IN:   Instrument Number 2022-0131489
AMOUNT:        $25,900,000.00

Absolute Assignment of Leases, Lease Guaranties, Rents, Issues and Profits, recorded April 7, 2022 in Instrument Number 2022-0131490.

Subordination, Nondisturbance and Attornment Agreement recorded August 15, 2022 in Instrument Number 2022-0279616.

Memorandum of Amendment to Loan Documents recorded October 3, 2024 in Instrument Number 2024-0237949.

Subordination Agreement recorded October 3, 2024 in Instrument Number 2024-0237950.

DEED OF TRUST
DEBTOR:      Plaza Continental Group, LLC, a California Limited Liability Company
CREDITOR:  Nano Banc
BENEFICIARY:     Nano Banc
DATED:            November 10, 2022
RECORDED:        January 13, 2023
RECORDED IN:   Instrument Number 2023-0010106
AMOUNT:        $4,333,151.35

Substitution of Trustee naming First American Title Insurance Company as new Trustee, recorded May 20, 2025 in Instrument Number 2025-0115088.

Notice of Default and Election to Sell under Deed of Trust recorded May 20, 2025 in Instrument Number 2025-0115089.

76.     The purported title policy furnished by Borrower had no reference to the Preferred Bank and Nano Banc deeds of trust despite the fact the title policy provided by the Borrower should have been identical to the Title Policy provided directly from Chicago Title Insurance Company.

VERIFIED COMPLAINT

77. Following the title searches that were completed post-amendment, WAB then received a copy of Title Policy No. FBSC2500646 directly from Chicago Title Insurance Company which showed *two* deeds of trust for Preferred Bank and Nano Banc. The first deed of trust is for Preferred Bank for $25,900,000.00 dated March 30, 2022 and recorded on April 7, 2022. The second deed of trust is for Nano Banc for $4,333,151.35 dated November 10, 2022 and recorded January 13, 2023.

78. Of particular concern to WAB is that there is a Notice of Default and Election to Sell under Deed of Trust with regard to the Nano Banc deed of trust recorded on May 20, 2025.

**Fraudulent Title Report for Collateral Loan No. 44**

79. As another example, on April 3, 2025, Borrower's employee Jaspreet Singh Sethi provided to WAB a purported Chicago Title Insurance Company Title Policy No. FBSC2500660 dated March 21, 2025 related to Collateral Loan No. 44, which involves property located at 12233 Central Ave, Chino, CA with property owner Chino Central Group, LLC.

80. The purported title policy shows WAB's lien on the real property underlying the property as first priority and references no other deeds of trust.

81. However, a title search run by WAB after entering into the First Amendment to the BLSA shows *two* deeds of trust. The first deed of trust is for Preferred Bank for $22,400,000.00 dated August 4, 2016 and recorded on August 11, 2016. The second deed of trust is for Nano Banc for $5,990,000.00 dated January 26, 2023 and recorded June 30, 2023.

Ballard Spahr LLP
2029 Century Park East, Suite 1400
Los Angeles, CA 90067-2915
Telephone: 424.204.4400

21
VERIFIED COMPLAINT

**EXCEPTIONS:**

**MORTGAGES, LIENS AND OTHER MATTERS AFFECTING TITLE:**

DEED OF TRUST, ASSIGNMENT OF RENTS, SECURITY AGREEMENT AND FIXTURE FILING
DEBTOR:      Chino Central Group LLC, a Delaware limited liability company
CREDITOR:  Preferred Bank
TRUSTEE:      North American Title Company
DATED:            August 4, 2016
RECORDED:      August 11, 2016
RECORDED IN:    Instrument Number 2016-0324243
AMOUNT:        $22,400,000.00

Absolute Assignment of Leases, Lease Guaranties, Rents, Issues and Profits recorded August 11, 2016 in Instrument Number 2016-0324244.

Memorandum of Assumption Agreement recorded January 6, 2017 in Instrument Number 2017-0007923.

Substitution of Trustee naming Preferred Bank, as new Trustee, recorded July 26, 2019 in Instrument Number 2019-0252177.

Memorandum of Modification Agreement recorded October 18, 2019 in Instrument Number 2019-0375552.

Modification Agreement recorded June 21, 2022 in Instrument Number 2022-0220576.

Modification Agreement (Memorandum of Third Amendment to Loan Documents), recorded October 1, 2024 in Instrument Number 2024-0234700.

Subordination Agreement recorded October 1, 2024 in Instrument Number 2024-0234701.

DEED OF TRUST
DEBTOR:      Chino Central Group LLC, a Delaware limited liability company, as to an undivided 65.91% interest and Vineyard Village Group, LLC, a California limited liability company, as to an undivided 34.09%, as tenants in common
CREDITOR:  Nano Banc
TRUSTEE:      Nano Banc
DATED:            January 26, 2023
RECORDED:      June 30, 2023
RECORDED IN:    Instrument Number 2023-0161735
AMOUNT:        $5,990,000.00

NOTE: Deed of Trust covers additional property.

Ballard Spahr LLP
2029 Century Park East, Suite 1400
Los Angeles, CA 90067-2915
Telephone: 424.204.4400

22
VERIFIED COMPLAINT

82.     The purported title policy furnished by Borrower had no reference to the Preferred Bank and Nano Banc deeds of trust despite the fact the title policy provided by the Borrower should have been identical to the Title Policy provided directly from Chicago Title Insurance Company.

83.     Following the title searches that were completed post-amendment, WAB then received a copy of Title Policy No. FBSC2500660 directly from Chicago Title Insurance Company which showed *two* deeds of trust for Preferred Bank and Nano Banc. The first deed of trust is for Preferred Bank for $22,400,000.00 dated August 4, 2016 and recorded on August 11, 2016. The second deed of trust is for Nano Banc for $5,990,000.00 dated January 26, 2023 and recorded June 30, 2023.

**Fraudulent Title Report for Collateral Loan No. 45**

84.     As another example, on April 3, 2025, Borrower's employee Jaspreet Singh Sethi provided to WAB a purported Chicago Title Insurance Company Title Policy No. FBSC2500653 dated March 21, 2025 related to Collateral Loan No. 45, which involves property located at 9826 Cedar St, Bellflower, CA with property owner Cedar Street Group LLC.

85.     The purported title policy shows WAB's lien on the real property underlying the property as first priority and references no other deeds of trust.

86.     However, a title search run by WAB after entering into the First Amendment to the BLSA shows *two* deeds of trust. The first deed of trust is for Umpqua Bank for $6,470,000.00 dated November 6, 2018 and recorded on November 14, 2018. The second deed of trust is for Nano Banc for $8,000,000.00 dated September 16, 2024 and recorded on September 27, 2024.

Ballard Spahr LLP
2029 Century Park East, Suite 1400
Los Angeles, CA  90067-2915
Telephone: 424.204.4400

23
VERIFIED COMPLAINT

Ballard Spahr LLP
2029 Century Park East, Suite 1400
Los Angeles, CA  90067-2915
Telephone: 424.204.4400

**EXCEPTIONS:**

**MORTGAGES, LIENS AND OTHER MATTERS AFFECTING TITLE:**

DEED OF TRUST AND ABSOLUTE ASSIGNMENT OF RENTS AND LEASES AND SECURITY AGREEMENT (AND FIXTURE FILING)
DEBTOR:     Cedar Street Group, LLC, a California limited liability company
CREDITOR:  Umpqua Bank
TRUSTEE:     First American Title Company
DATED:             November 6, 2018
RECORDED:       November 14, 2018
RECORDED IN:   Instrument Number 20181148482
AMOUNT:       $6,470,000.00

DEED OF TRUST
DEBTOR:     Cedar Group, LLC, a California limited liability company
CREDITOR:  Nano Banc
TRUSTEE:     Nano Banc
DATED:             September 16, 2024
RECORDED:       September 27, 2024
RECORDED IN:   Instrument Number 20240660094
AMOUNT:       $8,000,000.00

87.    The purported title policy furnished by Borrower had no reference to the Umpqua Bank and Nano Banc deeds of trust despite the fact the title policy provided by the Borrower should have been identical to the Title Policy provided directly from Chicago Title Insurance Company.

88.    Following the title searches that were completed post-amendment, WAB then received a copy of Title Policy No. FBSC2500653 directly from Chicago Title Insurance Company which showed *two* deeds of trust. The first deed of trust is for Umpqua Bank for $6,470,000.00 dated November 6, 2018 and recorded on November 14, 2018. The second deed of trust is for Nano Banc for $8,000,000.00 dated September 16, 2024 and recorded on September 27, 2024.

VERIFIED COMPLAINT

## DEFENDANTS DO NOT RESPOND WHEN CONFRONTED WITH DOCTORED TITLE POLICIES

89. On August 5, 2025, WAB sent Defendants a letter alerting them that while "the title policies provided by the Borrower" for the Collateral Loans referenced above "insure the Borrower's lien as first priority, subject to no other liens," a "recent title search" reflected that "the Borrower's lien on the Underlying Collateral appears to be in second position."

90. WAB requested information "as soon as possible regarding the status of title" for the Collateral Loans referenced above, by August 14, 2025 at the latest.

91. Defendants ignored the request for any information regarding the discrepancies between the Borrower-provided title policies and the title searches completed by WAB.

92. Defendants' conduct constitutes an Event of Default under, among other provisions, BLSA Section 7.2 ("Any warranties or representations made or agreed to be made in this Agreement or in any of the other Loan Documents are breached in any material respect or shall prove to have been false or misleading in any material respect when made. Borrower shall not be entitled to a time period to cure any such default under this section.") and BLSA Section 7.11 ("Borrower has made certain statements and disclosures in order to induce Lender to make the Loan and enter into this Agreement, and, if Borrower has made material misrepresentations or failed to disclose any material fact, Lender may treat such misrepresentation or omission as a breach of this Agreement and Borrower shall not be entitled to a time period to cure any such default.").

## BORROWER'S FAILURE TO MAINTAIN $2 MILLION IN MONTHLY AVERAGE BALANCES IN ITS WAB OPERATING ACCOUNT

93. Cash management is central to the BLSA and acts as an additional collateral source. Borrower is required to maintain its operating cash at WAB and keep a monthly average balance of at least $2,000,000 in a WAB operating account (the "**Operating Account**"), measured each calendar month (BLSA § 6.18.4).

Ballard Spahr LLP
2029 Century Park East, Suite 1400
Los Angeles, CA 90067-2915
Telephone: 424.204.4400

94. For the month of July 2025, the BLSA provides that the measurement runs from July 18, 2025 (the date of the First Amendment) to July 31, 2025 (First Amend. § 5(a) (conforming edits to BLSA § 6.18.4)).

95. Despite Borrower's obligations to maintain a monthly average balance of at least $2,000,000 in the Operating Account, for July 2025, Borrower maintained an average of just $515,479.32.

96. As of August 18, 2025, Borrower held only $1,009.47 in the WAB Capital Account despite a required monthly average amount of $2,000,000.00.

97. On August 5, 2025, WAB alerted Borrower of its default under BLSA Section 6.18.4.

98. Borrower's failure to maintain at least $2,000,000 in the Operating Account for July 2025 constitutes an Event of Default that cannot be cured.

## BORROWER'S FAILURE TO ESTABLISH AND ROUTE FUNDS RELATED TO COLLATERAL LOANS THROUGH A WAB CAPITAL ACCOUNT

99. Borrower also agreed under the BLSA to establish and route all Collateral Loans-related proceeds through a WAB Capital Account by July 18, 2025. (BLSA §§ 6.18.8–6.18.9).

100. Despite Borrower's obligations, Borrower has neither established such a WAB Capital Account nor remitted any of the Collateral Loans-related proceeds through any such WAB Capital Account.

101. Borrower's failure to establish and route all Collateral Loans-related proceeds through a WAB Capital Account by July 18, 2025 constitutes an Event of Default.

## BORROWER'S FAILURE TO PROVIDE FINANCIAL STATEMENTS

102. Borrower also agreed under the BLSA to provide quarterly reporting within 30 days after each end of the quarter (including the calendar quarter ending June 30, 2025).

103. Quarterly reporting includes (i) financial statements, (ii) a Borrowing Base Certificate, and (iii) a portfolio loan tape (BLSA Schedule 6.7, including §§ 6.7.4, 6.7.8,

Ballard Spahr LLP
2029 Century Park East, Suite 1400
Los Angeles, CA  90067-2915
Telephone: 424.204.4400

VERIFIED COMPLAINT

6.7.11). An updated Borrowing Base calculation is required on a monthly basis under the First Amendment to the BLSA. (*See* BLSA § 6.7.8).

104. Despite Borrower's obligations, Borrower did not provide WAB with its interim financial statements, a borrowing base certificate, or a quarterly portfolio loan tape covering all borrower loans.

105. On August 5, 2025, WAB alerted Borrower of its breach of BLSA Schedule 6.7 Sections 6.7.4, 6.7.8, and 6.7.11.

106. Borrower's failure to provide the above-referenced required documentation constitutes an Event of Default.

## BORROWER'S FURTHER WRONGFUL CONDUCT AND BLSA'S REMEDIES PROVISIONS

107. While any Event of Default exists, Borrower may not make distributions to owners (BLSA § 6.8). On information and belief, Borrower has diverted and/or risks diverting collateral proceeds in violation of the cash-management covenants.

108. Upon an Event of Default, WAB may accelerate, cease further advances, and seek appointment of one or more receivers "without notice" (BLSA §§ 8.1, 8.2). The judicial-reference clause expressly carves out receivership and other provisional remedies, including expedited and ex parte relief (BLSA § 9.22.2(3)).

109. The BLSA grants WAB attorney-in-fact powers after default to protect and realize on collateral and proceeds (see BLSA § 8 and related power-of-attorney provisions).

## GUARANTY AGREEMENTS

110. The Guaranty Agreements are absolute and unconditional guarantees of payment, include waivers (including anti-deficiency and election-of-remedies waivers), and survive collateral actions; the Guarantors failed to pay after demand.

111. On or about October 28, 2024, Defendant Andrew Stupin executed an "Amended and Restated Commercial Guaranty" in favor of WAB (the "Stupin Guaranty"). In it, "Credit" is defined broadly to mean any and all obligations owed by Borrower to WAB

Ballard Spahr LLP
2029 Century Park East, Suite 1400
Los Angeles, CA 90067-2915
Telephone: 424.204.4400

27
VERIFIED COMPLAINT

under the BLSA, whether absolute or contingent, secured or unsecured, renewed or modified.

112. Similarly, on or about October 28, 2024, Defendant Gerald J. Marcil executed an "Amended and Restated Commercial Guaranty" in favor of WAB (the "Marcil Guaranty" and with the Stupin Guaranty, the "Guaranty Agreements"). It uses the same broad definition of "Credit," tied to the BLSA.

113. The Guaranty Agreements guarantee payment (not collection) under the BLSA, permitting WAB to collect directly from each Guarantor and without first foreclosing under the BLSA.

114. Under the Stupin Guaranty, Stupin must pay, on demand, forty-five percent (45%) of the "Credit," plus the "Additional Guaranteed Obligations," and the fees, costs and expenses described in paragraph 21 of the Stupin Guaranty.

115. Under the Marcil Guaranty, Marcil must pay, on demand, five percent (5%) of the "Credit," plus the "Additional Guaranteed Obligations," and similar fees, costs and expenses described in paragraph 21 of the Marcil Guaranty.

116. "Additional Guaranteed Obligations" in both Guaranty Agreements expressly include losses WAB suffers from, among other things: (i) fraud or intentional misrepresentation by Borrower or its officers/agents in connection with the Loan Documents or any certifications or warranties; (ii) misapplication of collections or other amounts relating to the Collateral; (iii) failure to deliver or grant a valid security interest in Collateral; and (iv) sales/transfers/encumbrances of Collateral in violation of the Loan Documents.

117. The Guaranty Agreements contain extensive waivers, including waivers of defenses and rights under California Code of Civil Procedure §§ 580a, 580b, 580d, and 726; waivers based on election of remedies; and waivers of presentment and numerous notices.

118. The Guaranty Agreements also: (a) make each Guarantor jointly and severally liable if there is more than one guaranty; (b) state each Guarantor's obligations are independent and WAB may sue a Guarantor separately; (c) grant WAB setoff/security interests in the Guarantor's property at WAB; (d) revive obligations if a payment is later

Ballard Spahr LLP
2029 Century Park East, Suite 1400
Los Angeles, CA  90067-2915
Telephone: 424.204.4400

Ballard Spahr LLP
2029 Century Park East, Suite 1400
Los Angeles, CA 90067-2915
Telephone: 424.204.4400

avoided as fraudulent/preferential; and (e) require the Guarantor to pay WAB's enforcement costs and attorneys' fees.

119.    Given the Borrower defaults already pleaded (including doctoring title policies to hide senior liens, misrepresenting first-lien status, failing cash-management covenants, and missing required deliverables), the Guarantors' obligations have been triggered: the doctored-title conduct and related misstatements fall squarely within the "Additional Guaranteed Obligations," and the payment guaranties are absolute and unconditional.

120.    WAB is entitled to judgment against the Guarantors for their respective guaranteed shares of the Credit, plus all "Additional Guaranteed Obligations," and all fees, costs and attorneys' fees recoverable under the Guaranty Agreements.

121.    All conditions precedent to WAB's demands under the Guaranty Agreements and BLSA have occurred, been satisfied, or are excused.

## FIRST CAUSE OF ACTION – BREACH OF CONTRACT
## (AGAINST BORROWER)

122.    WAB incorporates by reference all prior paragraphs as if they were fully set forth herein.

123.    The BLSA is a valid and enforceable contract.

124.    WAB performed all obligations under the BLSA (or any relevant obligations have been excused).

125.    Borrower breached the BLSA by, among other things: (a) pledging loans that were not first-lien and providing title policies that omitted senior liens (*see, e.g.*, BLSA §§5.3.1, 5.3.3, 5.3.10, 5.3.23); (b) failing to maintain the required monthly average in the Operating Account for July 2025 (*see, e.g.*, BLSA §6.18.4; First Amend. §5(a)); (c) failing to establish and use the WAB Capital Account and route proceeds (*see, e.g.*, BLSA §§6.18.8–6.18.9); (d) failing to deliver quarterly financial statements, a Borrowing Base Certificate, and the portfolio loan tape for the quarter ended June 30, 2025 (*see, e.g.*, Schedule 6.7, including §§6.7.4, 6.7.8, 6.7.11); and (e) failing to remove ineligible loans and pay down any resulting excess (*see, e.g.*, BLSA §§4.6.3, 4.1.1(a)).

Ballard Spahr LLP
2029 Century Park East, Suite 1400
Los Angeles, CA  90067-2915
Telephone: 424.204.4400

126.    Borrower's breaches constitute Events of Default under, among other sections, BLSA Sections 7.1, 7.2, and/or 7.11.

127.    WAB has been damaged in an amount to be proven at trial, including principal, interest (and default interest as applicable), late charges, fees, and costs.

## SECOND CAUSE OF ACTION – BREACH OF GUARANTY AGREEMENTS
## (AGAINST MARCIL AND STUPIN)

128.    WAB incorporates by reference all prior paragraphs as if they were fully set forth herein.

129.    The Guaranty Agreements are valid, binding guarantees of payment. They permit WAB to proceed directly against each Guarantor and include broad waivers.

130.    Borrower is in Event(s) of Default, as pleaded.

131.    The Guaranty Agreements obligate Stupin to pay 45% of the Credit and Marcil to pay 5% of the Credit, plus "Additional Guaranteed Obligations," and WABs enforcement fees and costs.

132.    Despite demand, the Guarantors have failed and refused to pay their obligations under the Guaranty Agreements.

133.    WAB is entitled to judgment against the Guarantors for their guaranteed shares of the Credit, all "Additional Guaranteed Obligations," and all fees and costs.

## THIRD CAUSE OF ACTION – APPOINTMENT OF RECEIVER
## (AGAINST BORROWER)

134.    WAB incorporates by reference all prior paragraphs as if they were fully set forth herein.

135.    The BLSA authorizes appointment of a receiver "without notice" upon default (BLSA § 8.2), and the judicial-reference clause expressly carves out receivership and other provisional remedies for expedited or *ex parte* relief (BLSA § 9.22.2(3)).

136.    Receivership is also proper under Cal. Code Civ. Proc. §564(b), including (but not limited to) subsections (6), (9), and (11), because the pledged loans and proceeds are in

danger of waste, loss, diversion, and impairment, and a receiver is necessary to preserve the property and enforce WAB's security and cash-management rights.

137.   WAB seeks appointment of a receiver with customary powers to take possession of, manage, collect, and preserve the pledged loans and proceeds, to implement the BLSA cash-management waterfall, and to otherwise protect the collateral pending judgment, together with temporary restraining order and preliminary injunction in aid of the receivership.

## FOURTH CAUSE OF ACTION – SPECIFIC PERFORMANCE / TURNOVER
## (AGAINST BORROWER)

138.   WAB incorporates by reference all prior paragraphs as if they were fully set forth herein.

139.   Monetary damages alone are inadequate because Borrower's performance concerns unique collateral administration, lien perfection, delivery of specific instruments, and routing of identifiable proceeds.

140.   WAB seeks orders compelling Borrower to: (a) maintain and comply with cash-management requirements, including Operating Account and WAB Capital Account obligations (BLSA §6.18.4; §§6.18.8–6.18.9; First Amend. §5(a)); (b) deliver all Collateral Loan Documents and title policies required by the BLSA and First Amendment, including recorded mortgages/assignments and missing items; and (c) remove ineligible loans from the Borrowing Base and pay down any resulting excess (BLSA §§4.6.3, 4.1.1(a)).

## FIFTH CAUSE OF ACTION – DECLARATORY RELIEF
## (AGAINST DEFENDANTS)

141.   WAB incorporates by reference all prior paragraphs as if they were fully set forth herein.

142.   An actual controversy exists concerning WAB's rights and Defendants' obligations under the BLSA, the First Amendment, the Note, and the Guaranties, including WAB's rights to accelerate, cease further advances, appoint a receiver, compel turnover, and recover from the Guarantors.

Ballard Spahr LLP
2029 Century Park East, Suite 1400
Los Angeles, CA  90067-2915
Telephone: 424.204.4400

143. WAB seeks a judicial declaration of, among other things, that:

(a) Events of Default have occurred and are continuing under the BLSA, including §§ 7.2 (breach of warranty), 7.11 (misrepresentation/non-disclosure), and 7.1 (failure to perform covenants), by reason of the doctored/defective title policies and non-first-lien pledges, cash-management breaches, missing deliverables, and related conduct pled above;

(b) WAB may accelerate all indebtedness and cease further advances (BLSA § 8.1) and otherwise enforce all Loan-Document remedies;

(c) WAB may remove any ineligible/withdrawn loans from the Borrowing Base and require a pay-down of any resulting excess within ten (10) Business Days after demand (BLSA §§ 4.6.3, 4.1.1(a));

(d) WAB is entitled to appointment of a receiver without notice under BLSA § 8.2 and under Cal. Code Civ. Proc. § 564(b)(6), (9), and (11), and receivership/provisional remedies are expressly carved out of judicial reference for expedited/ex parte relief (BLSA § 9.22.2(3));

(e) Borrower must comply with cash-management, including maintaining the Operating Account monthly average and establishing/using the WAB Capital Account and routing all collateral-related proceeds through it, with immediate turnover of all collections and proceeds to WAB/the receiver (BLSA § 6.18.4; §§ 6.18.8–6.18.9);

(f) Borrower must deliver all Collateral Loan Documents and title policies required by the Loan Documents (including recorded mortgages/assignments) and remove any pledged loan that fails eligibility (BLSA §§ 4.6.1–4.6.3; First Amendment §§ 11–12);

(g) While any Event of Default exists, Borrower is prohibited from making owner distributions (BLSA § 6.8);

(h) WAB may exercise the attorney-in-fact powers provided in the BLSA to protect and realize on collateral;

(i) Defendants Andrew Stupin and Gerald J. Marcil are liable under their Amended and Restated Commercial Guaranties for payment on demand of their respective

Ballard Spahr LLP
2029 Century Park East, Suite 1400
Los Angeles, CA  90067-2915
Telephone: 424.204.4400

32
VERIFIED COMPLAINT

45% and 5% shares of the Credit, all "Additional Guaranteed Obligations," and WAB's enforcement fees/costs; WAB may proceed directly against them without first foreclosing; and the guaranty waivers (including CCP §§ 580a, 580b, 580d, 726 and election-of-remedies) are enforceable;

(j) WAB is entitled to recover its reasonable attorneys' fees, costs, contract/default interest, late charges, and other agreed charges under the Loan Documents and Guaranties; and

(k) WAB may set off amounts owed to it against any funds or property of Borrower or the Guarantors in WAB's possession, and any payments later avoided as preferences or fraudulent transfers are reinstated as obligations under the guaranty revival provisions.

## SIXTH CAUSE OF ACTION – FRAUD IN THE INDUCEMENT (ALTERNATIVE TO BREACH OF CONTRACT)
## (AGAINST BORROWER)

144. WAB incorporates by reference all prior paragraphs as if they were fully set forth herein.

145. Prior to and at the time of entering into the BLSA and related Loan Documents, Borrower made false and fraudulent representations of material fact, including but not limited to representations that (a) all pledged Collateral Loans were secured by valid, perfected, first-priority liens; (b) the title policies furnished to WAB reflected the true lien status of the pledged Collateral Loans; and (c) Borrower had good, marketable title to the Collateral Loans free and clear of encumbrances having priority over WAB's interest.

146. These representations were false. In truth, many pledged Collateral Loans were junior to older, still-of-record deeds of trust and were already subject to foreclosure proceedings. Borrower, through its employees and agents, knowingly created and furnished doctored title policies that omitted these senior encumbrances, and then presented those doctored policies to WAB to induce WAB to extend and amend the Loan.

Ballard Spahr LLP
2029 Century Park East, Suite 1400
Los Angeles, CA 90067-2915
Telephone: 424.204.4400

33
VERIFIED COMPLAINT

Ballard Spahr LLP
2029 Century Park East, Suite 1400
Los Angeles, CA 90067-2915
Telephone: 424.204.4400

147.   Borrower knew these representations were false when made, or made them recklessly and without regard for their truth, with the intent that WAB rely on them.

148.   WAB reasonably and justifiably relied on Borrower's misrepresentations in deciding to extend the Loan, enter into the BLSA and First Amendment, advance funds, and accept the purported collateral as security.

149.   As a direct and proximate result of Borrower's fraud, WAB has suffered damages in an amount to be proven at trial, including but not limited to principal advances outstanding, lost interest, fees, and costs, and is further entitled to punitive damages because Borrower acted with malice, oppression, and fraud.

150.   Borrower holds or has diverted identifiable proceeds, collections, and other sums arising from pledged Collateral Loans that are subject to WAB's security interests, cash-management covenants, and turnover obligations.

151.   The amount of such proceeds cannot be ascertained without an accounting. Equity requires an accounting and imposition of a constructive trust over all proceeds and related accounts in favor of WAB, pending final judgment.

## SEVENTH CAUSE OF ACTION – NEGLIGENT MISREPRESENTATION
## (ALTERNATIVE TO BREACH OF CONTRACT AND FRAUDULENT
## INDUCEMENT CLAIM)
## (AGAINST BORROWER)

152.   WAB incorporates by reference all prior paragraphs as if fully set forth herein.

153.   In connection with the BLSA, First Amendment, and related Loan Documents, Borrower represented to WAB that (a) each pledged Collateral Loan was secured by a valid, perfected, first-priority lien; (b) the title policies furnished to WAB accurately reflected lien priority and insured first-lien status; and (c) Borrower had good, marketable title to the Collateral Loans free and clear of encumbrances having priority over WAB's interest.

154.   These representations were false. In truth, many pledged Collateral Loans were junior to existing, still-of-record senior deeds of trust and, in some cases, already subject to foreclosure.

155.   At the time the representations were made, Borrower had no reasonable grounds for believing them to be true. Borrower either (a) knew of the existing senior liens and foreclosure activity, or (b) acted without exercising reasonable care or competence to verify lien status before making the representations to WAB.

156.   WAB reasonably and justifiably relied on Borrower's representations in deciding to enter into the BLSA and First Amendment, advance funds, and accept the purported collateral as security.

157.   As a direct and proximate result of Borrower's negligent misrepresentations, WAB has suffered damages in an amount to be proven at trial, including but not limited to principal advances outstanding, lost interest, fees, and costs.

**WHEREFORE**, WAB prays for judgment against Defendants as follows:

A.   Against Borrower for all amounts due under the BLSA and related Loan Documents, including principal, accrued and default interest (as applicable), late charges, attorneys' fees, and costs;

B.   Against the Guarantors, jointly and severally, for all amounts owing under their Guaranty Agreements, including their guaranteed shares, "Additional Guaranteed Obligations," and attorneys' fees and costs;

C.   Appointing, without bond or on such bond as the Court deems appropriate, a receiver with customary powers to take possession of, manage, collect, and preserve the collateral and proceeds, and granting related injunctive relief;

D.   Ordering specific performance and turnover;

E.   Declaring the parties' rights and obligations as set forth above;

F.   Awarding WAB compensatory damages in an amount to be proven at trial, together with punitive and exemplary damages sufficient to punish and deter Defendants' fraudulent conduct;

G.   Decreeing rescission of the BLSA, First Amendment, Note, and related Loan Documents (in the alternative), cancellation of such instruments, restitution to WAB of all

Ballard Spahr LLP
2029 Century Park East, Suite 1400
Los Angeles, CA  90067-2915
Telephone: 424.204.4400

35
VERIFIED COMPLAINT

amounts advanced under the Loan, disgorgement of collateral proceeds wrongfully diverted, and restoration of the status quo ante, with offsets as equity requires;

H.   Awarding WAB its attorneys' fees and costs, and pre- and post-judgment interest at the contract and legal rates; and

I.   Granting all further relief the Court deems just and proper.

DATED:  August 18, 2025                    **BALLARD SPAHR LLP**

By: */s/Craig Soloman Ganz*
   Craig Solomon Ganz
   Michael S. Myers
   Elliot G. Johnson
   Mitchell L. Turbenson
   2029 Century Park East, Suite 1400
   Los Angeles, CA 90067-2915
   Email:  ganzc@ballardspahr.com
   Email:  myersm@ballardspahr.com
   Telephone:  424.204.4400
   Facsimile:  424.204.4350

   *Attorneys for Plaintiff Western Alliance Bank*

36
VERIFIED COMPLAINT

### **VERIFICATION**

I, Al Thuma, declare:

I am the Senior Vice President and Division Chief Credit Officer at Western Alliance Bank.

I have read the foregoing Verified Complaint and know the contents thereof.  I have reviewed Western Alliance Bank's records and on that basis I am informed and believe or, based upon my personal knowledge know, that the matters stated in the Verified Complaint are true, except as to those matters which are therein stated on information and belief, and as to those matters, I believe it to be true.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

DATED: August 18, 2025

By:  Signed by:
    *Al Thuma*
    11FBD494649540A...

Al Thuma

Ballard Spahr LLP
2029 Century Park East, Suite 1400
Los Angeles, CA  90067-2915
Telephone: 424.204.4400

37
VERIFIED COMPLAINT

**docusign**

## Certificate Of Completion

| | | |
|---|---|---|
| Envelope Id: 65657E8C-8036-4D17-B470-E0AF1BDDB705 | | Status: Completed |
| Subject: Complete with Docusign: 2025-08-18 Verification of Al Thuma.docx | | |
| Source Envelope: | | |
| Document Pages: 38 | Signatures: 1 | Envelope Originator: |
| Certificate Pages: 5 | Initials: 0 | Britney Tomko |
| AutoNav: Enabled | | 1735 Market Street |
| EnvelopeId Stamping: Enabled | | Philadelphia, PA  19103-7599 |
| Time Zone: (UTC-05:00) Eastern Time (US & Canada) | | tomkob@ballardspahr.com |
| | | IP Address: 165.85.50.146 |

## Record Tracking

| | | |
|---|---|---|
| Status: Original | Holder: Britney Tomko | Location: DocuSign |
| 8/18/2025 12:23:04 PM | tomkob@ballardspahr.com | |

| Signer Events | Signature | Timestamp |
|---|---|---|
| Al Thuma | Signed by: *Al Thuma* —11FBD494649540A... | Sent: 8/18/2025 12:25:32 PM |
| | | Viewed: 8/18/2025 12:26:18 PM |
| Security Level: Email, Account Authentication (None) | | Signed: 8/18/2025 12:33:03 PM |
| | Signature Adoption: Pre-selected Style | |
| | Using IP Address: 8.23.75.250 | |
| **Electronic Record and Signature Disclosure:** Accepted: 8/18/2025 12:26:18 PM ID: 13a5aa73-9f1b-4061-b8e6-7de64a29931e | | |

| In Person Signer Events | Signature | Timestamp |
|---|---|---|

| Editor Delivery Events | Status | Timestamp |
|---|---|---|

| Agent Delivery Events | Status | Timestamp |
|---|---|---|

| Intermediary Delivery Events | Status | Timestamp |
|---|---|---|

| Certified Delivery Events | Status | Timestamp |
|---|---|---|

| Carbon Copy Events | Status | Timestamp |
|---|---|---|
| Mitch Turbenson Turbensonm@ballardspahr.com Security Level: Email, Account Authentication (None) | COPIED | Sent: 8/18/2025 12:25:32 PM Viewed: 8/18/2025 12:26:09 PM |
| **Electronic Record and Signature Disclosure:** Not Offered via Docusign | | |

| Witness Events | Signature | Timestamp |
|---|---|---|

| Notary Events | Signature | Timestamp |
|---|---|---|

| Envelope Summary Events | Status | Timestamps |
|---|---|---|
| Envelope Sent | Hashed/Encrypted | 8/18/2025 12:25:32 PM |
| Certified Delivered | Security Checked | 8/18/2025 12:26:18 PM |
| Signing Complete | Security Checked | 8/18/2025 12:33:03 PM |
| Completed | Security Checked | 8/18/2025 12:33:03 PM |

| Payment Events | Status | Timestamps |
|---|---|---|

# Exhibit 1

**FIRST AMENDMENT TO SECOND AMENDED AND RESTATED BUSINESS LOAN AND SECURITY AGREEMENT (REVOLVING LINE OF CREDIT) AND LOAN DOCUMENTS AND LIMITED WAIVER**

THIS FIRST AMENDMENT TO SECOND AMENDED AND RESTATED BUSINESS LOAN AND SECURITY AGREEMENT (REVOLVING LINE OF CREDIT) AND LOAN DOCUMENTS AND LIMITED WAIVER ("Amendment") is entered into as of July 18, 2025 ("Amendment No. 1 Effective Date"), by and among CANTOR GROUP V LLC, a Delaware limited liability company ("Borrower"), and GERALD J. MARCIL, an individual ("Marcil") and ANDREW STUPIN, an individual ("Stupin", and together with Marcil, individually and collectively hereinafter "Guarantor") on the one hand, and WESTERN ALLIANCE BANK, an Arizona corporation (at times hereinafter referred to as "Lender"), on the other hand.

## RECITALS

A.      Lender has made a loan in the maximum principal amount of One Hundred Millions and No/100 Dollars ($100,000,000.00) (the "Loan") to Borrower, as evidenced, in part, by that certain Second Amended and Restated Promissory Note dated October 28, 2024 in the original principal amount of One Hundred Million and No/100 Dollars ($100,000,000.00), executed by Borrower in favor of Lender (together with any and all amendments thereto or modifications thereof, the "Note"), which Note amended and restated in its entirety that certain Promissory Note dated February 14, 2022 in the original principal amount of $100,000,000.00 executed by Borrower in favor of Lender.

B.      In connection with the Loan, Borrower also executed and delivered to and in favor of Lender that certain Second Amended and Restated Business Loan and Security Agreement (Revolving Line of Credit) dated October 28, 2024 (together with any and all amendments thereto or modifications thereof prior to the date hereof, the "Amended Loan Agreement"), pursuant to which, among other things, Borrower granted to Lender a security interest in the Collateral to secure Borrower's obligations to Lender in connection with the Loan, and which Amended Loan Agreement amended and restated in its entirety that certain Amended and Restated Business Loan Agreement (Revolving Line of Credit) dated February 14, 2022 executed by and between Borrower and Lender.

C.      In order to induce Lender to make the Loan, each Guarantor executed and delivered to and in favor of Lender an Amended and Restated Commercial Guaranty dated October 28, 2024 (individually and collectively, the "Guaranty").

D.      Lender perfected its security interest in and to the Collateral by causing to be filed a UCC-1 financing statement with the State of Delaware on February 8, 2018 and February 16, 2022, as Filing Nos. 20180931259 and 20221353473, respectively (individually and collectively, the "UCC Financing Statement").  Lender's security interest in the Collateral is first in priority and duly perfected under applicable Law.

E.      The Note, Amended Loan Agreement, Guaranty, UCC Financing Statement, and all other agreements, instruments and other documents executed by Borrower or

Guarantor, as the case may be, in connection with the Loan shall at times hereinafter be referred to collectively as the "Loan Documents."

F.    Borrower has failed to perform certain of its obligations under the Loan Documents (the "Performance Failures"); to wit:

1.    Borrower has failed to provide a fully executed Borrowing Base Certificate on or before January 30, 2025, for the calendar quarter ending December 31, 2024, in violation of Section 6.7.8, of the Amended Loan Agreement;

2.    Borrower has failed to pay Lender $19,612,500.00 to cure a collateral deficiency identified on December 31, 2024, on or before January 14, 2025, in violation of Section 4.1.1(a) of the Amended Loan Agreement, or at any time thereafter;

3.    Borrower has failed to provide required documentation, including title policies, recorded mortgages, original loan notes, and assignments, for certain Collateral Loans pledged to the Lender, in violation of Sections 5.3.1, 5.3.3, and 5.3.16 of the Amended Loan Agreement;

4.    Borrower has pledged Collateral Loans made to Affiliates or principals of Borrower, or to entities where Affiliates of Borrower or its principals are the beneficial owners, in violation of paragraph (c) of Schedule 2 to the Amended Loan Agreement; and

5.    Borrower has failed to maintain the required minimum deposit balance of $5,000,000.00 in the Compensating Balance Account(s) as required under Section 4.2.2 of the Amended Loan Agreement.

G.    Borrower has requested an amendment to the Amended Loan Agreement and that Lender waive the Performance Failures, and Lender is willing to do so, in accordance with and subject to the terms and conditions set forth in this Amendment.

**AGREEMENT**

NOW, THEREFORE, for valuable consideration and the mutual promises of the parties hereto, the parties hereto do hereby acknowledge and agree as follows:

1.    <u>Recitals.</u>

The recitals are incorporated herein by this reference as are all exhibits.  All terms not expressly defined herein shall be as defined in the Amended Loan Agreement.

2.    <u>Borrower and Guarantor Acknowledgment as to Obligations.</u>

Borrower and Guarantor, and each of them, acknowledge and confirm that as of July 18, 2025, the total principal amount owing to Lender under the Note is $98,643,500.00, plus accrued and unpaid interest thereon.

3.    <u>Reaffirmation of Obligations.</u>

This Amendment is, in part, a reaffirmation of the obligations, indebtedness and liability of Borrower and Guarantor to Lender.  Therefore, Borrower and Guarantor, and each of them, acknowledge and agree that, except as specified herein, all of the terms and conditions of the Loan Documents are and shall remain in full force and effect, without waiver or modification of any kind whatsoever, and are ratified and confirmed in all respects.

4.    <u>Limited Waiver.</u>

A.    Subject to Borrower's and Guarantor's complete and unconditional compliance with the terms of this Amendment and the Loan Documents (including, without limitation, the timely and complete satisfaction of each and all of the conditions precedent set forth in Section 10 of this Amendment), Lender hereby irrevocably waives, on a one-time basis only (individually and collectively, "<u>Limited Waiver</u>"), the Performance Failures and, in connection therewith, agrees not to bring, commence, or continue any action, suit, or proceeding of any kind or nature seeking enforcement of or a remedy for the Performance Failures.

B.    The Limited Waiver shall be effective only to the extent specifically set forth herein and shall not (i) be construed as a waiver of any other breach, default or event of default under the Loan Documents, (ii) affect the right of Lender to demand compliance by Borrower and Guarantor with all terms and conditions of the Loan Documents, except as otherwise provided in this Amendment, (iii) be deemed a waiver of any transaction or future action on the part of Borrower and Guarantor, or either of them, requiring Lender's consent or approval under the Loan Documents, or (iv) except as for the Limited Waiver, be deemed or construed to be a waiver or release of, or a limitation upon, Lender's exercise of any rights or remedies under any of the Loan Documents, whether arising as a consequence of any default or event of default which may now exist or otherwise, all such rights and remedies hereby being expressly reserved.

C.    In the event that any other Event of Default is discovered, exists or occurs after the Amendment No. 1 Effective Date, such failure shall be an Event of Default and Lender shall be entitled to exercise any and all of its rights and remedies hereunder, under the Loan Documents and at Law and/or in equity.

5.    <u>Amendments to Loan Documents.</u>

Subject to the satisfaction of the conditions precedent specified in Section 10 below, effective as of the Amendment No. 1 Effective Date:

(a) the Amended Loan Agreement is amended to delete the bold, red stricken text (indicated textually in the same manner as the following example: **~~stricken text~~**) and to add the bold, blue double-underlined text (indicated textually in the same manner as the following example: **<u>double underlined text</u>**) as set forth in the Loan Agreement attached as <u>Exhibit A</u> hereto;

(b) a new Exhibit H shall be added to the Loan Agreement in the form attached as <u>Exhibit B</u> hereto; and

5538798v10 | 100775-0094                    3

(c) the Note is amended to delete the bold, red stricken text (indicated textually in the same manner as the following example: ~~stricken text~~) and to add the bold, blue double-underlined text (indicated textually in the same manner as the following example: **double underlined text**) as set forth in the Note attached as Exhibit C hereto.

6.      [Reserved].

7.      This Amendment is an Additional Loan Document

From and after the Amendment No. 1 Effective Date, this Amendment and any other documents and instruments executed in connection herewith shall each constitute a Loan Document, and this Amendment shall constitute a Loan Document.

8.      Effective Date of Amendment

This Amendment and the amendments provided for herein shall be effective as of the Amendment No. 1 Effective Date.

9.      Borrower's and Guarantor's Representations and Warranties.

Borrower and Guarantor, and each of them, hereby represents and warrants to Lender and covenants and agrees with Lender as follows:

A.      Borrower and Guarantor, and each of them, have full legal right, power and authority to enter into and perform this Amendment.  The execution and delivery of this Amendment by Borrower and the consummation by Borrower of the transactions contemplated hereby have been duly authorized by all necessary action by or on behalf of Borrower.  This Amendment is a valid and binding obligation of Borrower and Guarantor, and each of them, enforceable against Borrower and Guarantor in accordance with its terms, subject to applicable bankruptcy, insolvency, and similar laws affecting creditors' rights generally and subject to general principles of equity.

B.      Neither the execution and delivery of this Amendment by Borrower or Guarantor, nor the consummation by Borrower or Guarantor of the transactions contemplated hereby, conflicts with or constitutes a violation or a default under any law applicable to Borrower or Guarantor, or any contract, commitment, agreement, arrangement or restriction of any kind to which Borrower or Guarantor is a party, by which Borrower or Guarantor is bound or to which any of Borrower's or Guarantor's property or assets is subject, , except, in each case, to the extent such conflict, violation or default would not reasonably be expected to have a material adverse effect on the ability of Borrower or Guarantor to perform their respective obligations to Lender..

C.      There are no actions, suits or proceedings pending, or to the knowledge of Borrower or Guarantor, threatened in writing against or affecting Borrower or Guarantor, respectively, in relation to its obligations to Lender or involving the validity and enforceability of this Amendment, the Note, the Loan Agreement, the Guaranty or any of the other Loan Documents, as applicable, or the priority of any liens given by Borrower to Lender in accordance with the Note, the Loan Agreement, and the other Loan Documents, at Law or in equity, or before or by any Governmental Agency, or which would reasonably be expected to have a material

adverse effect on the financial condition, operations, properties, assets, liabilities or earnings of Borrower or Guarantor, or the ability of Borrower or Guarantor to perform its obligations to Lender.

D. Borrower and Guarantor, and each of them, hereby reaffirm and confirm that the representations and warranties of Borrower and Guarantor, as applicable, contained in the Loan Documents are, to Borrower's and Guarantor's knowledge, true, correct and complete in all material respects as of the date of this Amendment.

All covenants, representations and warranties of Borrower herein are incorporated by reference and hereby made a part of the Amended Loan Agreement.

10. Conditions Precedent to Effectiveness of Amendment.

The effectiveness of this Amendment is expressly conditioned upon the following having occurred or Lender having received as of July 18, 2025, all of the following documents, certificates and other instruments, in form and content reasonably satisfactory to Lender and its counsel, and suitable for filing or recording as required:

A. This Amendment, fully executed by Lender, Borrower and Guarantor;

B. The approval by Lender of the Borrower Loans more particularly described in Schedule 10B hereto as Collateral Loans (individually, a "New Collateral Loan" and collectively, "New Collateral Loans"), and (i) the pledge of the New Collateral Loans as security for the obligations of Borrower to Lender, including, in connection therewith, an Allonge and Assignment of Mortgage with respect thereto, and (ii) an updated Borrowing Base Certificate;

C. Board resolutions or written consents of the Borrower adopted by the Borrower for the purposes of authorizing such party to enter into and perform this Amendment; and

D. Payment by Borrower of the sum of $92,066.44, for the Increased Spread as a result of Borrower's failure to meet the Compensating Balance Requirement for the period from October 28, 2024 to April 15, 2025;

E. Pro Formas for the Title Policies, as defined in Section 11.A, below ("Pro Formas");

F. Borrower shall have complied with Section 6.18 of the Amended Loan Agreement; and

G. Payment of the reasonable and documented fees and costs of Lender in connection with the preparation, negotiation, administration and execution of this Amendment including, but not limited to, reasonable and documented appraisal fees and attorneys' fees and costs incurred by Lender. For the avoidance of doubt, any references to "documented" attorneys' fees contained in the Loan Documents shall not require Lender or its attorneys to provide billing invoices with entries or information detailing attorney work product or attorney-client privileged matters, and that any documentation provided to satisfy the requirement to provide "documented"

5538798v10 | 100775-0094                                    5

attorneys fees may be redacted by Lender and/or its attorneys to the extent deemed necessary or appropriate in their sole and absolute discretion.

11.     Title Policies; Recordation of Assignment of Mortgages.

A.     Borrower shall provide to Lender title policies consistent with the Pro Formas for each New Collateral Loan (including Loan #48 (Century) and Loan #49 (Pioneer), no later than thirty (30) calendar days following the date such loans are pledged as Collateral Loans (individually, a "Title Policy," and collectively, "Title Policies").

B.     Lender shall record the corresponding Assignment of Mortgage for each New Collateral Loan at the earlier of (i) the date of Lender's receipt of the applicable Title Policy for such New Collateral Loan or (ii) thirty (30) calendar days following the date such New Collateral Loan is pledged as Collateral.

12.     Post-Closing Condition.

Within thirty (30) days of the Amendment No. 1 Effective Date, Borrower shall deliver to Lender (i) the Collateral Loan Documents that Borrower previously failed to deliver to Lender, and (ii) satisfactory evidence of payment of the delinquent property taxes, all more particularly described in Schedule 10C hereto.  Any failure by Borrower to satisfy this post-closing condition within the thirty (30) day period shall constitute an immediate Event of Default under the Loan Documents subject to any applicable grace or cure period.

13.     Release of Lender.

A.     Except as to the obligations imposed upon Lender as provided in this Amendment and the other Loan Documents from and after the Amendment No. 1 Effective Date, Borrower, Guarantor, and each of them, on behalf of themselves, their respective successors and assigns, and each of them, do each hereby forever relieve, release, acquit and discharge Lender and its predecessors, successors and assigns, and their respective past and present attorneys, accountants, insurers, representatives, affiliates, partners, subsidiaries, officers, employees, directors, and shareholders, and each of them (collectively, the "Lender Released Parties"), from any and all claims, debts, liabilities, demands, obligations, promises, acts, agreements, costs and expenses (including, but not limited to, reasonable and documented attorneys' fees), damages, injuries, actions and causes of action, of whatever kind or nature, whether legal or equitable, known or unknown, suspected or unsuspected, contingent or fixed, which Borrower, Guarantor, and each of them, now own or hold or have at any time heretofore owned or held or may at any time hereafter own or hold against the Lender Released Parties, or any of them, by reason of any acts, omissions, facts, transactions or any circumstances whatsoever occurring or existing through the date of this Amendment, including, but not limited to, those based upon, arising out of, appertaining to, or in connection with the Recitals above, the Loan, the facts pertaining to this Amendment, any collateral heretofore granted to Lender or granted in connection herewith, or to any other

obligations of Borrower, Guarantor, and each of them, to Lender, or the lending arrangements between Lender and Borrower.

As to the matters released herein, each of the Borrower, Guarantor, and each of them, expressly waive any and all rights under Section 1542 of the Civil Code of the State of California, which provides as follows:

> "A general release does not extend to claims which the creditor or releasing party does not know or suspect to exist in his or her favor at the time of executing the release and that, if known by him or her, would have materially affected his or her settlement with the debtor or released party."

B.    Borrower, Guarantor, and each of them, expressly waive and release any right or benefit which they have or may have under Section 1542 of the Civil Code of the State of California, and any similar law of any state, territory, commonwealth or possession of the United States, or the United States, to the full extent that they may waive all such rights and benefits pertaining to the matters released herein. In connection with such waiver and relinquishment, Borrower, Guarantor, and each of them, acknowledge that they are aware that they may hereafter discover claims presently unknown or unsuspected, or facts in addition to or different from those which they now know or believe to be true. Nevertheless, it is the intention of Borrower, Guarantor, and each of them, through this Amendment, to fully, finally and forever release all such matters, and all claims relative thereto, which do now exist, may exist, or heretofore have existed. In furtherance of such intention, the release herein given shall be and remain in effect as a full and complete release of such matters notwithstanding the discovery or existence of any such additional or different claims or facts relative thereto.

Borrower, Guarantor, and each of them, shall indemnify, defend and hold Lender and each of the other Lender Released Parties, and each of them, harmless from and against any claims, liabilities, actions, causes of action, demands, injuries, costs, and expenses (including, but not limited to, attorneys' fees), based upon or arising in connection with any prior assignment or transfer, or any purported assignment or transfer, of any claims or other matters released herein.

14.    <u>Release of Borrower and Guarantors</u>.

A.    Except as to the obligations expressly imposed upon Borrower and Guarantor as provided in this Amendment and the other Loan Documents from and after the Amendment No. 1 Effective Date, Lender, on behalf of itself, its successors and assigns, and each of them, does hereby forever relieve, release, acquit and discharge Borrower and Guarantor and their respective predecessors, successors and assigns, and their respective past and present attorneys, accountants, insurers, representatives, affiliates, partners, subsidiaries, officers, employees, directors, and shareholders, and each of them (collectively, the "<u>Borrower Released Parties</u>"), from any and all claims, debts, liabilities, demands, obligations, promises, acts, agreements, costs and expenses (including, but not limited to, reasonable and documented attorneys' fees), damages, injuries, actions and causes of action, of whatever kind or nature, whether legal or equitable, known or unknown, suspected or unsuspected, contingent or fixed, which Lender now owns or holds or has at any time heretofore owned or held or may at any time hereafter own or hold against the Borrower Released Parties, or any of them, by reason of any acts,

omissions, facts, transactions or any circumstances whatsoever occurring or existing through the date of this Amendment based solely upon, concerning or arising from Borrower's Performance Failures.

      15.    <u>Miscellaneous.</u>

      A.    Section headings used in this Amendment are for convenience only and shall not affect the construction of this Amendment.

      B.    This Amendment may be executed in one or more counterparts but all of the counterparts shall constitute one Amendment; provided, however, that this Amendment shall not be effective and enforceable unless and until it is executed by all parties hereto.

      C.    This Amendment and the other documents and instruments executed in connection therewith constitute the product of the negotiation of the parties hereto and the enforcement hereof shall be interpreted in a neutral manner, and not more strongly for or against any party based upon the source of the draftsmanship hereof.

      D.    This Amendment shall be binding upon and inure to the benefit of Lender, Borrower and Guarantor, and each of them, and their respective successors and assigns, except that neither Borrower nor any Guarantor shall assign their rights hereunder or any interest therein without the prior written consent of Lender.

      E.    This Amendment is not a novation, nor, except as expressly provided in this Amendment, is it to be construed as a release or modification of any of the terms, conditions, warranties, waivers or rights set forth in the Loan Documents. Nothing contained in this Amendment shall be deemed to constitute a waiver by Lender of any required performance by Borrower or Guarantor, and each of them, of any Event of Default or default heretofore or hereafter occurring under or in connection with the other Loan Documents. In the event there is a conflict in any term, condition or provision of this Amendment, on the one hand, and the Loan Agreement, the Guaranty, or any of the other Loan Documents, on the other hand, the terms, conditions and provisions of this Amendment are to control.

      F.    Sections 9.18 and 9.22 of the Loan Agreement are incorporated by reference herein.

[Signature page follows.]

**IN WITNESS WHEREOF**, Borrower, Guarantor and Lender have executed and delivered this Amendment as of the date set forth above.

"**Borrower**":

CANTOR GROUP V LLC,
a Delaware limited liability company

By: Cantor Group Manager, LLC,
a Delaware limited liability company
Its: Managing Member

By: _____
Name:  Deba Shyam
Its:       Manager

"**Guarantor**"

_____
GERALD J. MARCIL, an individual

_____
ANDREW STUPIN, an individual

[Signature Page to First Amendment To Second Amended and Restated Business Loan
and Security Agreement (RLOC) and Loan Documents and Limited Waiver]

**IN WITNESS WHEREOF**, Borrower, Guarantor and Lender have executed and delivered this Amendment as of the date set forth above.

"**Borrower**":

CANTOR GROUP V LLC,
a Delaware limited liability company

By: Cantor Group Manager, LLC,
a Delaware limited liability company
Its: Managing Member


By: _____
Name: Deba Shyam
Its:    Manager

"**Guarantor**"


_____
GERALD J. MARCIL, an individual


_____
ANDREW STUPIN, an individual

[Signature Page to First Amendment To Second Amended and Restated Business Loan and Security Agreement (RLOC) and Loan Documents and Limited Waiver]

**IN WITNESS WHEREOF**, Borrower, Guarantor and Lender have executed and delivered this Amendment as of the date set forth above.

**"Borrower"**:

CANTOR GROUP V LLC,
a Delaware limited liability company

By: Cantor Group Manager, LLC,
a Delaware limited liability company
Its: Managing Member

By: _____
Name: Deba Shyam
Its:    Manager

**"Guarantor"**

_____
GERALD J. MARCIL, an individual


_____
ANDREW STUPIN, an individual


**"Lender"**:

WESTERN ALLIANCE BANK,
an Arizona corporation

By: _____
Name:  Joshua Ormiston
Title:   Senior Vice President

"**Lender**":

WESTERN ALLIANCE BANK,
an Arizona corporation

By: _____
Name:  Joshua Ormiston
Title:    Senior Vice President

[Signature Page to First Amendment To Second Amended and Restated Business Loan
and Security Agreement (RLOC) and Loan Documents and Limited Waiver]

## EXHIBIT A

## (Form of Amended Loan Agreement)

**[see attached]**

## SECOND AMENDED AND RESTATED BUSINESS LOAN AND SECURITY AGREEMENT
## (REVOLVING LINE OF CREDIT)

This SECOND AMENDED AND RESTATED BUSINESS LOAN AND SECURITY AGREEMENT (REVOLVING LINE OF CREDIT) (as it may be modified, supplemented, extended, renewed or amended from time to time, this "Agreement") is made as of October 28, 2024 (the "Effective Date"), by and between CANTOR GROUP V LLC, a Delaware limited liability company (the "Borrower"), and WESTERN ALLIANCE BANK, an Arizona corporation ("Lender").

A.      Borrower is engaged in the business of acquiring loans made to certain eligible borrowers secured by real estate.

B.      Lender heretofore extended to Borrower a revolving line of credit in the original maximum principal amount of One Hundred Million and No/100 Dollars ($100,000,000.00) (the "Existing Loan") pursuant to that certain Amended and Restated Business Loan Agreement (Revolving Line of Credit) dated as of February 14, 2022 between Borrower and Lender (together with any and all amendments thereto or modifications thereof, the "Prior Agreement").

C.      Borrower and Lender now desire, among other provisions, to (i) amend and restate the Prior Agreement and the related Loan Documents in their entirety, (ii) supersede and replace in its entirety the Prior Loan Agreement with this Agreement, and (iii) make certain other changes to the Existing Loan herein, including, but not limited to, (a) amending the interest rate, (b) amending the Borrowing Base (as defined herein), and (c) amending certain financial covenants.

D.      As of the Effective Date, the outstanding principal amount of the Existing Loan is One Hundred Million and No/100 Dollars ($100,000,000.00) and is secured by the Collateral Loans set forth in Exhibit G attached hereto and incorporated herein by this reference.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto hereby agree as follows:

## SECTION 1.
## DEFINITIONS.

The definitions set forth in the Recitals are incorporated herein by reference. Capitalized terms not defined in this Agreement have the meanings given them in the California Uniform Commercial Code. For purposes of this Agreement, the following terms shall have the following meanings:

"Advance" means any advance or disbursement of Loan Proceeds pursuant to this Agreement or any other Loan Document.

"Advance Rate" shall mean, as set forth in detail in the advance rate schedule attached hereto as Exhibit D, and incorporated by reference herein, for each Eligible Receivable, the

5319636v65319636v13 | 100775-0094

lesser of (i) the acquisition cost of such Eligible Receivable to Borrower, or (ii) an amount equal to a percentage of, the lesser of (a) the unpaid principal balance of such Eligible Receivable ("LTB"), or (b) an amount equal to a percentage of the appraised value (as reflected in the most recent Appraisal of the underlying real property collateral delivered by Borrower to, and reviewed and approved by, Lender) of the underlying real property collateral securing such Eligible Receivable ("LTV").

"Agreement" means this Business Loan and Security Agreement (Revolving Line of Credit), as originally executed or as it may be modified, supplemented, extended, renewed or amended from time to time.

"Affiliate" of any Person means any other Person, directly or indirectly controlling, or controlled by, or under common control with such Person. For the purposes of this definition, "control" means the power to direct the management and policies of such Person, directly or indirectly, whether through the ownership of voting equity, by contract or otherwise.

"Allonge" means an attachment to a Collateral Loan Note (and included in the Collateral Loan Document Package) containing the endorsement by Borrower of the Collateral Loan Note, substantially in the form attached hereto as Exhibit A and incorporated herein by this reference, or in form otherwise approved by Lender in writing.

"Amendment No. 1" means that certain Amendment No. 1 to Second Amended and Restated Business Loan and Security Agreement (Revolving Line of Credit) and Loan Documents and Limited Waiver, dated as of July 18, 2025 by and among the Borrower and the Lender.

"Amendment No. 1 Effective Date" means the Amendment No. 1 Effective Date, as such term is defined in Amendment No. 1.

"Anti-Money Laundering Laws" means the USA Patriot Act of 2001, the Bank Secrecy Act, as amended through the date hereof, Executive Order 1 3324—Blocking Property and Prohibiting Transactions with Persons Who Commit, Threaten to Commit, or Support Terrorism, as amended through the date hereof, and other federal laws and regulations and executive orders administered by OFAC which prohibit, among other things, the engagement in transactions with, and the provision of services to, certain foreign countries, territories, entities and individuals (such individuals include specially designated nationals, specially designated narcotics traffickers and other parties subject to OFAC sanction and embargo programs), and such additional laws and programs administered by OFAC which prohibit dealing with individuals or entities in certain countries regardless of whether such individuals or entities appear on any of the OFAC lists.

"Appraisal" means an appraisal of the Underlying Collateral, or such other report acceptable to Lender, performed and prepared for Lender at Borrower's sole expense by a duly licensed or certified appraiser approved by Lender and possessing all qualifications required by Lender and applicable Laws, setting forth the appraiser's opinion and determination of the fair market value of the Underlying Collateral; said Appraisal shall be prepared in full narrative form meeting all requirements and approaches to value as shall be necessary or appropriate in order to

comply with all customary and generally accepted appraisal standards within the appraisal industry and in accordance with Lender's requirements, and to Lender's satisfaction and all applicable Laws governing Lender's operations (including, but not limited to, the Financial Institutions Reform, Recovery and Enforcement Act (FIRREA) and Uniform Standards of Professional Appraisal Practice (USPAP)).

"Assets" has the meaning usually given that term in accordance with GAAP.

"Assignment of Mortgage" means each Collateral Assignment of Mortgage [or Deed of Trust] and Related Documents, if required by Lender, executed and delivered by Borrower to Lender in connection with any Collateral Loan to be secured by real property and included in the Collateral Loan Document Package, substantially in the form attached hereto as Exhibit B and incorporated herein by this reference, or in form as otherwise approved by Lender in writing (with such modifications to such form as may be required in order for such form to be recorded in the real property records of the applicable jurisdiction).

"Authorized Person" means any person duly authorized by a general borrowing resolution of the Borrower, or in the absence of such a resolution, board minutes. As of the date hereof, the following persons currently, individually or collectively, are authorized to request Advances and authorize payments until the Lender receives from the Borrower, at the Lender's address, written notice of revocation of their authority: Deba Shyam.

"Availability" means the lesser of (a) the Credit Limit, and (b) the Borrowing Base.

"Borrower Loans" means loans originated by Borrower to third-party borrowers and secured by real property collateral located in the United States of America (excluding territories and protectorates), subject to the limitations described further in this Agreement, of which Borrower is the holder thereof.

"Borrower's Loan Portfolio" means those Borrower Loans held by Borrower for Borrower's own account.

"Borrowing Base" shall mean the aggregate sum of the amounts calculated by Lender for each individual Eligible Receivable based on its Advance Rate.

"Borrowing Base Certificate" means a Borrowing Base Certificate substantially in the form of Exhibit C attached hereto.

""Business Day" means Monday through Friday, excluding any day of the year on which banks are required or authorized to close in California.

"Collateral" means all real property and personal property security for the Loan, including as more particularly described in Sections 4.9 and 5.

"Collateral Loan" means, individually and collectively, any Borrower Loan for which Borrower has granted to Lender a security interest and has been pledged to Lender as Collateral, as identified on the Borrowing Base.

"Collateral Loan Documents" means all instruments, agreements, and documents evidencing and securing all covenants, terms, and conditions of a Collateral Loan, in form and content satisfactory to Lender in its sole opinion and judgment, duly executed by a Collateral Loan Obligor to and in favor of Borrower (or Borrower's predecessor in interest with respect to such Collateral Loan, provided the same have been assigned to Borrower) and pledged to Lender as security for the obligations of Borrower hereunder and under the other Loan Documents.

"Collateral Loan Document Package" means: all instruments, agreements, and documents described in Schedule 1 attached to this Agreement and incorporated herein by reference either in original or photocopy form as therein provided, evidencing and/or securing the Advance therein requested and/or the Collateral Loan therein described.

"Collateral Loan Note" means the promissory note executed or to be executed by each Collateral Loan Obligor to evidence a Collateral Loan, in form and content satisfactory to Lender in its sole opinion and judgment.

"Collateral Loan Obligor" means a Person which is obligated by contract or by operation of law to pay and/or perform any or all of the indebtedness and other obligations of the borrower under and arising out of a Collateral Loan and Collateral Loan Documents evidencing and securing the same, including, without limitation, a Person designated as borrower or co-borrower thereunder and a Person guaranteeing said indebtedness and/or other obligations, whether by pledge of collateral or by agreeing to be personally liable therefor.

"Collateral Mortgage" means any deed of trust or mortgage, as applicable, and assignment of rents executed and delivered by a Collateral Loan Obligor to secure repayment of a Collateral Loan, in form and content satisfactory to Lender in its sole opinion and judgment.

"Commitment Term" means that period during which Loan Proceeds may be disbursed under this Agreement, which is a period commencing on the date of this Agreement and expiring on ~~the Initial Maturity Date~~May 15, 2025.

"Compensating Balance Account(s)" means checking, savings or money market accounts maintained at Lender by Borrower, Guarantor, and/or any Affiliates thereof, in aggregate, but shall not include certificates of deposit.

"Conversion Fee" means the sum of one quarter of one percent (0.25%) of the then outstanding principal balance of the Loan for ~~an extension of the Initial Maturity Date if requested and given in accordance with the provisions of~~ conversion of the Loan to a term loan pursuant to Section 4.13~~,~~ below.

"Credit Limit" means ~~One Hundred Million and No/100 Dollars ($100,000,000.00)~~the lesser of (a) the Maximum Credit Amount and (b) the amount determined by the Borrowing Base.

"Document Delivery Deadline" means ten (10) Business Days after the date of pledge of the related Collateral Loan to Lender, unless Lender requires a different deadline, as notified by Lender to Borrower in writing.

"Dwell Time" means the number of months that a Collateral Loan may be included in calculating the Borrowing Base, as set forth in the Exhibit D.

"E-Sign" means the Electronic Signatures in Global and National Commerce Act, 15 U.S.C. § 7001 et seq.

"Eligible Receivables" means those Collateral Loans that Lender, in its sole and absolute opinion and judgment, shall deem eligible for borrowing pursuant to the terms hereof. Without limitation, Eligible Receivables shall not include any Ineligible Receivables.

"Event of Default" means any of those occurrences specified in Section 7 of this Agreement, or as otherwise specified in the Loan Documents.

"Financial Statements" means balance sheets, income statements, reconciliations of capital structure and statements of sources and applications of funds, all prepared in accordance with GAAP.

"Financing Statement" means one or more financing statements (Form UCC-1) naming Borrower as debtor and Lender as secured party covering the Collateral.

"GAAP" means generally accepted accounting principles consistently applied and maintained throughout the period indicated and consistent with the prior financial practice of the Person providing such financial information, except for changes mandated by the Financial Accounting Standards Board or any similar accounting authority of comparable standing.

"Governmental Agency" means any federal, state or local governmental or ~~quasi governmental~~quasi-governmental agency.

"Gross Income" means, for any given time, any and all revenues, income, receipts and money received by or on behalf of, and moneys due to, the Person whose Gross Income is being measured, solely from such Person's use, operation, management and/or conduct of its businesses, including, without limitation, (a) gross revenues derived from such Person's operation and possession of any real property, and (b) proceeds derived from (1) accounts receivable, (2) inventory and other tangible and intangible property and (3) contract rights and other rights and assets now or hereafter owned by such Person in connection with its business.

"Guarantor" means, individually and collectively, Andrew Stupin, an individual and Gerald Marcil, an individual.

"Guaranty" means, individually and collectively, the Amended and Restated Commercial Guaranty from each Guarantor, in form and content satisfactory to Lender in its sole opinion and judgment, guarantying certain obligations of Borrower to Lender, as more specifically provided therein.

"Ineligible Receivable" means any Collateral Loan that (a) meets any of the clauses as more particularly described on Schedule 2, or (b) that was previously accepted by Lender as an

Eligible Receivable that subsequently would not have qualified as an Eligible Receivable because of any one or more of clauses on Schedule 2.

"Initial Advance" means that certain advance or disbursement of Loan Proceeds by Lender to Borrower, in the amount specified in a Request for Advance, upon satisfaction of the terms and conditions in this Agreement for the making of the Initial Advance, including without limitation pledging the Loan Collateral to Lender.

"Initial Maturity Date" means ~~October 1, 2026~~the Maturity Date subject to earlier acceleration upon the terms and conditions set forth in the Note.

"Initial Loan Collateral" shall mean those Borrower Loans set forth on Exhibit G attached hereto, which shall be pledged to Lender as Collateral for the Loan.

"Initial Loan Collateral Document Package" shall mean, for the Initial Loan Collateral: all instruments, agreements, and documents described in Schedule 1 attached to this Agreement and incorporated herein by reference, either in original or photocopy form as therein provided, evidencing and securing the Initial Loan Collateral therein described.

"Laws" means all federal, state, and local laws, rules, regulations, ordinances, and codes.

"Liabilities" shall have the meaning usually given that term in accordance with GAAP.

"Liquidity Event" means any event where (i) a Collateral Loan is refinanced with another lender, (ii) a repayment of a Collateral Loan occurs or (iii) there is a sale of the Underlying Collateral for a Collateral Loan.

"Loan" means the total amount of Advances, as described in Section 4 of this Agreement in a principal amount not to exceed the Availability at any one time.

"Loan Agreement" means this Second Amended and Restated Business Loan and Security Agreement (Revolving Line of Credit) dated as of October 28, 2024, as it may be amended from time to time.

"Loan Closing" means the date on which the Loan closes in accordance with Section 4.4 hereof.

"Loan Collateral" means all of the following real and personal property and related rights of Borrower, whether now existing or hereafter acquired or arising, whether now owned or hereafter acquired, and wherever located: (1) each Collateral Loan and all Collateral Loan Documents, (2) all of Borrower's right, title and interest in and to all Underlying Collateral, including, without limitation, all Underlying Collateral repossessed and acquired by Borrower by foreclosure or by transfer or retention in lieu of foreclosure, (3) the books, records and files pertaining to the Collateral Loan Documents and Underlying Collateral, and (4) all proceeds of the foregoing, including, without limitation, all proceeds in the form of accounts, instruments, chattel paper, contract rights, general intangibles, deposit accounts, insurance policies, insurance

proceeds and returned premiums for insurance subject to the rights and interests of the Collateral Loan Obligors pursuant to the Collateral Loan Documents.

"Loan Documents" means this Agreement, the Note, the Guaranty, and such other documents as Lender may require Borrower to give to Lender as evidence of and/or security for the Loan, together with each Assignment of Mortgage, Allonge, Financing Statement, and all other instruments, agreements, and documents evidencing and securing the Advances made and to be made by Lender hereunder and all obligations of Borrower hereunder and herein described, including, without limitation, all those documents described in Section 4.5 below, as applicable.

"Loan Fee" means the sum of Two Hundred Fifty Thousand and 00/100 ($250,000.00) payable by Borrower to Lender for the making of the Loan, which shall be fully earned by Lender at Loan Closing.

"Loan Proceeds" means all funds advanced by Lender as an Advance or otherwise to Borrower under this Agreement.

"Manager" means Cantor Group Manager, LLC, a Delaware limited liability company.

"Maturity Date" means ~~the Initial Maturity Date, and any extension in connection with the conversion of the Loan to a term loan~~ ~~as provided in Section 4.13 of this Agreement~~May 16, 2026, subject to the terms and conditions of the Note.

"Maturity Restriction" means the maximum term, measured from the date of its execution and including any extensions thereof, that any Collateral Loan may be included in calculating the Borrowing Base, as set forth in Exhibit D attached hereto and incorporated herein by this reference.

"Maximum Credit Amount" means the sum of $98,643,500.00.

"Mortgage" means each mortgage, assignment of rents, security agreement and fixture filing, or deed of trust, assignment of rents, security agreement and fixture filing, deed to secure debt, assignment of rents, security agreement and fixture filing, or similar instrument creating and evidencing a first lien on real property and other property and rights incidental thereto.

"Net Operating Income" means, at any given time, the amount by which Gross Income exceeds Operating Expenses.

"Note" means the Second Amended and Restated Promissory Note of even date herewith, in the face amount of the Loan, executed by Borrower in favor of and payable to Lender, or order, which shall be in form and content satisfactory to Lender, in its sole discretion.

"Obligations" means all obligations and indebtedness evidenced by the Loan and Loan Documents.

"OFAC" means the United States Department of the Treasury, Office of Foreign Assets Control.

"OFAC Prohibited Person" means a country, territory, individual or person (i) listed on, included within or associated with any of the countries, territories, individuals or entities referred to on The Office of Foreign Assets Control's List of Specially Designated Nationals and Blocked Persons or any other prohibited person lists maintained by governmental authorities, or otherwise included within or associated with any of the countries, territories, individuals or entities referred to in or prohibited by OFAC or any other Anti-Money Laundering Laws, or (ii) which is obligated or has any interest to pay, donate, transfer or otherwise assign any property, money, goods, services, or other benefits from the Property directly or indirectly, to any countries, territories, individuals or entities on or associated with anyone on such list or in such laws.

"Operating Account" means, individually and collectively, Borrower's demand deposit accounts with Lender, bearing the account numbers to be advised by Lender, into which all of Borrower's receipts from its operations are deposited and from which all of Borrower's disbursements for its operations are made, including, but not limited to the WAB Capital Account.

"Operating Expenses" means, at any given time, the sum of the current expenses of operation, maintenance and conducting of the businesses of the Person whose Operating Expenses are being measured, including, without limitation, wages, salaries, benefits and bonuses to personnel, the cost of goods, materials and supplies used for current business operations and maintenance, security costs, utility expenses, all taxes and assessments, including, without limitation, bond assessments, insurance premiums, trash removal, advertising, insurance premiums, rental payments for real or personal property (other than capital lease payments), interest paid by such Person on any indebtedness or monetary obligations of such Person, and charges for the accumulation of appropriate reserves for current expenses that are not recurrent monthly but may reasonably be expected to be incurred in accordance with GAAP.

"Person" means an individual, corporation, partnership, limited liability company, joint venture, trust or unincorporated organization or a Governmental Agency.

"Power of Attorney" means a Special Power of Attorney dated the date hereof executed by Borrower for the benefit of Lender in substantially the form of Exhibit E attached hereto, which shall expire upon the satisfaction in full of all of the Obligations of Borrower to Lender.

"Release Price" shall have the meaning set forth in Exhibit H, attached hereto and incorporated by reference herein.

"Request for Advance" means each request either written or via electronic mail, for an Advance under this Agreement delivered by Borrower to Lender in the form and with the information requested by Lender, which request shall be deemed to constitute Borrower's representation and warranty to Lender that all conditions to the Advance therein requested have been satisfied unless otherwise previously disclosed in writing to Lender or in the Request for Advance.

"Section" means a numbered or lettered paragraph, sub-paragraph or other division of this Agreement, and all references in this Agreement to a Section (other than references to statutes) are to Sections of this Agreement.

"UETA" means the Official Text of the Uniform Electronic Transactions Act as approved by the National Conference of Commissioners on Uniform State Laws at its Annual Conference on July 29, 1999.

"Underlying Collateral" means the real property and any and all other assets of any Collateral Loan Obligor, or of other Persons, pledged or otherwise assigned to Borrower as collateral security for repayment of any Collateral Loan, as more fully described in the Collateral Loan Documents; and including all land and improvements described in the Collateral Loan Document Package, including, without limitation, all fixtures, rights, rights of way, easements, rents, income, and profits, and all policies and proceeds of insurance and other interests appurtenant thereto which shall be encumbered by a Collateral Mortgage constituting a valid and enforceable trust deed or mortgage lien of record thereon.

"Unused Credit Limit" means, for the subject calendar quarter the amount by which the average daily unpaid principal amount of Advances is less than fifty percent (50%) of the average daily Credit Limit for the period measured.

~~"Unused Line Fee" means a quarterly fee equal to one half of one percent (0.50%) per annum times the Unused Credit Limit. The Unused Line Fee shall be payable as provided in Section 4.1.1(e).~~

"WAB Capital Account" means a deposit account established and maintained with Lender as set forth in Section 6.18.8. The WAB Capital Account shall be an Operating Account.

## SECTION 2.
## INTERPRETATIONS

2.1.    NUMBER, GENDER. Any defined terms used in the plural shall include the singular, references to any gender include any other gender, and such terms shall encompass all members of the relevant class.

2.2.    SCHEDULES AND EXHIBITS. All schedules and exhibits to this Agreement are incorporated herein by reference.

2.3.    ACCOUNTING TERMS AND DETERMINATIONS. Unless otherwise specified herein, all accounting terms used herein shall be interpreted, all accounting determinations hereunder shall be made, and all financial statements required to be delivered hereunder shall be prepared, in accordance with GAAP. When used herein, the terms "financial statements", "income statement", "operating statement" and "balance sheet" shall include the notes and schedules thereto. However, if there is a change in GAAP following the date of this Agreement and that change is implemented by Borrower, such change shall not be given effect if such change would affect a calculation that measures compliance with, or entitles Borrower to any rights under, any provision of the Loan Documents unless Borrower and Lender agree in advance and in writing to modify such provisions to reflect such change. Unless such provisions are modified, all financial statements, compliance certificates and similar documents provided pursuant to the Loan Documents shall be provided together with a reconciliation between the calculations and amounts set forth therein before and after giving effect to such change. Notwithstanding any other provision contained herein or any of the other Loan Documents, all

terms of an accounting or financial nature used in this Agreement or any of the other Loan Documents shall be construed, and all computations of amounts and ratios provided for in this Agreement or any of the other Loan Documents shall be made, without giving effect to any election under FAS 159 (ASC 825) (or any other financial accounting standard having a similar result or effect) to value any Liabilities of Borrower at "fair value," as defined therein.

2.4.   OTHER TERMS~~OTHER TERMS~~. Capitalized terms other than accounting terms, and not defined herein, have the meanings given them in the California Uniform Commercial Code. Capitalized accounting terms not otherwise defined herein have the meaning provided by GAAP. The term "document" is used in its broadest sense and encompasses agreements, certificates, opinions, consents, instruments and other written material of every kind. The terms "including" and "include" mean "including (include), without limitation."

2.5.   COMPUTATION OF TIME PERIODS. In this Agreement or in any other Loan Document, with respect to the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including" and the words "to" and "until" each mean "through and including." Periods of days referred to in this Agreement or in any other Loan Document shall be counted in calendar days unless otherwise stated.

2.6.   PAYMENT~~PAYMENT~~. Any reference herein or in any other Loan Document to the satisfaction, repayment, or payment in full of the Obligations shall mean the indefeasible repayment in U.S. Dollars in full in immediately available funds (and in the case of any other contingent Obligations, providing cash collateral or other collateral as may be requested by the Lender) of all of the Obligations other than unasserted contingent indemnification Obligations.

2.7.   NO PRESUMPTION AGAINST ANY PARTY. Neither this Agreement nor any other Loan Document nor any uncertainty or ambiguity herein or therein shall be construed or resolved using any presumption against any party hereto or thereto, whether under any rule of construction or otherwise, and without regard to such factors as which party prepared the document, the relative bargaining powers of the parties, or any party's domicile. This Agreement and the other Loan Documents have been reviewed by each of the parties and their counsel (should they choose to engage any) and, in the case of any ambiguity or uncertainty, shall be construed and interpreted, according to the ordinary meaning of the words used so as to fairly accomplish the purposes and intentions of all parties hereto.

2.8.   DIVISIONS~~DIVISIONS~~. For all purposes under the Loan Documents, in connection with any division of Borrower that is a limited liability company, if any asset, right, obligation or liability of any Person becomes the asset, right, obligation or liability of a different Person, then it shall be deemed to have been transferred from the original Person to the subsequent Person and shall be subject to all terms and provisions of the Loan Documents restricting, limiting or otherwise governing transfers of assets and other property and delegation of duties or other obligations.

## SECTION 3.
## REPRESENTATIONS AND WARRANTIES OF BORROWER

Borrower hereby represents and warrants to Lender as of the date of this Agreement, the date any Loan Proceeds are disbursed to Borrower, and each and every date during the term of the Loan, or any portion thereof, as the context admits or requires, that:

3.1.    BORROWER'S CAPACITY~~BORROWER'S CAPACITY~~. Borrower is a limited liability company, formed under the laws of the State of Delaware and duly qualified to do business in the State of California and in any state in which the nature of its business requires it to be so qualified and is lawfully empowered and possesses the capacity to enter into and carry out the terms and provisions of this Agreement.

3.2.    VALIDITY OF LOAN DOCUMENTS. The Loan Documents are and shall continue to be in all respects valid and binding upon Borrower according to their terms. The execution and delivery by Borrower of and the performance by Borrower of all its obligations under the Loan Documents have been duly authorized by all necessary action and do not and will not:

3.2.1    Require any consent or approval not heretofore obtained.

3.2.2    Violate any provision of other agreements to which Borrower is bound.

3.2.3    Result in or require the creation or imposition of any mortgage, deed of trust, pledge, lien, security interest, claim, charge, right of others or other encumbrance of any nature (other than under the Loan Documents) upon or with respect to any property now owned or leased or hereafter acquired by Borrower.

3.2.4    Violate any provision of any Laws, or of any order, writ, judgment, injunction, decree, determination, or award binding upon Borrower.

3.2.5    Result in a breach of or constitute a default under, cause or permit the acceleration of any obligation owed under, or require any consent under any indenture or loan or credit agreement or any other agreement, lease, or instrument to which Borrower is a party or by which Borrower or any property of Borrower is bound or affected.

3.3.    BORROWER NOT IN DEFAULT OR VIOLATION. Borrower has not received written notice that Borrower is, and Borrower is not otherwise in default under or in violation in any material respect of any Laws, order, writ, judgment, injunction, decree, determination or award or under any obligation, agreement, instrument, loan, or indenture, whether to Lender or otherwise, or any lease, in each case to which Borrower is bound, and no event has occurred and is continuing, or would result from the making of any Advance, which constitutes an Event of Default, or would constitute an Event of Default but for the requirement that notice be given or time elapse or both.

3.4.    NO GOVERNMENTAL APPROVALS REQUIRED. Borrower does not require any authorization, consent, approval, order, license, exemption from, or filing,

~~5319636v6~~5319636v13 | 100775-0094    11

registration, or qualification with, any Governmental Agency in connection with the execution and delivery by Borrower, and the performance by Borrower, of all or any of its obligations under the Loan Documents.

3.5.    TAX LIABILITY~~TAX LIABILITY~~. Borrower has filed all income and other tax and related information returns (federal, state, and local) required to be filed and has paid all taxes shown thereon to be due and all property taxes due (if any~~()~~), including interest and penalties, if any, in each case, prior to delinquency.

3.6.    FINANCIAL STATEMENTS~~FINANCIAL STATEMENTS~~. All Financial Statements, tax returns and other financial information of Borrower and Guarantor which are submitted to Lender fairly present the financial positions of Borrower and Guarantor at the respective dates of their preparation in all material respects and do not omit any material information. As for the Financial Statements, tax returns and other financial information submitted prior to the Loan Closing, there has been no material adverse change in the financial condition of Borrower and Guarantor from what it disclosed in such statements and other information.

3.7.    PENDING LITIGATION~~PENDING LITIGATION~~. To the best of Borrower's knowledge, after due and diligent inquiry, there are no actions, suits, or proceedings pending, or to the knowledge of Borrower threatened in writing, against or affecting the Borrower, including any such actions, suits, or proceedings involving the validity or enforceability of any of the Obligations, except actions, suits, and proceedings that are fully covered by insurance or which, if adversely determined, would not substantially impair the ability of Borrower to perform its Obligations, and Borrower is not in default with respect to any order, writ, injunction, decree or demand of any Governmental Agency.

3.8.    VIOLATION OF LAWS. To the best of Borrower's knowledge, after due and diligent inquiry, there are no violations or notices of violations of any Laws relating to the Loan Collateral.

3.9.    COMPLIANCE WITH ENVIRONMENTAL LAWS. Borrower does not presently, and will not in the future, use, store, manufacture, generate, transport to or from, or dispose of any toxic substances, hazardous materials, hazardous wastes, radioactive materials, flammable explosives or related material on or in connection with any real property owned by Borrower, if any, in violation of applicable Laws, except in each case, for any such substances or materials used in the ordinary course of business in properties similar to such properties owned by Borrower, including office, cleaning and building maintenance supplies, and gasoline or diesel fuel in the tanks of automobiles located on such properties, so long as such substances and materials are stored, maintained, used and disposed of substantially in compliance with applicable Laws (collectively, "Permitted Materials"). Borrower does not presently, and will not in the future, knowingly permit any lessee on any property owned by Borrower to use, including any Collateral Loan Obligor and any other occupant of any Underlying Collateral real property, store, manufacture, generate, transport to or from, or dispose of any hazardous materials on property in violation of applicable Laws, other than Permitted Materials. "Hazardous materials," and "hazardous waste" shall include, but not be limited to, such substances, materials and wastes

which are or become regulated under applicable Laws relating to hazardous material or hazardous wastes or which are classified as hazardous or toxic under applicable Laws.

3.10.  SOLVENCY~~SOLVENCY~~. Borrower is able to pay its debts as they mature and the realizable value of its Assets is sufficient to satisfy any and all of its Obligations.

3.11.  PRINCIPAL PLACE OF BUSINESS. The principal place of business of Borrower is 520 Newport Center Drive, Suite 480, Newport Beach, California 92660-7034. If Borrower hereafter intends to move its principal place of business, it shall first give at least thirty (30) days' prior written notice to Lender of its intention so to move, the date that such move is anticipated, and its new address.

3.12.  PERMITS~~PERMITS~~. To the best of Borrower's knowledge, after due and diligent inquiry, Borrower possesses all licenses, permits, franchises, patents, copyrights, trademarks, and trade names, or rights thereto, that are necessary to conduct its business and Borrower is not in material violation of any valid rights of others with respect to any of the foregoing.

3.13.  NO ERISA PLAN. Borrower does not maintain a plan under the Employee Retirement Income Security Act of 1974, as amended from time to time.

3.14.  FULL DISCLOSURE~~FULL DISCLOSURE~~. All information in the loan application, Financial Statements, certificates, or other documents and all information prepared and delivered by Borrower or its Affiliates to Lender in obtaining the Loan is correct and complete in all respects, and there are no omissions therefrom that result in such information being incomplete, incorrect, or misleading in any material adverse respect as of the date thereof. All information in any loan application, Financial Statement, certificate or other document prepared and delivered to Lender on behalf of Borrower by Persons other than Borrower or its Affiliates, and acknowledged by Borrower or its Affiliates, and all other information prepared and delivered to Lender on behalf of Borrower by Persons other than Borrower or its Affiliates, and acknowledged by Borrower or its Affiliates, in applying for the Loan is correct and complete in all material respects, and there are no omissions therefrom that result in any such information being incomplete, incorrect, or misleading in any material adverse respect as of the date thereof.

3.15.  USE OF PROCEEDS; MARGIN STOCK. The proceeds of each Advance will be used by Borrower solely for the purposes specified in this Agreement. None of such proceeds will be used for the purpose of purchasing or carrying any "margin stock" as defined in Regulation U of the Board of Governors of the Federal Reserve System (12 C.F.R. Part 221 and 207), or for the purpose of reducing or retiring any indebtedness which was originally incurred to purchase or carry a margin stock or for any other purpose which might constitute this transaction a "purpose credit" within the meaning of such Regulation U. Borrower is not engaged in the business of extending credit for the purpose of purchasing or carrying margin stock. Neither Borrower nor any Person acting on behalf of Borrower has taken or will take any action which might cause any Loan Documents to violate Regulation U or any other regulations of the Board of Governors of the Federal Reserve System or to violate Section 7 of the Securities Exchange Act of 1934, or any rule or regulation thereunder, in each case as now in effect or as the same

may hereafter be in effect. Borrower and, to the best of Borrower's knowledge, Borrower's Affiliates own no "margin stock".

3.16.  GOVERNMENTAL                    REGULATION~~GOVERNMENTAL REGULATION~~. Borrower is not subject to regulation under the Federal Power Act, the Investment Company Act of 1940, the Interstate Commerce Act (as any of the preceding have been amended), or any other Law which regulates the incurring by Borrower of indebtedness, including but not limited to Laws relating to common or contract carriers or the sale of electricity, gas, steam, water, or other public utility services.

3.17.  NO PROHIBITED PERSONS. Neither (i) Borrower; (ii) any Guarantor; (iii) any Person controlled by Borrower; (iv) nor any Person for whom Borrower is acting as agent or nominee in connection with this transaction, is an OFAC Prohibited Person.

3.18.  NO FURTHER ENCUMBRANCE. There is not any mortgage, deed of trust, pledge, lien, hypothecation, charge (fixed or floating), security interest or other encumbrance whatsoever on any of the Collateral Loans or any interest therein, except as expressly permitted pursuant to this Agreement.

## SECTION 4.
## THE LOAN

4.1.  REVOLVING LINE OF CREDIT.

4.1.1   ~~4.1.1~~   Revolving Line of Credit. Upon the request of Borrower, in the form of a Request for Advance, made at any time and from time to time during the Commitment Term, and so long as there is no continuing Event of Default under the Loan Documents (and no event has occurred that, with notice or the lapse of time, or both, would constitute an Event of Default of a monetary obligation of Borrower to Lender), Lender shall make Advances to Borrower, subject to the covenants, terms and conditions of the Loan Documents; provided, however, that Lender shall not be obligated to make Advances to Borrower whenever the aggregate principal amount of all Advances outstanding at any time exceeds or would exceed, at any one time, the Availability. Borrower may repay Advances and obtain new Advances within the Availability, subject to the provisions of this Agreement, provided such Advances are requested and complete Collateral Loan Document Packages are submitted to Lender prior to the expiration of the Commitment Term. This is a revolving line of credit providing for Advances. During the Commitment Term, Borrower may repay principal amounts and re-borrow them. Borrower agrees not to permit the outstanding principal balance of Advances under the line of credit to exceed the Availability. Subject to the other terms and conditions of this Agreement, Borrower agrees as follows:

(a)                                        ~~(a)~~    The total amount of Advances available to Borrower is limited to the Borrowing Base, which shall be calculated by Lender, in Lender's sole determination, upon receipt of the Borrowing Base Certificate as set forth herein. Borrower acknowledges that an Eligible Receivable may become an Ineligible Receivable as a result of events occurring after an Advance is made. In the event that any Eligible Receivable used in calculating the Borrowing Base becomes an Ineligible Receivable,

Lender may, at its option, and in its sole discretion, re-calculate the Borrowing Base. At no time shall the aggregate outstanding Advances exceed the Availability. If, at any time, the aggregate outstanding amount of Advances exceeds the Borrowing Base or the Availability, then Borrower shall repay Lender forthwith such amount as may be necessary to eliminate such excess within ten (10) Business Days following demand.

(b)      (b)      Each Request for an Advance under the Loan shall be made by an Authorized Person completing and delivering a Request for Advance and Borrowing Base Certificate to Lender. Each Request for Advance shall be deemed delivered only upon actual receipt by Lender at the address specified in Section 9.4 hereof of such Request for Advance, which receipt may be in the form of an e-mail communication. Lender shall have the right, but not the obligation to conduct any preliminary due diligence reasonably desired by Lender, all at Borrower's expense. If Lender makes a preliminary determination in Lender's sole and absolute opinion that (a) the requested Advance does not satisfy Lender's underwriting criteria or (b) any of the conditions precedent set forth in Section 4 or elsewhere in this Agreement have not been satisfied, Lender shall have no obligation to make the requested Advance. From the Loan Closing to the end of the Commitment Term, Borrower may borrow and repay the Advances in whole or in part, and re-borrow, all in accordance with the terms and conditions of this Agreement. The Lender shall incur no liability to Borrower in acting upon any request referred to herein which the Lender believes in good faith to have been made by an Authorized Person.

(c)      (c)      Upon satisfaction of the terms and conditions as required hereunder for the making of the Initial Advance and the pledging of the Initial Loan Collateral, including without limitation, satisfaction of the conditions precedent as set forth in Section 4.4 and Section 4.5, Lender shall disburse the Initial Advance to Borrower.

(d)      (d)      From and after the expiration of the Commitment Term, Borrower shall not be entitled to request or obtain any Advances of Loan Proceeds.

(e)      Commencing with the calendar quarter ending September 30, 2024 for each calendar quarter during which the aggregate average daily unpaid principal amount of outstanding Advances is less than fifty percent (50%) of the average daily Credit Limit for such calendar quarter, Borrower shall pay to Lender, from its own funds, the Unused Line Fee.  The Unused Line Fee shall be calculated on a calendar quarterly basis by Lender for the preceding calendar quarter, if Lender determines that an Unused Line Fee is due and payable, Lender shall provide written notice thereof to Borrower.  Such Unused Line Fee shall be due and payable by Borrower to Lender in arrears on the tenth (10th) Business Day following the last day of each March, June, September and December during the Commitment Term.  The Unused Line Fee shall be non-refundable, and shall be deemed fully earned by Lender upon the expiration of each calendar quarter during the Commitment Term of the Loan.

     4.2.      NOTE; PAYMENTS; INTEREST RATE.

4.2.1   Each Advance shall be evidenced by the Note, and shall accrue interest at the rate provided therein.

4.2.2   <u>Compensating Balances</u>. Borrower, Guarantor, and any Affiliates thereof shall maintain the Compensating Balance Account(s) with an average daily aggregate balance of not less than $5,000,000.00 at all times ("<u>Compensating Balance Requirement</u>") during the term of the Loan, to be reviewed quarterly, beginning with the calendar quarter ending September 30, 2024. Should the Compensating Balance Requirement fail to be maintained during any calendar quarter, as tested at the end of such quarter during the term of the Loan ("<u>Quarter</u>"), commencing with the Quarter ending September 30, 2024, and continuing through the Quarter ending December 31, 2024, the interest rate that is applicable on the Note during the next Quarter shall automatically be increased by one-quarter of one percent (0.25%) ("<u>Initial Increased Spread</u>") over the interest rate that would otherwise be applicable on the Note for such Quarter had the Compensating Balance Requirement been satisfied. Commencing with the Quarter ending March 31, 2025, and continuing through each Quarter thereafter during the term of the Loan, should the Compensating Balance Requirement fail to be maintained at any date during any Quarter, the interest rate that is applicable on the Note during the next Quarter shall automatically be increased by three-quarters of one percent (0.75%) ("<u>Additional Increased Spread</u>", and together with the Initial Increased Spread, individually and collectively, the "<u>Increased Spread</u>") over the interest rate that would otherwise be applicable on the Note for such Quarter had the Compensating Balance Requirement been satisfied. For the avoidance of doubt, in any Quarter that the Compensating Balance Requirement is satisfied, Borrower will not be charged the Increased Spread on the applicable Note Rate (as defined in the Note) in the next succeeding Quarter. In any Quarter that the Compensating Balance Requirement is not satisfied, Borrower will be charged the Increased Spread on the applicable Note Rate for the next succeeding Quarter.

4.2.3   Borrower shall timely make all payments of principal and interest when due under the terms of the Note.

4.2.4   Borrower will repay in full any and all outstanding principal under the Note and all interest accrued thereon on or before the Maturity Date, subject to earlier acceleration upon the terms and conditions set forth in the Note.

4.3.   <u>PURPOSE OF ADVANCES; LOAN FEE.</u>

4.3.1   ~~4.3.1~~ Loan Proceeds of each Advance under this Agreement shall be used by Borrower exclusively to purchase or fund one or more Collateral Loans, or to reimburse Borrower for actual amounts expended by Borrower to purchase or fund one or more Collateral Loans, and pay expenses associated therewith.

4.3.2   ~~4.3.2~~ The Loan Fee shall be paid by Borrower to Lender at Loan Closing as part of the Initial Advance if such Advance is made at Loan closing, or otherwise from Borrower's own immediately available funds. The Loan Fee will be in addition to all other fees mentioned in this Agreement, and shall be deemed fully

earned and nonrefundable when paid, whether or not any Loan Proceeds, are disbursed at any time.

4.4.    CONDITIONS PRECEDENT TO LOAN CLOSING. In addition to all other conditions of the effectiveness of this Agreement, and to make the Initial Advance, the obligations of Lender pursuant to this Agreement shall be subject to the satisfaction or waiver by Lender of the following conditions:

4.4.1    Borrower, at its sole expense, shall deliver to Lender, at its office located at 2701 E. Camelback Road, Suite #110, Phoenix, Arizona 85016, on or before the date of the Initial Advance the following, in form and substance satisfactory to Lender, in Lender's sole opinion and judgment:

(a)    This Agreement;

(b)    The Note;

(c)    The Guaranty;

(d)    A Request for Advance in respect of the Initial Advance;

(e)    The Financing Statement;

(f)    The Initial Loan Collateral Document Package;

(g)    The Power of Attorney;

(h)    Resolutions, certifications and/or other authorizations of Borrower, and such other Persons as Lender shall request, evidencing, without limitation, approval and authorization of the transactions contemplated hereunder and the documents and instruments to be executed by Borrower in connection herewith;

(i)    Such additional assignments, agreements, certificates, reports, approvals, instruments, documents, financing statements, consents, and opinions as Lender may request;

4.4.2    Borrower shall have opened the Operating Account, and the Compensating Balance Account(s) with Lender;

4.4.3    Lender shall have approved the Financial Statements of Borrower and Guarantor;

4.4.4    No suit, action, or other proceeding of material consequence shall be pending or threatened in writing naming Borrower or Guarantor which seeks to restrain or prohibit the consummation of the transactions contemplated by this Agreement, or to obtain damages or other relief in connection therewith;

4.4.5    Borrower shall have paid to Lender the Loan Fee and any and all other fees and charges due under the terms of the Loan Documents, including, without limitation, reasonable attorney's fees and closing costs;

4.4.6    Lender shall have conducted, or caused to be conducted by an independent professional satisfactory to Lender, (i) a field audit of Borrower (including, without limitation, of Borrower's processes, practices and regulatory compliance), the results of which must be satisfactory to Lender, in Lender's sole and absolute opinion and judgment, and (ii) background checks of Borrower, Guarantor and such other Persons as Lender shall require, the results of which must be satisfactory to Lender, in Lender's reasonable opinion and judgment;

4.4.7    Lender's security interest in all Collateral then in existence shall have been perfected by the filing of the Financing Statement, the delivery of the original Collateral Loan Documents to Lender before the Document Delivery Deadline, and the recording of any recordable Collateral Loan Documents, and shall be and remain a first priority perfected security interest in and to all such Collateral, subject only to such action as may be required under applicable law to perfect Lender's security interest in collateral subsequently acquired by Borrower pursuant to each Collateral Loan;

4.4.8    There shall be no breach of any warranty or representation of Borrower; and

4.4.9    There shall be no event or circumstance which constitutes, or would upon the giving of notice or passage of time, constitute an Event of Default under this Agreement.

4.5.    CONDITIONS OF ADVANCES. Lender's obligation to make each Advance shall be subject to the following additional conditions precedent, in addition to all other conditions of each Advance provided elsewhere in this Agreement and in the other Loan Documents:

4.5.1    All conditions to this Agreement under Section 4.4, above, shall be satisfied in full;

4.5.2    Borrower shall have delivered to Lender a Request for Advance;

4.5.3    Concurrent with each Request for an Advance, Borrower shall execute and deliver to Lender (i) a fully complete and executed Borrowing Base Certificate and (ii) an updated summary, in form and detail satisfactory to Lender, of the Collateral Loans and other Borrower Loans in Borrower's Loan Portfolio detailing the status of such Collateral Loans and other Borrower Loans, including without limitation, outstanding amounts due, status of performance, status of real property collateral and other information that may be required by Lender for each Borrower Loan;

4.5.4    Borrower shall have paid to Lender, in addition to any other fees required under this Agreement or any of the other Loan Documents, a Collateral Loan review fee of $100.00 for each Collateral Loan secured by residential property or a Collateral Loan review fee of $250.00 for each Collateral Loan secured by commercial property (including, without

limitation, each of the Collateral Loans included in the Loan Collateral). In addition, in the event Lender retains an appraiser to perform a review of any Appraisal of the Underlying Collateral for a Collateral Loan, Borrower shall pay an Appraisal review fee not to exceed $150.00 for each Collateral Loan secured by residential property and $1,500.00 for each Collateral Loan secured by commercial property. In addition, Borrower shall have paid to Lender any appraisal review fees set forth in Section 4.6.4 herein;

4.5.5    No event or circumstance shall have occurred or be continuing which constitutes, or would upon the giving of notice or passage of time, constitute an Event of Default or failure of any condition under the Loan Documents;

4.5.6    Lender shall have received payment of the actual out of pocket third party fees and costs of Lender in connection with each Advance and the preparation of the Loan Documents, including, but not limited to, reasonable attorneys' fees; and

4.5.7    Lender shall have approved the Collateral Loans that have qualified as Eligible Receivables (as provided in Section 4.6) in connection with the Request for Advance.

4.6.    ELIGIBLE RECEIVABLES

4.6.1    Approval of Eligible Receivables. Lender shall have no obligation to consider any Collateral Loan (including any Borrower Loan that in connection with the approval thereof as an Eligible Receivable will be a Collateral Loan) for approval as an Eligible Receivable unless and until the following conditions precedent are satisfied in Lender's reasonable opinion and judgment, in addition to all other conditions to approval of any Eligible Receivable provided elsewhere in this Agreement and in the other Loan Documents:

(a)    Borrower shall prepare and deliver to Lender, for Lender's review and approval, a complete Collateral Loan Document Package by the Document Delivery Deadline, in form and content reasonably acceptable to Lender in its sole opinion and judgment evidencing and otherwise pertaining to the Collateral Loan between Borrower and its Collateral Loan Obligor;

(b)    All terms and conditions of the Collateral Loan and all Collateral Loan Documents pertaining thereto shall comply with all requirements for Collateral Loans as provided in this Agreement;

(c)    Borrower's security interest in all Underlying Collateral shall then, or thereafter concurrently with actual disbursement of Loan Proceeds to or for the account of a Collateral Loan Obligor, constitute a valid, enforceable, and duly perfected security interest in the Underlying Collateral in a first priority position, and all proceeds and products thereof;

(d)    No event or circumstance shall have occurred or be continuing which constitutes, or would upon the giving of notice or passage of time, constitute

an Event of Default of a monetary obligation of borrower to Lender or failure of any condition under the Loan Documents;

(e)    Borrower shall deliver to Lender the Collateral Loan Document Package, including, without limitation, an executed Assignment of Mortgage, Allonge and all other items set forth in Schedule 1 attached hereto;

(f)    Borrower shall execute and deliver to Lender an Allonge and an Assignment of Mortgage (which shall be retained by Lender and not recorded unless an Event of Default has occurred and is continuing under this Agreement or any other Loan Document, or Lender otherwise decides to record the Assignment of Mortgage, in its sole discretion) for each Collateral Loan, and Lender's security interest in all Loan Collateral and related rights of Borrower with respect to each Collateral Loan shall then, or thereafter concurrently with actual disbursement of Loan Proceeds to or for the account of Borrower, be a valid, enforceable and first priority perfected security interest in and to all such Loan Collateral, and all proceeds thereof;

(g)    Any title policy included within any Collateral Loan Document Package shall include such endorsement(s) as Lender deems necessary or appropriate, in its reasonable judgment, including, without limitation, mechanic's lien coverage, insuring the validity, priority and enforceability of Borrower's security interest in the Collateral Mortgage; and

(h)    All conditions of the funding of the Collateral Loan shall have been satisfied in accordance with the provisions of the Collateral Loan Documents and the Collateral Loan shall be fully funded, or the Loan Proceeds shall be used to fund the Collateral Loan.

4.6.2    Review of Collateral Loan Document Package; Approval of Eligible Receivables. Lender shall have a period of twenty (20) Business Days following submission by Borrower of a completed Collateral Loan Document Package for any Collateral Loan within which to review and approve, or not approve, Borrower's request to approve such Collateral Loan as an Eligible Receivable. If, within such twenty (20) Business Day period, Lender has not notified Borrower in writing that such Collateral Loan is approved as an Eligible Receivable, then Lender shall be deemed to have not approved such Collateral Loan and such Collateral Loan shall not be an Eligible Receivable at Lender's sole discretion.

4.6.3    Withdrawal and Termination of Approval of Eligible Receivables. Notwithstanding any approval by Lender of any Collateral Loan as an Eligible Receivable, any such approval shall be deemed withdrawn and terminated if, at any time, any such Collateral Loan fails to satisfy the conditions for being an Eligible Receivable (including, without limitation, if any default occurs in the payment or performance of any obligations of the Collateral Loan Obligor under the Collateral Loan Documents for such Collateral Loan subject to the terms set forth in paragraphs (i) and (j) of Schedule 2 attached hereto). Upon any such withdrawal and termination of an approval as an Eligible Receivable, the applicable Collateral Loan shall automatically cease to be an Eligible Receivable and be removed from the Borrowing Base and, Borrower shall repay the Advances in such amount as may be required pursuant to

Section 4.1.1(a). Notwithstanding the removal of any such Collateral Loan from the Borrowing Base, such Collateral Loan shall remain a "Collateral Loan" until, and unless, such Collateral Loan is released pursuant to Section 4.7.

4.6.4    Appraisals. The initial Appraisal of any underlying real property collateral securing any Borrower Loan (including, without limitation, any Appraisals of the Underlying Collateral securing the Borrower Loans comprising the Loan Collateral) shall be provided by Borrower to Lender, at Borrower's expense as more particularly set forth in Section 4.5.4, above.

4.7.  RELEASE OF COLLATERAL LOANS.    Borrower may request that any Borrower Loan constituting a Collateral Loan be released as a Collateral Loan, and the liens and security interests of Lender therein be released, and, if such Borrower Loan is also an Eligible Receivable, that such Borrower Loan cease to be an Eligible Receivable, provided, that:

4.6.5    Approved Collateral Loan Status; Material Adverse Change Standard. Once any Collateral Loan has been approved by Lender as an Eligible Receivable and included in the Borrowing Base (each, an "Approved Collateral Loan"), such Approved Collateral Loan shall remain an Eligible Receivable for all purposes under this Agreement and shall not be removed from the Borrowing Base or re-designated as ineligible, notwithstanding anything to the contrary in this Agreement or Schedule 2 (except as otherwise provided in this Section or Section 5.2), unless and until a Material Adverse Change (as defined below) with respect to such Approved Collateral Loan (or the underlying Collateral Loan Obligor thereof) has occurred and is continuing at the time it is deemed ineligible by Lender. In the event of any inconsistency or conflict between this Section 4.6.5 and Schedule 2 with respect to the continued eligibility of an Approved Collateral Loan, this Section 4.6.5 shall control.

For purposes of this Section 4.6.5, a "Material Adverse Change" with respect to any Approved Collateral Loan shall mean the occurrence of any of the following events after the date of Lender's approval of such loan as an Eligible Receivable, as reasonably determined by Lender:

(A)        a payment default continuing for more than sixty (60) consecutive days under the applicable Collateral Loan Documents, without such default having been waived, modified, or being subject to a valid forbearance or workout arrangement entered into in accordance with the terms of the applicable Collateral Loan Documents and with the prior approval by Lender in its reasonable determination;

(B)        the commencement of a bankruptcy or insolvency proceeding by or against any Collateral Loan Obligor under such Approved Collateral Loan that is not dismissed or discharged within ninety (90) days; provided, however, that this clause (B) shall not apply to any voluntary filing by such Collateral Loan Obligor under Chapter 11 of the Bankruptcy Code so long as (x) a plan of reorganization is on file within such ninety (90) day period, (y) such plan, together with the facts and circumstances then existing, does not, in Lender's sole opinion and judgment, materially and adversely impair the collectability of such Approved Collateral Loan or the value of the applicable Underlying Collateral, and (z) such Collateral Loan Obligor remains current on required payments under the Collateral Loan Documents or, subject to clause (y) any court-approved restructuring terms;

(C) a material breach by any Collateral Loan Obligor of any non-monetary provision of the Collateral Loan Documents that continues unremedied for sixty (60) days or more following notice to such Collateral Loan Obligor, provided, that such Collateral Loan Obligor remains current on required payments under the Collateral Loan Documents, subject to clause (A), above;

(D) the appointment of a receiver or trustee over all or substantially all of the assets of any Collateral Loan Obligor or the applicable Underlying Collateral for the Approved Collateral Loan; provided, however, that this clause (D) shall not apply (x) if such receiver is appointed at the request of Borrower (or any of its affiliates or servicers) or (y) if such receiver or trustee is appointed pursuant to, or is acting in accordance with, any provision in the applicable Collateral Loan Documents (including any provision substantially similar in effect to an assignment of rents), any order of a court of competent jurisdiction, or any statutory or regulatory framework in the relevant jurisdiction that provides for similar enforcement or protective remedies, and in any such case, the receiver or trustee is acting for the benefit of Borrower (or its Affiliates or services), or is otherwise not taking any action materially adverse to Borrower, and the Approved Collateral Loan continues to perform in accordance with its terms;

(E) the loss of priority or perfection of Borrower's lien in the applicable Underlying Collateral, unless such loss is cured within sixty (60) days after Borrower receives notice thereof;

(F) any material modification or amendments are made to the Collateral Loan Documents for any Approved Collateral Loan, or any waivers are granted by Borrower, without the required prior written consent of Lender that is required under Section 5.2, below; or

(G) Borrower has made any material misrepresentations or any material omissions or otherwise committed fraud in connection with the making of or submitted to Lender of the Approved Collateral Loan.

Lender shall not withdraw its prior approval of any Approved Collateral Loan or remove any Approved Collateral Loan from the Borrowing Base unless a Material Adverse Change has occurred and is continuing at the time it is deemed ineligible by Lender.  In the event Lender reasonably determines a Material Adverse Change has occurred and is continuing, it shall provide Borrower written notice of the Material Adverse Change to Borrower and Borrower shall have ten (10) Business Days after delivery of such notice to provide Lender evidence that refutes such Material Adverse Change determination to the reasonable satisfaction of Lender.

4.7. RELEASE OF COLLATERAL LOANS. Upon a Liquidity Event, the liens and security interests of Lender in such Collateral Loan shall be released by Lender upon satisfaction by Borrower of the following terms and conditions:

4.7.1 Borrower shall provide Lender a written request to remove such ~~Borrower Loan as a~~ Collateral Loan as Collateral, which request shall specify the requested date for the removal ~~of such Borrower Loan as a Collateral Loan~~ to occur;

4.7.2   Lender shall have received the Release Price for the Collateral Loan prior to or concurrently with removal thereof;

~~4.7.2 Lender shall have received at least five (5) Business Days prior to the requested date of removal of such Borrower Loan as a Collateral Loan, a Borrowing Base Certificate presenting Borrower's computation of the Borrowing Base as of the requested date of removal and after giving effect to the removal of such Borrower Loan as a Collateral Loan and, if such Borrower Loan is also an Eligible Receivable, after giving effect to such Borrower Loan ceasing to be an Eligible Receivable;~~

~~4.7.3 After giving effect to the removal of such Borrower Loan as a Collateral Loan and, if such Borrower Loan is also an Eligible Receivable, after giving effect to such Borrower Loan ceasing to be an Eligible Receivable, the outstanding Advances shall not exceed the Borrowing Base;~~

4.7.3   ~~4.7.4~~ No event or circumstance which constitutes, or would upon the giving of notice or passage of time, constitute an Event of Default under this Agreement shall exist prior to or after giving effect to the removal of such ~~Borrower Loan as a~~ Collateral Loan, which shall be certified to by an Authorized Person; and

~~4.7.5 Lender shall have received a certificate signed by an Authorized Person certifying that the conditions in subsections 4.7.1 through 4.7.4 of this Section 4.7 are satisfied; and~~

4.7.4   ~~4.7.6~~ Borrower shall have provided to Lender such documents, in form and substance satisfactory to Lender in its reasonable discretion, as may be necessary to release Lender's liens and security interests in the Collateral Loan Documents.

4.8.   REPAYMENT~~REPAYMENT~~. In addition to the other provisions set forth herein, repayment of the Loan will be required as follows:

4.8.1   Interest and principal payments under the Loan shall be due and payable to Lender pursuant to the provisions of the Note.

4.8.2   Borrower hereby authorizes Lender, if and to the extent any payment of principal or interest or sum otherwise due hereunder is not promptly made pursuant to the Note, and to the extent of any obligation of Borrower to Lender under this Agreement or any other Loan Document that is due and payable, to charge against any account of Borrower with Lender an amount equal to the principal and accrued interest from time to time due and payable to Lender under the Note or otherwise; provided, however, that the foregoing shall not limit in any way Borrower's obligation to pay such amounts as and when due.

4.8.3   All payments hereunder or under the Note shall be made by Borrower without any offset or deduction for or on account of any present or future taxes, imposts or duties, of whatever nature, imposed or levied by or on behalf of any Governmental Agency.  If at any time, whether by reason of any present or future Law or other requirement, Borrower shall be compelled by such Law or other requirement to deduct or withhold such taxes, imposts or duties, Borrower shall pay such additional amounts to Lender as may be necessary

such that every net payment under this Agreement and the Note on which Borrower is obligated, after such deduction or withholding, will not be less than the amount required hereunder or thereunder.

4.8.4   Whenever any payment to be made under this Agreement and the Note shall be due on a day other than a Business Day of Lender, such payment may be made on the next succeeding Business Day, and such extension of time shall in such cases be included in the computation of payment of interest hereunder and under the Note.

4.8.5   In the event that Borrower pays to Lender the Release Price, Lender shall immediately apply the Release Price to reduce the outstanding principal balance of the Loan.

4.9.   DEPOSIT ACCOUNTS~~DEPOSIT ACCOUNTS~~. Borrower hereby grants to Lender a security interest in, and assigns, pledges and hypothecates to Lender all of Borrower's right, title and interest in and to all deposit accounts maintained by Borrower with Lender, as security for each and all of the obligations of Borrower to Lender under the Loan Documents, including without limitation, the Operating Account, and any and all Compensating Balance Accounts.

4.10.   NO AUTOMATIC SET-OFF. The existence of any sum or sums being on deposit with Lender in any deposit account(s) maintained by Borrower shall in no way constitute a set off against or be deemed to compensate the obligations of the Loan or any payment or performance due under the Loan Documents or this Agreement, unless and until Lender, by affirmative action, shall so apply said accounts or any portion thereof, and then only to the extent thereof as so designated by Lender.

4.11.   RELIANCE BY LENDER AND ACQUITTANCE. Lender may conclusively assume that the statements, facts, information, and representations contained herein and/or in any affidavits, orders, receipts, or other written instrument(s) prepared or approved by Borrower or Guarantor that are filed with Lender or exhibited to it, are true and correct in all material respects, and Lender may rely thereon without any investigation or inquiry, and any payment made by Lender in reliance thereon shall be a complete release in its favor for all sums so paid.

4.12.   [INTENTIONALLY OMITTED]

4.13.   CONVERSION TO TERM LOAN. Upon expiration of the Commitment Term ("Conversion Date"), ~~Borrower shall have the option of converting~~ the Loan shall be automatically converted to a term loan in an amount not to exceed the then outstanding principal balance of the Loan as of the Conversion Date, and~~, in connection therewith, obtaining an extension of the Maturity Date to twenty-four (24) months from the Conversion Date, provided, however, that such conversion of the Loan to a term loan and such extension of the Maturity Date shall be subject to the occurrence or satisfaction (or waiver by Lender in writing), as applicable, of each and all of the following conditions by no later than the Conversion Date:~~:

~~4.13.1   As of the Conversion Date, no Event of Default (or event which, with the giving of notice or the passage of time, or both, would become an Event of~~

~~Default) shall exist under any of the Loan Documents and Borrower shall be in full compliance with each term, condition and covenant contained in this Agreement and the other Loan Documents;~~

~~4.13.2 Borrower shall have provided Lender a written request for extension of the Maturity Date no later than thirty (30) days prior to the Conversion Date;~~

~~4.13.3 There shall have occurred no material adverse change in the financial conditions of Borrower or Guarantor from that which existed as of Loan Closing;~~

4.13.1 ~~4.13.4~~ Borrower shall not be entitled to any new Advance of Loan Proceeds, and shall not request the same from and after the Conversion Date;

4.13.2 Borrower shall be required to pay the Conversion Fee to Lender on December 31, 2025; provided, however, that if the Loan is repaid in full on or before such date, no Conversion Fee shall be due or payable; and

4.13.3 The Loan shall be all due and payable on the Maturity Date.

~~4.13.5 Borrower shall provide Lender with such additional assignments, agreements, promissory notes, security agreements, certificates, reports, approvals, instruments, documents, subordination agreements, financing statements, consents and opinions as Lender may reasonably request in connection with conversion of the Loan to a term loan;~~

~~4.13.6 Borrower shall pay to Lender, from Borrower's own funds, all costs and expenses of Lender arising from or relating to the conversion of the Loan to a term loan, including, without limitation, Lender's legal fees and expenses; and~~

~~4.13.7 Borrower shall have paid the Conversion Fee to Lender, from Borrower's own funds, which Conversion Fee shall be deemed fully earned and non-refundable to Borrower upon receipt by Lender.~~

## SECTION 5.
## THE COLLATERAL LOANS

To secure the Obligations, Borrower hereby assigns, pledges, transfers, hypothecates and sets over to Lender all of its right, title and interest in and to the Collateral Loans and Collateral Loan Documents, including, without limitation, the right to receive all payments, proceeds, and recoveries thereunder, collections and cash collateral of the Collateral Loan Documents, any casualty insurance or condemnation proceeds payable to Borrower thereunder, any and all policies of title insurance issued in connection with any Collateral Mortgage, and the proceeds and products of any of the foregoing. From and after the occurrence of an Event of Default and during the continuance thereof, Lender shall have the exclusive right to (a) receive and enforce the Collateral Loan Documents, (b) exercise the ~~Borrower's~~Borrower's decision-making authority as lender thereunder, and (c) collect all payments and recoveries thereon and all proceeds thereof, to be applied by Lender to payment of the Loan and all fees, costs, and expenses incurred by Lender in connection with the Loan. Lender's rights hereunder shall

include, from and after the occurrence of an Event of Default and only during the continuance thereof, the exclusive right to collect and receive all payments, proceeds, and recoveries under and with respect to the Collateral Loan Documents, including, without limitation, the exclusive right to enforce the provisions of the Collateral Loan Documents in any manner Lender shall determine to be necessary or appropriate, including, without limitation, by judicial action or nonjudicial proceedings, and to otherwise bill for and account to Borrower for any and all payments, proceeds, and recoveries thereon as herein provided. Notwithstanding the foregoing assignment, Borrower, alone, and not Lender, shall be obligated to fulfill all of the monetary and non-monetary obligations of the lender to the Collateral Loan Obligor under the Collateral Note, Collateral Mortgage and additional Collateral Loan Documents.

Borrower shall fully and faithfully perform and satisfy all covenants and conditions of the Collateral Loan Documents, and Borrower shall, as of the closing of each Collateral Loan, take all steps necessary and appropriate in order to perfect Borrower's security interest in and lien upon all Underlying Collateral and to perfect Lender's security interest in and lien upon all Loan Collateral. Borrower shall not make any Collateral Loan to any Person other than a Collateral Loan Obligor without Lender's prior written consent. Borrower shall service (or caused to be serviced) the Collateral Loans in accordance with this Agreement and all applicable Laws in a commercially reasonable manner and, to the extent not expressly governed thereby, will, at a minimum, exercise the same degree of care as Borrower exercises with respect to the servicing and administration of loans held by Borrower for its own account.

Each Collateral Loan shall be identified by Lender with (i) the date and amount of each Collateral Note, (ii) the name of the Collateral Loan Obligor, (iii) the identification of the Collateral Mortgage, and (iv) the identification of the Collateral. Such records of Collateral Loans shall be maintained at Lender's office, and the records of Lender shall, absent manifest error, be binding and conclusive upon Borrower.

5.1.     COLLECTION~~COLLECTION~~. Borrower shall diligently and promptly take all steps necessary and/or appropriate under the circumstances consistent with prudent and customary lending practices to cause all Collateral Loan Obligors to make full and timely payment of all obligations due under the Collateral Loan Documents.

5.2.     MONITORING COMPLIANCE; NO MODIFICATIONS. Borrower shall at all times diligently monitor and verify compliance by Collateral Loan Obligors with all monetary and material non-monetary obligations under the Collateral Loan Documents consistent with prudent and customary lending practices. Borrower shall not modify, amend or waive any provision of the Collateral Loan Documents that (~~a~~i) lowers the interest rate on the Collateral Note ~~below the Note Rate (as defined in the Note)~~, (~~b~~ii) extends the stated maturity date of the Collateral Loan ~~for a period of more than eighteen (18) months~~, except (a) to permit the exercise of any extension option held by the applicable Collateral Loan Obligor pursuant to the terms of the Collateral Loan Documents or (b) to effect an extension that does not extend the maturity of such Collateral Loan beyond the Maturity Date of the Loan, (iii) advances additional funds, or creates an unfunded commitment to advance additional funds, under the Collateral Loan, or (~~c~~iv) would otherwise make a Collateral Loan ~~that would~~ no longer qualify as an Eligible Receivable. Borrower shall promptly provide Lender written notice and a copy of any amendment, modification or waiver made to the Collateral Loan Documents. Borrower shall

service and administer (or caused to be serviced and administered by Servicer under the Servicing Agreement) the Collateral Loans in accordance with servicing practices and procedures (including collection procedures) that are in all respects legal, proper and customary in the mortgage servicing industry in accordance with (a) the accepted mortgage servicing practices of prudent mortgage lending institutions that service mortgage loans of the same type as the Collateral Loans in the jurisdiction where the real Property secured by the related Collateral Mortgage is located, (b) applicable law, (c) the terms of the related Collateral Loan Documents, and (d) the servicing practices that Borrower customarily employs and exercises in servicing and administering mortgage loans of the same type as the Collateral Loans for its own account (to the extent not conflicting with clauses (a) through (c) above) and shall have full power and authority, acting alone or through subservicers or agents, to do or cause to be done any and all things in connection with such servicing and administration which Borrower may deem necessary or desirable and consistent with the terms of this Agreement. Borrower hereby authorizes Lender, in Lender's reasonable discretion, upon reasonable notice during normal business hours to perform a collateral audit on any Collateral Loan at any time during the term of the Loan, utilizing an auditor acceptable to Lender, and the audit shall be at Borrower's sole expense.

5.3. <u>REPRESENTATIONS AND WARRANTIES REGARDING COLLATERAL LOANS</u>. Borrower makes the following representations and warranties to Lender with respect to each Collateral Loan as of the date such Collateral Loan is pledged as Collateral (unless otherwise disclosed to Lender, and approved by Lender, in writing):

5.3.1   Subject to Permitted Exceptions (as defined below), the Mortgage creates a first lien or a first priority ownership interest in an estate in fee simple estate in real property securing the related Collateral Loan Note.

5.3.2   To the actual knowledge of Borrower, after due and diligent inquiry, all buildings and improvements which were included for the purpose of determining the appraised value of the Underlying Collateral lie wholly within the boundaries and building restriction lines of the Underlying Collateral and no buildings or improvements on adjoining properties encroach upon the Mortgaged Property. No improvement located on or being part of the Underlying Collateral is in violation of any applicable zoning law, subdivision law, ordinance or regulation.

5.3.3   The Collateral Loan is covered by an American Land Title Association or California Land Title Association mortgage title insurance policy, or such other generally acceptable form of policy or insurance pursuant to insurance policies, and the issuer thereof is qualified to do business in the jurisdiction where the Underlying Collateral is located, and which insures the holder of such Collateral Loan, its successors and assigns, as to the first priority lien of the Collateral Mortgage in the original principal amount of the Collateral Loan and against any loss by reason of the invalidity or unenforceability of the lien resulting from the provisions of the Collateral Mortgage. Additionally, such title insurance policy affirmatively insures ingress and egress, and against encroachments by or upon the Underlying Collateral or any interest therein. The title policy does not contain any special exceptions (other than the

standard exclusions) for zoning and uses and has been marked to delete the standard survey exception or to replace the standard survey exception with a specific survey reading.

5.3.4 The Underlying Collateral (including all buildings and improvements thereon) are insured by an insurer acceptable to Lender, against loss by fire, hazards of extended coverage and such other hazards as are customary in the area where the Underlying Collateral is located. If required by the Flood Disaster Protection Act of 1973 ("FDPA"), the Collateral Loan is covered by a flood insurance policy meeting the requirements of the current guidelines of the Federal Insurance Administration, in an amount not less than the amount required by the FDPA, with such flood policy being issued by a generally acceptable insurer. The Mortgage obligates the Collateral Loan Obligor thereunder to maintain all such insurance at the Collateral Loan ~~Obligor's~~Obligor's cost and expense, and upon the Collateral Loan ~~Obligor's~~Obligor's failure to do so, authorizes the holder of the Mortgage to obtain and maintain such insurance at the Collateral Loan ~~Obligor's~~Obligor's cost and expense and to seek reimbursement therefore from the related Collateral Loan Obligor. Any such hazard insurance policy shall be a valid and binding obligation of the insurer, be in full force and effect, and be in full force and effect.

5.3.5 To the actual knowledge of Borrower, after due and diligent inquiry, the Collateral Loan Note or Mortgage is not subject to any right of rescission, set-off, counterclaim or defense, including, without limitation, the defense of usury, nor will the operation of any of the terms of the Collateral Loan Note or the Mortgage, or the exercise of any right thereunder, render either the Collateral Loan Note or the Mortgage unenforceable, in whole or in part, or subject to any right of rescission, set-off, counterclaim or defense, including the defense of usury, and no such right of rescission, set-off, counterclaim or defense has been asserted with respect thereto, and no Collateral Loan Obligor in respect of the Collateral Loan was a debtor in any state or federal bankruptcy or insolvency proceeding at the time the Collateral Loan was originated.

5.3.6 The Collateral Loans were, and will have been, at all times serviced in accordance with the terms of the related Collateral Loan Note and in accordance with applicable Law. With respect to escrow deposits and escrow payments, all such payments are in the possession of, or under the control of, the Borrower or the Servicer and there exist no deficiencies in connection therewith for which customary arrangements for repayment thereof have not been made. All escrow payments have been collected in full compliance with applicable Law and the provisions of the related Collateral Loan Note and Mortgage. An escrow of funds is not prohibited by applicable Law and has been established in an amount sufficient to pay for every item that remains unpaid and has been assessed but is not yet due and payable. No escrow deposits or escrow payments or other charges or payments due the Borrower have been capitalized under the Mortgage or the Collateral Loan Note.

5.3.7 There is no action, suit, proceeding or investigation pending, or to the actual knowledge of Borrower, after due and diligent inquiry, threatened, that is related to the Collateral Loan and likely to affect materially and adversely such Collateral Loan.

5.3.8 The documents required to be delivered on or before the related closing date with respect to such Collateral Loan have been delivered to Lender. The Collateral

Loan Document Package contains each of the documents and instruments specified to be included therein duly executed and in due and proper form, and each such document or instrument is in form acceptable to the applicable federal or state regulatory agency.

5.3.9   The Collateral Loan Note, the related Mortgage and any intervening assignments of the Mortgage are genuine, and each is the legal, valid and binding obligation of the maker thereof, enforceable in accordance with its terms, except as enforceability may be limited by (i) applicable bankruptcy, insolvency, reorganization or other similar Laws relating to or affecting the enforcement of creditors'' rights and (ii) by general principles of equity. All parties to the Collateral Loan Note, the Mortgage and any intervening assignments had legal capacity to execute the Collateral Loan Note, the Mortgage and such assignments, and the Collateral Loan Note, Mortgage and such assignments have been duly and properly executed by such parties.

5.3.10  The related Mortgage is a valid, subsisting, enforceable and perfected first lien on the Underlying Collateral, subject only to Permitted Exceptions, including all buildings on the Underlying Collateral, and all installations and mechanical, electrical, plumbing, heating and air conditioning systems affixed to such buildings, and all additions, alterations and replacements made at any time with respect to the foregoing securing the Collateral Loan Note'sNote's original principal balance. The Mortgage and the Collateral Loan Note do not contain any evidence of any security interest or other interest or right thereto. Such lien is free and clear of all adverse claims, liens and encumbrances having priority over the first lien of the Mortgage subject only to (1) the lien of non-delinquent current real property taxes and assessments not yet due and payable, (2) covenants, conditions and restrictions, rights of way, easements and other matters of the public record as of the date of recording which are acceptable to mortgage lending institutions generally and specifically referred to in the lender'slender's title insurance policy and either (A) which are referred to or otherwise considered in the appraisal made in connection with the origination of the Collateral Loan, or (B) which do not adversely affect the appraised value of the Underlying Collateral as set forth in such appraisal and (3) other matters to which like properties are commonly subject which do not materially interfere with the benefits of the security intended to be provided by the Mortgage or the use, enjoyment, value or marketability of the related Underlying Collateral (collectively, "Permitted Exceptions"). Any security agreement, chattel mortgage or equivalent document related to and delivered in connection with the Collateral Loan establishes and creates a valid, subsisting, enforceable and perfected first lien and first priority security interest on the property described therein.

5.3.11  The Mortgage and the related Collateral Loan Note contain customary and enforceable provisions which render the rights and remedies of the holder thereof adequate for the realization against the Underlying Collateral of the benefits of the security provided thereby, including, (i) in the case of a Mortgage designated as a deed of trust, by trustee'strustee's sale, and (ii) otherwise by judicial foreclosure, subject only to rights of redemption, seizure and other Laws that would not materially interfere with the ultimate realization of the benefits of the security.

5.3.12  The Mortgage contains the usual and enforceable provisions, to the extent not prohibited by applicable Law as of the date of such Mortgage, for the acceleration of the payment of the unpaid principal amount of the Collateral Loan in the event that the related

Underlying Collateral is sold or transferred without the prior consent of the beneficiary of the Mortgage thereunder.

5.3.13 The terms of the Collateral Loan Note and the Mortgage have not been impaired, waived, altered or modified in any respect from the date of origination; except by a written instrument which has been recorded, if necessary to protect the interests of Lender, and which has been delivered to the Lender. The substance of any such waiver, alteration or modification has been approved by the title insurer, to the extent required, and its terms are reflected on the Custodial Asset Schedule. No Collateral Loan Obligor in respect of the Collateral Loan has been released, in whole or in part, except in connection with an assumption agreement approved by the title insurer, to the extent required by such policy, and which assumption agreement is part of the Collateral Loan Document Package delivered to the Lender.

5.3.14 To the actual knowledge of Borrower, after due and diligent inquiry, there are no mechanics'' or similar liens or claims which have been filed for work, labor or material (and no rights are outstanding that under law could give rise to such lien) materially and adversely affecting the Underlying Collateral which are, or may be, liens prior or equal to, or coordinate with, the lien of the related Mortgage.

5.3.15 To the actual knowledge of Borrower, after due and diligent inquiry, there is no default, breach, violation or event of acceleration existing under the Mortgage or the related Collateral Loan Note and no event which, with the passage of time or with notice and the expiration of any grace or cure period, would constitute a default, breach, violation or event of acceleration; and neither the Borrower nor any prior owner of such Collateral Loan has waived any default, breach, violation or event permitting acceleration except as otherwise disclosed in the Collateral Loan Document Package. Neither the Borrower nor, to the actual knowledge of Borrower, after due and diligent inquiry, any such prior owner has waived the performance by any Collateral Loan Obligor of any action, if such ~~party's~~party's failure to perform such action would cause the Collateral Loan to be in default, except as otherwise contained in the Collateral Loan Document Package.

5.3.16 Each original Mortgage was recorded, and all subsequent assignments of the original Mortgage have been recorded in the appropriate jurisdictions in which such recordation is necessary to perfect the liens against each related Collateral Loan Obligor or are in the process of being recorded.

5.3.17 The Collateral Loan has been closed and the proceeds of the Collateral Loan have been fully disbursed, there is no requirement for future advances thereunder, and any and all requirements as to completion of any on-site or off-site improvement and as to disbursements of any escrow funds therefor have been complied with. All costs, fees and expenses incurred in making or closing Collateral Loans and the recording of the Mortgage were paid, and each Collateral Loan Obligor is not entitled to any refund of any amounts paid or due under the Collateral Loan Note or Mortgage. All points and fees related to the Collateral Loan were disclosed in writing to each Collateral Loan Obligor in accordance with all applicable Laws.

5.3.18  No loan payment has been escrowed as part of the loan proceeds on behalf of the Collateral Loan Obligor. No payments due and payable under the terms of the Collateral Loan Note and Mortgage, except for seller or builder concessions, have been paid by any person who was involved in, or benefited from, the sale or purchase of the Underlying Collateral or the origination, refinancing, sale, purchase or servicing of the Collateral Loan other than the Collateral Loan Obligor.

5.3.19  To the actual knowledge of Borrower, after due and diligent inquiry, all taxes, governmental assessments, insurance premiums and water, sewer and municipal charges which previously became due and owing have been paid by each Collateral Loan Obligor, or an escrow of funds from such Collateral Loan Obligor has been established in an amount sufficient to pay for every such item which remains unpaid and which has been assessed but is not yet due and payable.

5.3.20  To the actual knowledge of Borrower, after due and diligent inquiry, all inspections, licenses and certificates required to be made or issued with respect to all occupied portions of the Underlying Collateral and, with respect to the use and occupancy of the same, have been made or obtained from the appropriate authorities and the Underlying Collateral is lawfully occupied under applicable Law.

5.3.21  In the event the Mortgage is a deed of trust, a trustee, authorized and duly qualified under applicable law to serve as such, has been properly designated, is named in the Mortgage and currently so serves, and no fees or expenses are or will become payable by the holder thereof to the trustee under the deed of trust, except in connection with a ~~trustee's~~trustee's sale after default by the Collateral Loan Obligor.

5.3.22  No Collateral Loan is secured by a leasehold interest.

5.3.23  The Borrower or its trustee is the sole legal, beneficial and equitable owner and holder of the Collateral Loan and the indebtedness evidenced by the Collateral Loan Note. Each sale of the Collateral Loan from any prior owner thereof was in exchange for fair equivalent value in Borrower's reasonable estimation, and the prior owner was solvent on the sale date of the Collateral Loan and had sufficient capital to pay and was able to pay its debts as they would generally mature. The Borrower has good, and marketable title to and is the sole owner thereof has full right and authority to pledge and assign the Collateral Loan to the Lender free and clear of any encumbrance, equity, lien, pledge, charge, claim (including, but not limited to, any preference or fraudulent transfer claim) or security interest.

5.3.24  All parties which have had any interest in the Collateral Loan, whether as mortgagee, assignee, pledgee or otherwise, are (or, during the period in which they held and disposed of such interest, were) in compliance with any and all applicable licensing requirements of the Laws of the state wherein the Underlying Collateral is located, except to the extent that failure to be so licensed would not give rise to any claim against the holder.

5.4.   MAINTENANCE OF INSURANCE; SETTLEMENT. Borrower shall (a) cause the Collateral Loan Obligors to at all times insure the Underlying Collateral against loss or damage by fire and other risks as shall be required pursuant to the Collateral Loan Documents,

with Borrower to be the loss payable beneficiary and/or additional insured or (b) force place such insurance if any Collateral Loan Obligor fails to so comply with the Collateral Loan Documents. In the event of any damage or destruction of the Underlying Collateral, or any taking of all or a portion of the Underlying Collateral by power of eminent domain, Borrower shall take any and all action as may be reasonably necessary or appropriate to make a timely claim for proceeds or an award to which the holder of the Collateral Loan Documents is or may then be entitled; provided, however, that Borrower shall not settle or compromise the amount of any claim, settlement, payment, or award without the prior written approval of Lender, which approval Lender may give or withhold in its reasonable opinion and judgment, so long as the amount of such settlement or award that is payable to Borrower pursuant to the terms of the Collateral Loan Documents shall be paid first to Lender to be applied to repay the Advances made by Lender with respect to the Underlying Collateral which is the subject of such claim. In the event that all or any part of the Underlying Collateral is materially damaged or destroyed by fire or other casualty and the loss shall prove to be inadequately covered by insurance actually collected or in the process of collection to restore the Underlying Collateral to its condition prior to such fire or other casualty, then the Collateral Loan shall be deemed an Ineligible Receivable pursuant to Section 4.6.3, and Borrower shall repay the Advances in such amount as may be required pursuant to Section 4.1.1(a).

5.5.    MANAGEMENT OF PROPERTY. If Borrower acquires title to the Underlying Collateral, Borrower (i) shall take all commercially reasonable steps necessary to cause the Underlying Collateral to be properly managed, maintained, repaired, and adequately insured, (ii) to the extent provided by applicable Law, shall cause all rents and other income and proceeds and other rights generated from the Underlying Collateral and any insurance proceeds to be properly collected and applied for the account and benefit of Borrower and/or Lender according to their respective interests in the Underlying Collateral, and (iii) maintain insurance on the Underlying Collateral consistent with Section 5.4. If required by Lender, Lender shall obtain, at Borrower's expense, an updated Appraisal or broker's price opinion for such Underlying Collateral and Borrower shall have paid to Lender, in addition to any other fees required under this Agreement or any of the other Loan Documents, an appraisal review fee of approximately $1,500.00, which actual amount is to be determined by Lender in its sole discretion, for review of such updated Appraisal.

5.6.    REPORTING~~REPORTING~~. Should Borrower at any time become aware of the occurrence of any loss, damage, destruction, waste, presence or release of any hazardous substance, or nuisance upon or from the Underlying Collateral, Borrower shall promptly report in writing to Lender Borrower's findings and such other information related to such occurrence as Lender may reasonably request.

5.7.    MAINTENANCE OF SECURITY INTEREST. Borrower shall perfect, and maintain the perfected status and priority, of all security for the Collateral Loans, including, but not limited to, all security interests in personal property and real property security. Without limiting the generality of the foregoing, Borrower shall cause to be filed at all appropriate locations all such financing statements as shall be required or permitted pursuant to the Collateral Loan Documents, and all continuation statements extending the financing statements.

5.8.    REPORTING AND REMITTANCE. Within thirty (30) days following the end of each calendar month, Borrower shall prepare and deliver to Lender a written report of the status of each Collateral Loan as of the end of such calendar month, which report shall include the following and all other information regarding each Collateral Loan as Lender may reasonably request from time to time: (a) the name and notice address of the Collateral Loan Obligors, and the loan number; (b) the unpaid principal amount of all advances, and all accrued and unpaid interest, on each Collateral Loan, and the date last paid and next due date; and (c) to the actual knowledge of Borrower, after due and diligent inquiry, the existence of any breach or default by Collateral Loan Obligors under the Collateral Loan Documents and, if so, any actions taken by Borrower or its servicer to enforce the Collateral Loan Documents.

5.9.    DEFAULT BY COLLATERAL LOAN OBLIGORS; THIRD PARTY CLAIMS.

5.9.1    In the event of any breach or default by any Collateral Loan Obligor in the payment or performance of any obligations under the Collateral Loan Documents, then, so long as no Event of Default shall have then occurred and be continuing, Borrower shall have the right and obligation to promptly and diligently exercise and enforce any and all rights and remedies available to Borrower under the Collateral Loan Documents and by operation of law in order to collect all indebtedness thereunder and to realize upon and liquidate all Underlying Collateral in payment thereof, including, without limitation, by commencing and pursuing to completion foreclosure, whether judicial or nonjudicial, of all liens and security interests encumbering the Underlying Collateral. Borrower shall also have the right to timely file and pursue any and all claims which the holder of the Collateral Loan Documents shall be entitled to assert against third parties as may be reasonably necessary or appropriate in order to prevent losses to the Underlying Collateral or to the Loan Collateral, including, without limitation, all claims against any title insurance company with respect to any policy of title insurance issued in connection with a Collateral Loan. All actions taken by Borrower in the exercise and enforcement of the Collateral Loan Documents shall be undertaken and carried out by Borrower at its sole expense and risk, and in full compliance with applicable Law and in a commercially reasonable manner. Borrower hereby indemnifies and shall defend and hold harmless Lender from and against any and all claims, liabilities, losses, actions, suits, proceedings, damages, and expense of whatever kind or description in connection with any and all actions taken by Borrower and its agents and attorneys in the exercise and enforcement of Borrower's rights, remedies, and obligations under this Agreement or as a result of any failure by Borrower to perform its obligations hereunder, including, without limitation, all related expenses and reasonable attorneys' fees incurred by Lender in connection with any such matters. Any and all payments, proceeds, and recoveries received and/or recovered by Borrower with respect to any and all such claims, actions and proceedings shall be paid first to Lender to the extent of the unpaid principal balance of any Collateral Loan Note which is the subject of any such matter; provided, however, Borrower shall not settle or compromise the amount of any claim, settlement, payment, or award without the prior written approval of Lender, which approval Lender may give or withhold its sole opinion and judgment.

5.9.2    Notwithstanding anything herein to the contrary, in the event that any Collateral Loan that is an Eligible Receivable becomes an Ineligible Receivable, then (i) Lender's approval of such Collateral Loan as an Eligible Receivable shall automatically

terminate, (ii) such Collateral Loan shall automatically cease to be an Eligible Receivable and shall be removed from the Borrowing Base, and (iii) Borrower shall make such repayment of the Loan as may be required pursuant to Sections 4.1.1.(a) or 4.6.3.

5.9.3   Nothing herein contained shall be construed as a waiver by Lender of any obligation or duty of Borrower hereunder or under any other Loan Documents, including, without limitation, Borrower's duty to enforce all Collateral Loan Documents in a diligent and timely manner.

5.10.   <u>CONTINUOUS AND REPLACEMENT SECURITY</u>. In the event Borrower commences a judicial or nonjudicial foreclosure action or proceeding against a Collateral Loan Obligor pursuant to the provisions of Section 5.9 above, and intends to proceed to sell or otherwise dispose, or to cause a sale or other disposition to be made, of any Underlying Collateral pursuant to any such action or proceedings in liquidation of the indebtedness under a Collateral Loan, then Borrower shall sell or cause a sale of the Underlying Collateral in accordance with applicable Law and standards of commercial reasonableness. If Borrower acquires title to the Underlying Collateral in such a sale or through the acceptance of a deed in lieu ("DIL Transaction"), then Lender's security interest under the Loan Documents shall attach to, and continue in, all such property purchased by Borrower, and all such Underlying Collateral purchased by Borrower shall automatically become and be deemed to constitute Collateral for any and all unpaid indebtedness and other obligations owing by Borrower to Lender hereunder or under the other Loan Documents, having a first lien priority and subject to the provisions of this Agreement. Notwithstanding any provision to the contrary herein contained, and without limiting the validity and effectiveness of the foregoing provisions, Borrower shall notify Lender of each such proposed sale or DIL Transaction concerning Underlying Collateral in writing at least ten (10) Business Days prior to the scheduled date of sale or DIL Transaction, and shall execute and deliver to Lender prior to such sale all such security instruments, in recordable form, as Lender shall reasonably require in order to create, continue, and perfect Lender's lien upon and security interest in such Underlying Collateral, to be effective and perfected as of the time Borrower acquires title thereto as herein provided, including, without limitation, a deed of trust and assignment of rents (or mortgage, as applicable) in form and content required by Lender, encumbering any and all interests in real property which may then be the subject of such sale or DIL Transaction ("Lender Deed of Trust"). Lender may, in its sole discretion, cause such security agreements, financing statements or Lender Deeds of Trust to be duly filed or recorded prior to, concurrently with, or subsequent to, the completion of such sale or DIL Transaction and, in the case of any sale or DIL Transaction concerning Underlying Collateral constituting interests in real property, may condition such sale or DIL Transaction and acquisition by Borrower upon the issuance of a title insurance policy to Lender, as the sole insured with respect to each Lender Deed of Trust, following Borrower's acquisition of title to said property and at Borrower's sole expense, in the amount of the then unpaid principal balance of the Collateral Loan Note secured thereby and in form and content otherwise substantially identical to the title insurance policy issued to Borrower in connection with the original Collateral Loan.

5.11.   <u>RIGHT OF ENTRY</u>. Lender and Lender's employees or agents shall have the right at all times, during business hours, upon reasonably advance notice and subject to the rights of tenants thereof, to enter upon any and all real property collateral repossessed or acquired by foreclosure or deed in lieu of foreclosure for whatever purpose Lender deems

appropriate, including, without limitation, inspection of the premises and the posting of such notices and other written or printed material thereon as Lender may deem appropriate or desirable.

5.12.   <u>ENFORCEMENT UPON EVENT OF DEFAULT</u>. Unless and until all obligations to Lender have been fully and finally satisfied and discharged (other than contingent indemnification obligations for which no claims have been asserted at the time the Loan is paid in full and the commitment of Lender to make any further Advances has been terminated (herein referred to as "Surviving Indemnity Requirements")), upon the occurrence of an Event of Default and only during the continuance thereof, Lender shall have the sole right to receive any and all payments, proceeds and recoveries under or in connection with the Collateral Loan, and Lender shall have the right to notify Collateral Loan Obligors to make all payments under the Collateral Loans to Lender. Notwithstanding the foregoing or any other provision of this Agreement to the contrary, so long as there exists no uncured Event of Default, Borrower shall have the sole and exclusive right to bill and collect all payments due under and pursuant to all Collateral Loans and otherwise to communicate in any manner or for any purpose with any Collateral Loan Obligor or guarantors under the Collateral Loans. Borrower shall observe reasonable loan servicing practices with respect to collection of such obligations in the ordinary course of its business. Borrower shall at all times diligently monitor and verify compliance by the Collateral Loan Obligor with all obligations under the Collateral Loan in accordance with reasonable loan servicing policies, practices, and procedures.

5.12.1 Lender shall have the right to take any and all other actions as Lender determines to be necessary or appropriate in order to establish and perfect its rights and interests in and to the Collateral Loan Documents and in all payments, proceeds, and recoveries thereon; provided, however, notwithstanding the foregoing or any other provision of this Agreement or applicable law to the contrary, no Assignment of Collateral Mortgage delivered by Borrower hereunder shall be recorded in the Official Records of any county unless and until there occurs an Event of Default that has not already been cured prior to such recordation.

5.12.2 In addition to any other power of attorney provided in the Loan Documents, Borrower hereby appoints Lender as Borrower's attorney in fact, with full power of substitution, to endorse and otherwise negotiate payment in any form made by Collateral Loan Obligor under the Collateral Loan to or for the account of Lender, subject to the provisions of this Agreement; provided, however, Lender shall only be entitled to exercise the appointment from and after an Event of Default and during the continuance thereof. Collateral Loan Obligor may conclusively rely upon all instructions, notices, requests for payment, and receipts given by Lender in connection with collection of the Collateral Loan.

5.12.3 In addition to any other indemnity herein provided, Borrower hereby indemnifies, releases and holds harmless Lender from and against any and all losses, damages, claims, costs, and expenses, including attorneys' fees and related costs, suffered or incurred by Lender (except if such arises as a result of Lender's gross negligence or willful misconduct) as a result of any action or proceeding taken by Lender in the collection and enforcement of the provisions of the Collateral Loan Documents as herein provided, or as a result of any nonaction by Lender in connection therewith.

## SECTION 6.
## BORROWER'S COVENANTS

In addition to anything else herein stated:

6.1. COVERAGE~~COVERAGE~~. Borrower shall maintain "all risk" business insurance providing sufficient coverage for fire and other risk or hazard, public liability insurance, product liability insurance, and such other insurance as Lender may require with respect to Borrower's properties and operations, in form, amounts, coverages and with insurance companies reasonably acceptable to Lender and in no event with general policyholder's ratings of less than A and financial ratings of not less than X as rated in the most current available Best's Insurance Reports, and licensed to do business in the State of California or, as applicable, in the state in which the subject property is located. Borrower shall deliver to Lender prior to the effective date of this Agreement, and upon request of Lender, shall thereafter deliver to Lender from time to time certificates of insurance in form, amount and coverage satisfactory to Lender (as well as a copy of the policies or declarations if requested by Lender), including a stipulation (i) promising that coverages will not be canceled or diminished without at least twenty (20) days' prior written notice to Lender or in compliance with the applicable Laws of the state in which the subject property is located and (ii) designating Lender as an additional insured and payee, and (iii) that, with respect to any coverage or payment, Lender shall be a first priority mortgagee. Each insurance policy shall also include an endorsement providing that coverage in favor of Lender will not be impaired in any way by any act, omission or default of Borrower or any other Person. In connection with all policies covering assets in which Lender holds or is offered a Security Interest for the Loan, Borrower will provide Lender with such loss payable or other endorsements as Lender may require.

6.2. INSURANCE REPORTS~~INSURANCE REPORTS~~. Borrower shall furnish to Lender, upon request by Lender, reports on each existing insurance policy showing such information as Lender may reasonably request, including without limitation the following: (i) the name of the insurer; (ii) the risks insured; (iii) the amount of the policy; (iv) the properties insured; (v) the then current property values on the basis of which insurance has been obtained, and the manner of determining those values; and (vi) the expiration date of the policy. In addition, upon request of Lender (not more often than once per calendar year), Borrower shall have an independent appraiser satisfactory to Lender determine, as applicable, the actual cash value or replacement cost of any Collateral of Borrower. The cost of such appraisal(s) shall be paid by Borrower.

6.3. LENDER MAY EXAMINE BOOKS AND RECORDS. Lender shall have the right, at any time, during business hours and upon reasonable advance notice, acting by and through its employees or agents, to examine the books, records, and accounting data of Borrower, and to make extracts therefrom or copies thereof, at Lender's sole cost and expense. Borrower shall promptly (but in no event later than two (2) Business Days after the request) make such books, records, and accounting data available to Lender, as stated above, upon written request, and at Borrower's expense, and upon like request shall promptly advise Lender, in writing, of the location of such books, records, and accounting data. Borrower shall at all times

permit Lender to review, audit and examine all such books and records, either directly or through one or more auditors designated by Lender, including independent contractors.

6.4. PAYMENT OF TAXES AND OTHER DEBT. Borrower shall pay, or cause to be paid, and discharge, or cause to be discharged, (a) before delinquency all taxes, assessments, and governmental charges or levies imposed upon it, upon its income or profits, or upon any property belonging to it (including, without limitation, the Collateral); (b) when due all lawful claims (including, without limitation, claims for labor, materials, and supplies), which, if unpaid, might become a lien, charge or encumbrance upon any of its assets or property (including, without limitation, the Collateral); and (c) all its other obligations and indebtedness when due; provided, however, that Borrower may contest any of the foregoing in good faith and by appropriate proceedings diligently prosecuted by Borrower as long as Borrower has adequate reserves to pay any adverse determination or has otherwise provided Lender evidence of a surety or bond to pay any adverse determination.

6.5. COMPLY WITH APPLICABLE LAWS. Borrower shall comply with all applicable Laws, including without limitation, all health and environmental Laws, and all other directions, orders and notices of violations issued by any Governmental Agency relating to or affecting Borrower or the Collateral. Further, Borrower shall indemnify and hold Lender harmless from the failure by Borrower to comply with such Laws to the full extent provided for herein.

6.6. PRESERVE EXISTENCE~~PRESERVE EXISTENCE~~. Borrower shall do all things reasonably necessary to preserve and keep in full force and effect Borrower's organizational status, will not change its name, and will comply with all Laws, orders and decrees of any Governmental Agency or court applicable to Borrower or to the Loan Collateral and/or the Underlying Collateral.

6.7. REPORTING REQUIREMENTS~~REPORTING REQUIREMENTS~~. So long as Borrower shall have any obligation to Lender under this Agreement and/or the Loan Documents, Borrower shall prepare, or cause to be prepared, and deliver, or cause to be delivered to Lender, Financial Statements and reports set forth on Schedule 6.7.

6.8. DISTRIBUTIONS~~DISTRIBUTIONS~~. Borrower shall not make, declare or permit any distribution to any officer, member, manager, partner or other direct or indirect beneficial owner of Borrower at any time that an Event of Default (or an event that with the giving of notice or passage of time, or both, would constitute an Event of Default of a monetary obligation of Borrower to Lender) has occurred and is continuing or if any such distribution would cause or contribute to an Event of Default (or an event that with the giving of notice or passage of time, or both, would constitute an Event of Default).

6.9. TERRORISM AND ANTI-MONEY LAUNDERING. Borrower warrants and agrees as follows:

6.9.1 As of the date hereof and throughout the term of the Loan: (i) Borrower; (ii) any Person controlled by Borrower; (iii) any Person for whom Borrower is acting as agent or nominee in connection with this transaction, is not an OFAC Prohibited Person.

6.9.2    To comply with applicable U.S. Anti-Money Laundering Laws and regulations, all payments by Borrower to Lender or from Lender to Borrower will only be made in Borrower's name and to and from a bank account of a bank based or incorporated in or formed under the laws of the United States or a bank that is not a "foreign shell bank " within the meaning of the U.S. Bank Secrecy Act (31 U.S.C. § 5311 et seq.), as amended, and the regulations promulgated thereunder by the U.S. Department of the Treasury, as such regulations may be amended from time to time.

6.9.3    To provide Lender at any time and from time to time during the term of the Loan with such information as Lender determines to be necessary or appropriate to comply with the Anti-Money Laundering Laws and regulations of any applicable jurisdiction, or to respond to requests for information concerning the identity of Borrower, or any Person controlled by Borrower, from any governmental authority, self-regulatory organization or financial institution in connection with its anti-money laundering compliance procedures, or to update such information.

6.9.4    The representations and warranties set forth in this Section 6.7 shall be deemed repeated and reaffirmed by Borrower as of each date that Lender makes an Advance to Borrower and each date that Borrower makes a payment to Lender under the Note, this Agreement and the other Loan Documents or receives any payment from Lender. Borrower agrees promptly to notify Lender in writing should Borrower become aware of any change in the information set forth in these representations.

6.10.    CHANGE OF MANAGEMENT; CHANGE OF OWNERSHIP.

6.10.1  There shall be no change in the management of Borrower without the prior written consent of Lender. If required by Lender, any additional individual who becomes part of the management of Borrower shall be required to sign a guaranty in the same form and content as the Guaranty.

6.10.2  There shall not be any change, direct or indirect, in the equity ownership of Manager without the prior written consent of Lender; provided, however, the following transfers of direct and indirect interests in Manager shall be permitted without Lender's consent or notice to Lender so long as no such transfer results in a change in control of Manager: (a) any transfer of any direct or indirect ownership interest in Manager that is listed on a nationally or internationally recognized stock exchange or stock quotation system;

(a)      (b)  any transfer of any direct or indirect interest in Manager related to or in connection with the estate planning of such transferor to (1) an immediate family member of such interest holder (or to partnerships or limited liability companies controlled by one or more of such family members) or (2) a trust established for the benefit of such immediate family members;

(b)      (c)  any transfer of any direct or indirect interest in Manager that occurs by devise or bequest or by operation of law upon the death of a natural person that was the holder of such interest; and (d) any transfer of any direct or indirect interest in Manager to any Guarantor or any Affiliate of any Guarantor or Borrower; provided, however,

5319636v65319636v13 | 100775-0094 38

at all times Mahender Makhijani shall be in charge of the day to day management of Borrower. For purposes of this Section 6.110, "transfer" shall mean any sale, transfer, lease, conveyance, alienation, pledge, hypothecation, or other disposition.

6.11.   COOPERATIONCOOPERATION. Borrower shall take any and all action reasonably requested by Lender to carry out the intent of this Agreement.

6.12.   SITE VISITS, OBSERVATIONS AND TESTING. Subject to the terms of the Collateral Loan Documents and subject to the rights of any tenants therof,thereof, Lender and its agents and representatives will have the right at any reasonable time, after giving reasonable notice to Borrower, to enter and visit any locations where the Collateral or Underlying Collateral is located for the purposes of observing the Collateral or Underlying Collateral. Lender will make reasonable efforts during any site visit, observation or testing conducted pursuant to this Section to avoid interfering with Borrower's use of the Collateral. Lender is under no duty to observe the Collateral or Underlying Collateral or to conduct tests, and any such acts by Lender will be solely for the purposes of protecting Lender's security and preserving Lender's rights under this Agreement. No site visit, observation or testing, or any report or findings made as a result thereof, will (a) result in a waiver of any default of Borrower; (b) impose any liability on Lender; or (c) be a representation or warranty of any kind regarding the Collateral or Underlying Collateral (including its condition or value or compliance with any Laws) or any environmental report (including its accuracy or completeness).

6.13.   NO TRANSFER OR FURTHER ENCUMBRANCE. Borrower shall not, without the prior written consent of Lender:

6.13.1  Create, incur, assume, permit or suffer to exist, any mortgage, deed of trust, pledge, lien, hypothecation, charge (fixed or floating), security interest or other encumbrance whatsoever on any Assets of Borrower, including, without limitation, the Collateral Loans or any interest therein, except as permitted pursuant to this Agreement; provided, however, the foregoing shall not apply to taxes, assessments or governmental charges or levies on property of Borrower, or in respect of a judgment or award against Borrower, if (i) such taxes, assessments or governmental charges are not delinquent at the time or thereafter can be paid without penalty, (ii) if Borrower shall have set aside adequate reserves therefor as determined or approved by its certified independent accounting firm, or (iii) if in the case of a judgments or award, execution on the same shall have been effectively stayed pending appeal or review or insured or bonded to the extent of Borrower's liability in respect thereof, and in the case of all of the foregoing, the same are being contested in good faith and by appropriate proceedings.

6.13.2  Transfer the Collateral, or any interest therein, except as expressly permitted under the Agreement; or

6.13.3  Change the use of the Collateral.

6.14.   NAME, FISCAL YEAR AND ACCOUNTING METHOD. Borrower will not change its name, fiscal year, or method of accounting. Borrower will not directly or indirectly engage in any business other than the business in which Borrower is engaged on the date of this

5319636v65319636v13 | 100775-0094   39

Agreement, discontinue any existing lines of business that are material to the business or operations of Borrower, or substantially alter its method of doing business.

6.15. <u>LOANS TO THIRD PERSONS; INVESTMENTS</u>. Except for unsecured loans made by Borrower to any Affiliate in the ordinary course of business or investments by Borrower in any Affiliate in the ordinary course of business, Borrower will not directly or indirectly (a) make any loan or advance to any other Person other than Borrower Loans; (b) purchase or otherwise acquire any capital stock or any securities of any other Person, any limited liability company interest or partnership interest in any other Person, or any warrants or other options or rights to acquire any capital stock or securities of any other Person or any limited liability company interest or partnership interest in any other Person; (c) make any capital contribution to any other Person; (d) otherwise invest in or acquire any interest in any other Person or establish any subsidiaries, (e) guarantee or otherwise become obligated in respect of any indebtedness of any other Person, or (f) subordinate any claim against or obligation of any other Person to Borrower to any other indebtedness of such Person.

6.16. <u>INDEBTEDNESS</u><s>INDEBTEDNESS</s>. Except as approved, in writing, by Lender, Borrower shall not assume, create, incur, or permit to exist any obligations or indebtedness in favor of any Person except trade obligations and normal accruals in the ordinary course of business not yet due and payable. Except as approved, in writing, by Lender, Borrower shall not assume, create, incur, or permit to exist any contingent liabilities, including, without limitation, contingent reimbursement obligations under letters of credit.

6.17. <u>TRANSACTIONS WITH AFFILIATES</u>. Borrower will not enter into, or cause, suffer or permit to exist, any arrangement or contract with any of its Affiliates, including, without limitation, any management contract, unless such transaction is on terms that are no less favorable to Borrower than those that could have been obtained in a comparable transaction on an arms' length basis from a Person that is not an Affiliate.

6.18. <u>OPERATING ACCOUNT</u>.

6.18.1  At all times during the term of the Loan, (i) the Operating Account shall be maintained by Borrower with Lender, (ii) Borrower shall use the Operating Account as the only operating account(s) of Borrower, and (iii) no operating accounts of Borrower shall be maintained with any Person other than Lender.

6.18.2  At all times during the term of the Loan, Borrower shall (i) deposit into the Operating Account, on a monthly or more frequent basis, any and all Net Operating Income of Borrower, and (ii) pay from the Operating Account any and all Operating Expenses of Borrower.

6.18.3  In addition to being Borrower's depository account(s) for any and all Net Operating Income of Borrower, the funds on deposit in the Operating Account shall be utilized, on a monthly basis, to pay any and all principal and/or interest payments due under the Note. Borrower shall be responsible to pay interest and principal due under the terms of the Note from sources other than the Operating Account, regardless of whether the Operating Account has been disbursed in its entirety or an Event of Default has occurred.

6.18.4  Unless and until there occurs an Event of Default (or an event that with the giving of notice or passage of time, or both, would constitute an Event of Default), the funds in the Operating Account shall be accessible to Borrower, and Borrower shall have the right to withdraw any and all sums on deposit in the Operating Account; provided, however, that there must remain on deposit in the Operating Account ~~a sum sufficient to pay the installments of principal and/or interest due under the Note in the calendar month immediately following the date of Borrower's intended withdraw or utilization of funds in the Operating Account~~ an average of $2,000,000.00, measured as of the last day of each calendar month, with the measurement for the month ending on July 31, 2025 calculated on period beginning on the Amendment No. 1 Effective Date through July 31, 2025, and each calculation thereafter based on a full calendar month.  Notwithstanding the foregoing or anything to the contrary stated in this Agreement or in any of the other Loan Documents, upon the occurrence and during the continuance of any Event of Default, any and all rights of Borrower to withdraw or otherwise utilize any or all of the funds in the Operating Account shall terminate without notice to Borrower, and, thereafter, Borrower shall have no right to withdraw or otherwise utilize funds from the Operating Account or to reduce the balance in the Operating Account in any manner or for any purpose.

6.18.5  Upon the occurrence and during the continuance of any Event of Default, Lender may continue to withdraw funds from the Operating Account to pay any amounts of principal and/or interest due and unpaid under the Note, in Lender's sole and absolute opinion and judgment, without further authorization on the part of Borrower.

6.18.6  If, with respect to the Operating Account, an automatic debit is entered to pay amounts of principal and/or interest due under the terms of the Note, but there are insufficient funds in the Operating Account to pay such amounts of principal and/or interest in full on the date such debit is entered, then Lender may, in its sole and absolute discretion, reverse such debit.

6.18.7  Borrower acknowledges that Lender has made no representation or warranty concerning the adequacy or sufficiency of the funds that may, at any time, be maintained in the Operating Account for payment of interest and/or principal on the Loan or any portion thereof.

6.18.8  On or before the Amendment No. 1 Effective Date, Borrower shall move any and all accounts associated with the Collateral Loans, any proceeds associated with the Collateral Loans and any proceeds associated with the Underlying Collateral for each of the Collateral Loans, including but not limited to reserve accounts and capital accounts into the WAB Capital Account.

6.18.9  Subsequent to the Amendment No. 1 Effective Date, after the inception of the WAB Capital Account and until the Maturity Date, Borrower shall continually transfer any and all proceeds associated with the Collateral Loans or proceeds associated with the underlying properties of the Collateral Loans, including but not limited to reserve accounts and capital accounts, into the WAB Capital Account.

For the avoidance of doubt, Operating Account and WAB Capital Account is to comprise all proceeds associated with the Collateral Loans and proceeds associated with the Underlying Collateral for the Collateral Loans.

6.19.   ENVIRONMENTAL INDEMNITY~~ENVIRONMENTAL INDEMNITY~~. Borrower does and shall at all times indemnify and hold harmless Lender against and from any and all claims, liability, suits, actions, debts, damages, costs, losses, obligations, judgments, out of pocket charges, and expenses, of every and any nature whatsoever (individually and collectively, "Losses") actually suffered or incurred by Lender in connection with the discharge of hazardous materials or hazardous waste, the presence of any hazardous materials or hazardous waste, or any violation of applicable Laws concerning hazardous materials or hazardous waste regarding or concerning any underlying real property serving as security for any Collateral Loan. Notwithstanding the foregoing, Borrower shall not be obligated to indemnify Lender against any such Losses: (a) to the extent resulting from the gross negligence or willful misconduct of Lender if such gross negligence or willful misconduct occurs during such time as Lender is a mortgagee in possession or owner of such underlying real property; or (b) to the extent any discharge of hazardous materials or hazardous waste affecting such underlying real property (whether or not the same originates or emanates from such property or contiguous real estate) first occurs after Lender is a mortgagee in possession or owner of such property, unless and to the extent such discharge is the result of the acts or omissions of Borrower whether, before or after such transfer of possession or title.

6.20.   FINANCIAL COVENANTS~~FINANCIAL COVENANTS~~. Borrower shall at all times remain in compliance with the financial and performance-related covenants set forth on Schedule 6.20, as calculated by Lender based on information and documentation actually provided to Lender by Borrower. Although Lender will formally measure compliance with each covenant at the intervals stated on Schedule 6.20, Borrower must remain in compliance with such covenants at all times they are applicable, and Lender reserves the right to declare a default under any such covenant at any time based on information otherwise available to Lender.

6.21.   NO OTHER ASSETS. Borrower shall not own any property other than Borrower Loans.

**SECTION 7.
EVENTS OF DEFAULT**

There shall be an "Event of Default" under this Agreement if:

7.1.   DEFAULT UNDER LOAN DOCUMENTS. Borrower shall fail to pay any regularly scheduled installment of principal or interest, or both, when due under the terms of the Note within five (5) Business Days of such due date; or Borrower shall fail to pay any amounts due on the Maturity Date; or Borrower shall fail to pay any other amount owing under this Agreement or any of the other Loan Documents within five (5) Business Days after written demand from Lender that the same is due; or Borrower shall fail to perform or observe any term, covenant, or agreement contained in this Agreement or in any of the other Loan Documents and failure continues uncured for thirty (30) days following delivery of written notice from Lender to Borrower; provided, however, that if such Event of Default is susceptible of cure but such cure

cannot be accomplished with reasonable diligence within said period of time, and if Borrower commences to cure such Event of Default promptly after receipt of notice thereof from Lender, and thereafter prosecutes the curing of such Event of Default with reasonable diligence, such period of time shall be extended for such period of time as may be necessary to cure such Event of Default with reasonable diligence, but not to exceed an additional forty-five (45) days. Notwithstanding the foregoing, in the event that any of Sections 7.2 through 7.15 provide for a different time period to cure such failure, or no time period at all, then such provision shall control.

7.2.    BREACH OF WARRANTY. Any warranties or representations made or agreed to be made in this Agreement or in any of the other Loan Documents are breached in any material respect or shall prove to have been false or misleading in any material respect when made. Borrower shall not be entitled to a time period to cure any such default under this section.

7.3.    LITIGATION AGAINST BORROWER. Any suit is filed against Borrower, which, if adversely determined, could substantially impair the ability of Borrower to perform any or all of its obligations under and by virtue of this Agreement or any of the other Loan Documents, unless Borrower's counsel furnishes to Lender its opinion, to the satisfaction of Lender and Lender's ~~cousen~~counsel, that, in its judgment the suit is essentially without merit.

7.4.    ACCELERATION OF OTHER DEBTS. Borrower does, or omits to do, any act, or any event occurs, as a result of which any material obligation of Borrower, including, but not limited to, the occurrence of any breach or default by Borrower under the terms of any other agreement between Lender and Borrower, whether or not arising hereunder and/or relating to Borrower's ability to perform hereunder, may be declared immediately due and payable by the holder thereof.

7.5.    BANKRUPTCY ~~BANKRUPTCY~~. Borrower fails to pay its debts as they become due, or makes an assignment for the benefit of its creditors, or admits, in writing, its inability to pay its debts as they become due, or files a petition under any chapter of the Federal Bankruptcy Code or any similar law, now or hereafter existing, or becomes "insolvent" as that term is generally defined under the Federal Bankruptcy Code, or shall in any involuntary bankruptcy case commenced against it (other than one filed by Lender) file an answer admitting insolvency or inability to pay its debts as they become due, or fails to obtain a dismissal of such case within forty-five (45) calendar days after its commencement or convert the case from one chapter of the Federal Bankruptcy Code to another chapter, or be the subject of an order for relief in such bankruptcy case, or be adjudged a bankrupt or insolvent, or has a custodian, trustee, or receiver appointed for, or has any court take jurisdiction of, its properties, or any part thereof, in any voluntary or involuntary proceeding (other than one commenced by Lender), including those for the purpose of reorganization, arrangement, dissolution, or liquidation, and such custodian, trustee, or receiver shall not be discharged, or such jurisdiction shall not be relinquished, vacated, or stayed within forty-five (45) days after the appointment.

7.6.    BORROWER STATUS~~BORROWER STATUS~~. Borrower is liquidated, dissolved, or fails to maintain its status as a going concern. Borrower shall not be entitled to a time period to cure any default based on its liquidation or dissolution.

7.7. EXECUTION LEVY~~EXECUTION LEVY~~. Execution is levied against any of the Loan Collateral or any lien creditor shall commence suit to enforce a judgment lien against the Loan Collateral, and such action or suit shall not have been bonded or shall continue unstayed for a period of forty-five (45) days or more.

7.8. ATTACHMENT~~ATTACHMENT~~. Any proceeding is brought to make any part of the Lender's commitment to make the Advances subject or liable to attachment or levy by any creditor of Borrower.

7.9. DESTRUCTION~~DESTRUCTION~~. Any part or all of the Loan Collateral is materially damaged or destroyed by fire or other casualty and the loss shall prove to be inadequately covered by insurance actually collected or in the process of collection to restore such property to its condition prior to such fire or other casualty.

7.10. JUDGMENTS~~JUDGMENTS~~. A final judgment or judgments for the payment of money shall be rendered against Borrower, unless the same shall be (A) fully covered by insurance and the issuer(s) of the applicable policies shall have acknowledged full coverage in writing within thirty (30) days of judgment or (B) vacated, stayed, bonded, paid or discharged within a period of thirty (30) days from the date of such judgment.

7.11. MISREPRESENTATION AND/OR ~~NON DISCLOSURE~~NON-DISCLOSURE. Borrower has made certain statements and disclosures in order to induce Lender to make the Loan and enter into this Agreement, and, if Borrower has made material misrepresentations or failed to disclose any material fact, Lender may treat such misrepresentation or omission as a breach of this Agreement and Borrower shall not be entitled to a time period to cure any such default.

7.12. FINANCIAL CONDITION~~FINANCIAL CONDITION~~. There is a material adverse change in Borrower's or Guarantor's financial condition.

7.13. LOANS~~LOANS~~. Other than Borrower Loans, Borrower directly or indirectly makes a loan or advance to any other Person, including, without limitation, officers, shareholders, employees, Affiliates and subsidiaries of Borrower.

7.14. CROSS DEFAULT; OTHER OBLIGATIONS. Borrower, Guarantor, or any Affiliate thereof, commits a breach or default in the payment or performance of any other indebtedness, loans or credit facilities provided by Lender to Borrower, Guarantor, any Affiliate thereof, or Borrower, Guarantor, or any Affiliate thereof, commits a breach or default in the payment or performance of any other indebtedness, loans or credit facilities provided by any third-party lender, any of which continues beyond the applicable notice and cure period.

7.15. GUARANTOR~~GUARANTOR~~. Guarantor defaults under the Guaranty or revokes or attempts to revoke the Guaranty.

7.16. DEATH OF GUARANTOR. Guarantor dies or becomes ~~legally~~ incompetent.

## SECTION 8.
## REMEDIES

Upon and during the continuance of an Event of Default Lender shall have the following remedies:

8.1.                      8.1     CEASE  PAYMENT  AND/OR  ACCELERATE. Upon, or at any time after, the occurrence of an Event of Default, Lender shall have no obligation to make any further Advances, all sums disbursed or advanced by Lender and all accrued and unpaid interest thereon shall, at the option of Lender, become immediately due and payable, and Lender shall be released from any and all obligations to Borrower under the terms of this Agreement.

8.2.   COLLATERAL           8.2   COLLATERAL. Upon, or at any time after, the occurrence of an Event of Default, Lender may, at its option, without notice to Borrower or any Affiliate of Borrower or without regard to the adequacy of the Collateral for the payment of the Loan, appoint one or more receivers of the Collateral, and Borrower hereby irrevocably consents to such appointment, with such receivers having all the usual powers and duties of receivers in similar cases, including the full power to maintain, sell, dispose and otherwise operate the Collateral upon such terms that may be approved by a court of competent jurisdiction.

8.3.                      8.3     ENFORCEMENT OF RIGHTS. Upon, or at any time after, the occurrence of an Event of Default, Lender may enforce any and all rights and remedies under the Loan Documents, and all other documents delivered in connection therewith and against any or all Collateral and may pursue all rights and remedies available at Law or in equity. In addition to all the rights and remedies of a secured party under the UCC, Lender shall have the right, at any time and without demand of performance or other demand, advertisement or notice of any kind (except the notice specified below of time and place of public or private sale) to or upon Borrower or any other person (all and each of which demand, advertisements and/or notices are hereby expressly waived to the extent permitted by law), to proceed immediately to collect, redeem, receive, appropriate, sell, or otherwise dispose of and deliver the Collateral or any part thereof in one or more lots at public or private sale or sales at Lender's offices or elsewhere at such prices and on such terms as Lender may deem commercially reasonable. The foregoing disposition(s) must be for cash or on credit or for future delivery without assumption of any credit risk by Lender, with Lender having the right to purchase all or any part of said Collateral so sold at any such sale or sales, public or private, free of any right or equity of redemption in Borrower, which right or equity is hereby expressly waived or released by Borrower. The proceeds of any such collection, redemption, recovery, receipt, appropriation, realization, sale or other disposition, after deducting all costs and expenses of every kind incurred relative thereto or incidental to the care, safekeeping or otherwise of any and all Collateral or in any way relating to the rights of Lender hereunder (including, without limitation, reasonable attorneys' fees and legal expenses, including, without limitation, an estimate of the allocated cost of Lender's in house counsel and legal staff) shall be applied first to the satisfaction of the Obligations (in such order as Lender may elect and whether or not due) and then to the payment of any amounts required by applicable Law, including Section 9610 of the UCC. Borrower shall be liable to Lender for the payment on demand of all such costs and

expenses, together with interest at the default rate set forth in the Note, together with any attorneys' fees if placed with an attorney for collection or enforcement. Borrower agrees that ten (10) days' prior notice by Lender of the date after which a private sale may take place or a public auction may be held is reasonable notification of such matters and shall be deemed commercially reasonable under the UCC.

8.4.    8.4    RIGHTS                        AND                        REMEDIES NON EXCLUSIVENON-EXCLUSIVE. In addition to the specific rights and remedies hereinabove mentioned, Lender shall have the right to avail itself of any other rights or remedies to which it may be entitled, at Law or in equity, including, but not limited to, the right to have a receiver appointed over Borrower and/or its assets, the right to realize upon any or all of its security, and to do so in any order. Furthermore, the rights and remedies set forth above are not exclusive, and Lender may avail itself of any individual right or remedy set forth in this Agreement, or available at Law or in equity, without utilizing any other right or remedy.

## SECTION 9.
## GENERAL CONDITIONS AND MISCELLANEOUS

9.1.    NONLIABILITY OF LENDER. Borrower acknowledges and agrees that by accepting or approving anything required to be observed, performed, fulfilled, or given to Lender pursuant to this Agreement or the other Loan Documents, including any certificate, Financial Statement, appraisal or insurance policy, Lender shall not be deemed to have warranted or represented the sufficiency, legality, effectiveness or legal effect of the same, or of any term, provision, or condition thereof, and such acceptance or approval thereof shall not be or constitute any warranty or representation to anyone with respect thereto by Lender.

9.2.    NO THIRD PARTIES BENEFITTED. This Agreement is made for the purpose of defining and setting forth certain obligations, rights, and duties of Borrower and Lender in connection with the Loan. It shall be deemed a supplement to each Note and the other Loan Documents, and shall not be construed as a modification of any Note or other Loan Documents, except as provided herein. It is made for the sole protection of Borrower and Lender, and Lender's successors and assigns. No other person shall have any rights of any nature hereunder or by reason hereof or the right to rely hereon.

9.3.    TIME IS OF THE ESSENCE. Time is of the essence of this Agreement and of each and every provision hereof. The waiver by Lender of any breach hereof shall not be deemed, nor shall the same constitute, a waiver of any subsequent breach or breaches.

9.4.    NOTICESNOTICES. All notices, requests, demands, directions, and other communications provided for hereunder and under any other Loan Document (a "Notice"), must be in writing and must be mailed, personally delivered, sent by facsimile or sent by electronic mail to the appropriate party at its respective address set forth below or, as to any party, at any other address as may be designated by it in a written notice sent to the other parties in accordance with this Section.

Any notice given by facsimile or electronic mail must be confirmed within forty eightforty-eight (48) hours by letter mailed or delivered to the appropriate party at its

5319636v65319636v13 | 100775-0094   46

respective address. If any notice is given by mail, it will be effective three (3) calendar days after being deposited in the mails with first-- class or overnight delivery; if given by facsimile or electronic mail when sent; or if given by personal delivery, when delivered.

Such notices will be given to the following:

To Lender:   WESTERN ALLIANCE BANK
2701 East Camelback Road, Suite 110
Phoenix, Arizona 85016
Attention: Joshua Ormiston
Email: jormiston@westernalliancebank.com

~~Email: jormiston@westernalliancebank.com~~
WESTERN ALLIANCE BANK
2701 East Camelback Road, Suite 110
Phoenix, Arizona 85016
Attention:
~~docs@westernalliancebank.com~~docs@westernalliancebank.com
and notefinancing@westernalliancebank.com

~~and notefinancing@westernalliancebank.com~~

To Borrower:   CANTOR FUND V LLC
c/o Continuum Analytics, Inc.
520 Newport Center Drive, Suite 480
Newport Beach, CA 92660
Attention: Mr. Mahender Makhajani
Email: mahender@continuumanalytics.com

~~Email:  mahender@continuumanalytics.com~~

9.5.    USA PATRIOT ACT NOTICE~~USA PATRIOT ACT NOTICE~~. Federal law requires all financial institutions to obtain, verify and record information that identifies each person who opens an account or obtains a loan. Lender will ask for Borrower's legal name, address, tax ID number or social security number and other identifying information. Lender may also ask for additional information or documentation or take other actions reasonably necessary to verify the identity of Borrower, Guarantor or other related persons. Upon request from Lender, Borrower agrees to promptly provide all such information or documentation to Lender.

9.6.    INDEMNITY BY BORROWER. Borrower hereby indemnifies and agrees to hold Lender and its directors, officers, agents, attorneys, and employees (individually and collectively, the "Indemnitee(s)") harmless for, from and against:

9.6.1   Any and all claims, demands, actions, or causes of action that are asserted against any Indemnitee by any Person if the claim, demand, action, or cause of action, directly or indirectly, relates to a claim, demand, action, or cause of action that the Person has or asserts against Borrower;

9.6.2   Any and all claims, demands, actions or causes of action that are incurred by an Indemnitee as a result of a breach of Section 3.9 of this Agreement; and

9.6.3   Any and all claims, liabilities, losses, out of pocket costs, or expenses (including court costs and reasonable attorneys' fees) that any Indemnitee actually suffers or incurs as a result of the assertion of any claim, demand, action, or cause of action specified in this Section 9.6.

9.7.   SURVIVAL OF INDEMNITY. Any indemnification or other protection provided to Lender or any of Lender's Affiliates pursuant to any Loan Document, all representations and warranties made in any Loan Document, the provisions of Section 9.6, and all other provisions of the Loan Documents that are stated to survive, shall survive repayment in full and performance of the Obligations and inure to the benefit of any Person that at any time held a right thereunder and, thereafter, its successors and permitted assigns.

9.8.   CHANGE IN LAWS. In the event of the enactment, after the date of this Agreement, of any Laws: (a) deducting from the value of property for the purpose of taxation any lien or security interest thereon; (b) imposing upon Lender the payment of the whole or any part of the taxes or assessments or charges or liens herein required to be paid by Borrower; (c) changing in any way the Laws relating to the taxation of deeds of trust or mortgages or security agreements, or debts secured by deeds of trust or mortgages or security agreements, or the interest of the mortgagee or secured party in the property covered thereby; or (d) changing the manner of collection of such taxes; then, to the extent any of the foregoing may affect the Collateral or the indebtedness secured thereby or Lender, then, and in any such event, Borrower, upon demand by Lender, shall pay such taxes, assessments, charges, or liens, or reimburse Lender therefor. If Borrower shall be prohibited from paying such tax or from reimbursing Lender for the amount thereof, Borrower shall execute a modification to the Loan Documents and the Note, which modification shall increase the interest rate payable pursuant to the Note so as to permit Lender to maintain its yield as if such tax had not been imposed. If Borrower shall be prohibited from executing the ~~above referenced~~above-referenced modifications, Lender may, in Lender's sole discretion, declare the principal of all amounts disbursed and owing under the Note, this Agreement, and the other Loan Documents (including all obligations secured by the Loan Documents) and all other indebtedness of Borrower to Lender, together with interest thereon, to be immediately due and payable, regardless of any other specified maturity or due date.

9.9.   NONRESPONSIBILITY~~NONRESPONSIBILITY~~. Lender shall in no way be liable for any acts or omissions of Borrower or Borrower's agents or employees.

9.10.   TIME IS OF THE ESSENCE. Time is of the essence of this Agreement and of each and every provision hereof. The waiver by Lender of any breach or breaches hereof shall not be deemed, nor shall the same constitute, a waiver of any subsequent breach or breaches.

9.11.   BINDING EFFECTS; ASSIGNMENT. This Agreement shall be binding upon and inure to the benefit of Borrower and Lender and their respective successors and assigns, except that Borrower may not assign its rights hereunder or any interest herein without

the prior written consent of Lender. Lender shall have the right, without the written consent of Borrower, to assign its rights under this Agreement and to grant participations in the Loan to others, but all waivers or abridgements of Borrower's obligations that may be granted from time to time by Lender shall be binding upon such assignees or participants, but any such waivers or agreements, to be effective, must be in writing and signed by Lender. In that regard, Borrower agrees that Lender may disclose to each prospective and actual transferee or participant any and all documents relating to the Loan and Borrower, provided such parties shall agree to comply with all applicable Law regarding the privacy rights of customers of Lender. Borrower shall, promptly upon demand, provide Lender or any such purchaser or participant, one or more written statements confirming Borrower's indebtedness to Lender and all obligations in connection with the Loan, including the existence of any default thereunder.

9.12.   <u>EXECUTION IN COUNTERPARTS</u>. This Agreement and any other Loan Documents, except the Note, may be executed in any number of counterparts, and any party hereto or thereto may execute any counterpart, each of which, when executed and delivered, will be deemed to be an original, and all of which counterparts of this Agreement or any other Loan Document, as the case may be, taken together will be deemed to be but one and the same instrument. The execution of this Agreement or any other Loan Document by any party or parties hereto or thereto will not become effective until counterparts hereof or thereof, as the case may be, have been executed by all the parties hereto or thereto. Delivery of an executed counterpart of a signature page of this Agreement in a Portable Document Format (PDF) or by facsimile shall be effective as delivery of a manually executed original counterpart of this Agreement. The parties agree that this Agreement, any addendum or amendment hereto or any other document necessary for the consummation of the transactions contemplated by this Agreement may be accepted, executed or agreed to through the use of an electronic signature in accordance with the E-Sign Act, UETA and any applicable state law, but only, if "wet" signatures are provided to Lender within ten (10) Business Days thereof. Any document accepted, executed or agreed to in conformity with such laws will be binding on all parties hereto to the same extent as if it were physically executed and each party hereby consents to the use of any secure third party electronic signature capture service providers with appropriate document access tracking, electronic signature tracking and document retention as may be approved by Lender in its sole discretion.

9.13.   <u>INTEGRATION; AMENDMENTS; CONSENTS</u>. This Agreement, together with the documents referred to herein constitutes the entire agreement of the parties touching upon the subject matter hereof, and supersedes any prior negotiations or agreements on such subject matter. No amendment, modification, or supplement of any provision of this Agreement or any of the other Loan Documents shall be effective unless in writing, signed by Lender and Borrower; and no waiver of any of Borrower's obligations under this Agreement or any of the other Loan Documents or consent to any departure by Borrower therefrom shall be effective unless in writing, signed by Lender, and then only in the specific instance and for the specific purpose given.

9.14.   <u>NEUTRAL INTERPRETATION</u><s>NEUTRAL INTERPRETATION</s>. This Agreement is the product of the negotiations between the parties, and in the interpretation and/or enforcement hereof is not to be interpreted more strongly in favor of one party or the other.

9.15.    COSTS, EXPENSES, AND TAXES. Borrower shall pay to Lender, on demand:

9.15.1  All actual and reasonable attorneys' fees and expenses incurred by Lender in connection with the negotiation, preparation, execution, delivery and administration of this Agreement and any other Loan Document and any matter related thereto, including, but not limited to, any and all Appraisals of any Underlying Collateral, and any and all other appraisals of or relating to any Collateral;

9.15.2  The actual third party costs and expenses of Lender in connection with the administration and enforcement of this Agreement and any other Loan Document and any matter related thereto, including the actual expenses and reasonable attorney's fees of any legal counsel, independent public accountants, and other outside experts retained by Lender and including all costs and expenses of enforcing any judgment or prosecuting any appeal of any judgment, order or award arising out of or in any way related to the Loan, this Agreement, or the Loan Documents; and

9.15.3  All actual third party costs, expenses, fees, premiums, and other charges relating to or arising from the Loan Documents or any transactions contemplated thereby or the compliance with any of the terms and conditions thereof, including, but not limited to, recording fees, filing fees, credit report fees, release or reconveyance fees, title insurance premiums, audit fees and appraisal fees.

All sums paid or expended by Lender under the terms of this Agreement shall be considered to be, and shall be, a part of the Loan. All such sums, together with all amounts to be paid by Borrower pursuant to this Agreement, shall bear interest from the date that is ten (10) Business Days following written demand to Borrower for the payment of such expenditure at the rate provided in the Note until paid, shall be secured by the Loan Documents, and shall be due and payable by Borrower within ten (10) Business Days of demand.

9.16.    SURVIVAL OF REPRESENTATIONS AND WARRANTIES. All representations and warranties of Borrower contained herein or in any and all other Loan Documents shall survive the making of the Loan and the execution and delivery of the Note, and are material and have been or will be relied upon by Lender, notwithstanding any investigation made by Lender or on behalf of Lender. For the purpose of this Agreement, all statements contained in any certificate, agreement, financial statement, appraisal or other writing delivered by or on behalf of Borrower or Guarantor pursuant hereto or to any other Loan Document or in connection with the transactions contemplated hereby or thereby shall be deemed to be representations and warranties of Borrower or Guarantor, as applicable, contained herein or in the other Loan Documents, as the case may be.

9.17.    FURTHER ASSURANCES~~FURTHER ASSURANCES~~. Borrower shall, at its sole expense and without expense to Lender, do, execute, and deliver such further acts and documents as Lender from time to time may reasonably require for the purpose of assuring and confirming unto Lender the rights hereby created or intended, now or hereafter so to be, or for

carrying out the intention or facilitating the performance of the terms of any Loan Document, or for assuring the validity of any security interest granted to Lender under the Loan Documents.

9.18.    GOVERNING LAW; JURISDICTION.

9.18.1 The Loan shall be deemed to have been made in California, and the Loan Documents shall be governed by and construed and enforced in accordance with the Laws of the State of California. If there is a lawsuit, Borrower agrees upon Lender's request to submit to the jurisdiction of the courts, state or federal, of Los Angeles County, California. Notwithstanding the foregoing, the Laws of the jurisdiction in which the Collateral for the Loan is located shall apply to the creation and perfection of security interests therein and to the exercise of remedies by Lender that pertain or concern such Collateral, including, without limitation, the foreclosure of the security interests and liens granted in such Collateral.

9.18.2 Borrower irrevocably and unconditionally agrees that it will not commence any action, litigation or proceeding of any kind or description, whether in law or equity, whether in contract or in tort or otherwise, against the Lender or any affiliate of the Lender in any way relating to this Agreement or any other Loan Document or the transactions relating hereto or thereto, in any forum other than the courts of the State of California sitting in Los Angeles County, and of the United States District Court of the Central District of California, and any appellate court from any thereof, and each of the parties hereto irrevocably and unconditionally submits to the jurisdiction of such courts and agrees that all claims in respect of any such action, litigation or proceeding may be heard and determined in such California State court or, to the fullest extent permitted by applicable law, in such federal court. Each of the parties hereto agrees that a final judgment in any such action, litigation or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law. Nothing in this Agreement or in any other Loan Document shall affect any right that the Lender may otherwise have to bring any action or proceeding relating to this Agreement or any other Loan Document against the Borrower or its properties in the courts of any jurisdiction.

9.19.    SEVERABILITY OF PROVISIONS. Any provision in any Loan Document that is held to be inoperative, unenforceable, or invalid shall be inoperative, unenforceable, or invalid without affecting the remaining provisions, and to this end the provisions of all Loan Documents are declared to be severable.

9.20.    JOINT AND SEVERAL OBLIGATIONS. If this Agreement is executed by more than one Person as Borrower, the obligations of each of such Persons hereunder shall be joint and several obligations.

9.21.    GENERAL RELEASE.

9.21.1 Borrower does hereby forever relieve, release, acquit and discharge Lender and its predecessors, successors and assigns, and their respective past and present attorneys, accountants, insurers, representatives, affiliates, partners, subsidiaries, officers, employees, directors, and shareholders, and each of them (collectively, the "Released Parties"), from any and all claims, debts, liabilities, demands, obligations, promises, acts, agreements,

costs and expenses (including, but not limited to, attorneys' fees), damages, injuries, actions and causes of action, of whatever kind or nature, whether legal or equitable, known or unknown, suspected or unsuspected, contingent or fixed, which Borrower now owns or holds or has at any time heretofore owned or held or may at any time hereafter own or hold against the Released Parties, or any of them, by reason of any acts, facts, transactions or any circumstances whatsoever occurring or existing through the date of this Agreement, including, but not limited to, those based upon, arising out of, appertaining to, or in connection with the Recitals above, the Loan Documents, the facts pertaining to this Agreement, any collateral heretofore granted to Lender or granted in connection herewith (including the Collateral), or to any other obligations of Borrower to Lender. However, the foregoing release does not apply to claims for future performance of express contractual obligations that mature after the date hereof that are owing to Borrower by Lender.

9.21.2  As to the matters released herein, Borrower expressly waives any and all rights under Section 1542 of the Civil Code of the State of California, which provides as follows:

"A general release does not extend to claims which the creditor or releasing party does not know or suspect to exist in his or her favor at the time of executing the release and that, if known by him or her would have materially affected his or her settlement with the debtor or released party."

9.21.3  Borrower expressly waives and releases any right or benefit which it has or may have under Section 1542 of the Civil Code of the State of California, and any similar law of any state, territory, commonwealth or possession of the United States, or the United States, to the full extent that it may waive all such rights and benefits pertaining to the matters released herein. In connection with such waiver and relinquishment, Borrower acknowledges that it is aware that it may hereafter discover claims presently unknown or unsuspected, or facts in addition to or different from those which it now knows or believes to be true. Nevertheless, it is the intention of Borrower through this Agreement, to fully, finally and forever release all such matters, and all claims relative thereto, which do now exist, may exist, or heretofore have existed. In furtherance of such intention, the release herein given shall be and remain in effect as a full and complete release of such matters notwithstanding the discovery or existence of any such additional or different claims or facts relative thereto.

9.21.4  In entering into the release provided for in this Agreement, Borrower recognizes that no facts or representations are ever absolutely certain; accordingly, Borrower assumes the risk of any misrepresentation, concealment or mistake, and if Borrower should subsequently discover that any fact that it relied upon in entering into this release was untrue, or that any fact was concealed from it, or that any understanding of the facts or of the law was incorrect, Borrower shall be not entitled to set aside this release by reason thereof, regardless of any claims of fraud, misrepresentation, promise made without the intention of performing it, concealment of fact, mistake of fact or law, or any other circumstances whatsoever.

9.21.5  Borrower is the sole and lawful owner of all right, title and interest in and to every claim and other matter which it purports to release herein, and it has not heretofore assigned or transferred, or purported to assign or transfer to any Person claims or

other matters herein released. Borrower shall indemnify, defend and hold Lender and each of the other Released Parties, harmless from and against any claims, liabilities, actions, causes of action, demands, injuries, costs, and expenses (including, but not limited to, attorneys' fees), based upon or arising in connection with any such prior assignment or transfer, or any such purported assignment or transfer, or any claims or other matters released herein.

9.22. Judicial Reference~~Judicial Reference~~. If any action, suit, investigation, or proceeding is filed in a court of the State of California (the "Court") by or against any party hereto in connection with any controversy, dispute or claim directly or indirectly arising out of or relating to this Agreement or the transactions contemplated hereby (whether based on contract, tort or any other theory) (each, a "Claim") and the waiver set forth in the preceding Section is not enforceable in such action or proceeding, the parties hereto agree as follows:

9.22.1 With the exception of the matters specified in subsection (b) below, any Claim will be determined by a general reference proceeding in accordance with the provisions of California Code of Civil Procedure Sections 638 through 645.1. The parties intend this Section to be specifically enforceable in accordance with California Code of Civil Procedure Section 638. Except as otherwise provided in the Loan Documents, venue for the reference proceeding will be in the state or federal court in the county or district where venue is otherwise appropriate under Applicable Law.

9.22.2 The following matters shall not be subject to a general reference proceeding: (1) non-judicial foreclosure of any security interests in real or personal property, (2) exercise of self-help remedies (including, without limitation, set-off), (3) appointment of a receiver and (4) temporary, provisional or ancillary remedies (including, without limitation, writs of attachment, writs of possession, temporary restraining orders or preliminary injunctions). This Agreement does not limit the right of any party to exercise or oppose any of the rights and remedies described in clauses (1) through (4) and any such exercise or opposition does not waive the right of any party to a reference proceeding pursuant to this Agreement.

9.22.3 Upon the written request of any party, the parties shall select a single referee, who shall be a retired judge or justice. If the parties do not agree upon a referee within ten (10) days of such written request, then, any party may request the court to appoint a referee pursuant to California Code of Civil Procedure Section 640(b). A request for appointment of a referee may be heard on an ex parte or expedited basis, and the parties agree that irreparable harm would result if ex parte relief is not granted.

9.22.4 All proceedings and hearings conducted before the referee, except for trial, shall be conducted without a court reporter, except when any party so requests, a court reporter will be used and the referee will be provided a courtesy copy of the transcript. The party making such request shall have the obligation to arrange for and pay costs of the court reporter, provided that such costs, along with the referee's fees, shall ultimately be borne by the party who does not prevail, as determined by the referee.

9.22.5 The referee may require one or more prehearing conferences. The parties hereto shall be entitled to discovery, and the referee shall oversee discovery in accordance with the rules of discovery, and may enforce all discovery orders in the same manner as any trial

court judge in proceedings at law in the State of California. The referee shall apply the rules of evidence applicable to proceedings at law in the State of California and shall determine all issues in accordance with applicable state and federal law. The referee shall be empowered to enter equitable as well as legal relief and rule on any motion which would be authorized in a trial, including, without limitation, motions for default judgment or summary judgment. The referee shall report his decision, which report shall also include findings of fact and conclusions of law.

9.22.6 The parties recognize and agree that all claims resolved in a general reference proceeding pursuant hereto will be decided by a referee and not by a jury.

[SIGNATURE PAGE TO FOLLOW]

*[Different first page link-to-previous setting changed from on in original to off in modified.]*

IN WITNESS WHEREOF, Borrower and Lender have hereunto caused this Agreement to be executed on the date first above written.

BORROWER:

CANTOR GROUP V LLC,
a Delaware limited liability company

By: Cantor Group Manager, LLC,
a Delaware limited liability company
Its: Managing Member:

~~By:~~ _____
~~Name:  Deba Shyam~~

By: _____
Name: Deba Shyam
Its: Manager

LENDER:
WESTERN ALLIANCE BANK,

an Arizona corporation

By: _____
Name: Joshua Ormiston
Title: Senior Vice President

~~5319636v6 | 100775-0094~~
*[Signature Page to Second Amended & Restated Business Loan ~~And~~and Security Agreement]*

*[Different first page setting changed from off in original to on in modified.].*

## Schedule 1

### Collateral Loan Document Package - Real Property

The following instruments and documents, in form and content required by Lender in its sole opinion and judgment, shall be included in and collectively constitute a Collateral Loan Document Package as provided and defined in the Agreement:

1.      The original Collateral Loan Note in favor of Borrower executed by Collateral Loan Obligor;

2.      An original Allonge To Promissory Note, executed by Borrower, to be attached to the Collateral Loan Note at Lender's option, and when applicable, any intervening endorsements or alonges evidencing the complete chain of ownership;

3.      An original Assignment of Mortgage executed and acknowledged by Borrower, if required by Lender, and, when applicable, any intervening assignments evidencing a complete chain of ownership;

4.      True and complete copy of all other Collateral Loan Documents executed by a Collateral Loan Obligor to and in favor of Borrower, including, without limitation:

      a.      Loan Agreement;

      b.      Deed of Trust or Mortgage (which must include an environmental indemnity);

      c.      Security Agreement (if any separate from the Deed of Trust);

      d.      Environmental Agreement, if any;

      e.      Agreement Regarding Insurance Requirements and Certificate of Insurance;

      f.      Fixture Filing;

      g.      Financing statement(s), if any;

      h.      Certified organization authorization to borrow (corporate resolution, partnership authorization, and authorization of members of limited liability company);

      i.      Any amendments and/or modifications to any of the foregoing.

5.      If requested by Lender, true and complete copies of all relevant underwriting documentation required or otherwise obtained by Borrower, including, without limitation:

*[Different first page setting changed from off in original to on in modified.].*
*[Different first page link-to-previous setting changed from on in original to off in modified.].*
~~5319636v6~~5319636v13 | 100775-0094     Schedule 1-1
[Signature Page to Business Loan And Security Agreement]

*[Different first page setting changed from off in original to on in modified.].*

  a. Collateral Loan Obligor's application for the Collateral Loan and evidence of Borrower's approval of the Collateral Loan, signed by the requisite officers or representatives of Borrower authorized to approve the same;

  b. Appraisal;

  c. Copies of the certificates or other acceptable evidence of fire, casualty and flood (if applicable) insurance;

  d. Title policy and endorsements, including mechanic's lien coverage, to the real property;

  e. Updated preliminary title report and copies of all documents described in all reported exceptions;

  f. UCC search of existing financing statements and liens;

  g. Certified copies of loan escrow instructions and recording instructions to title company;

  h. Organizational documents (articles of incorporation, articles of organization, bylaws, operating agreement, current certificate of good standing unless Collateral Loan Obligor formed within 30 days of closing the Collateral Loan);

  i. Financial statements and credit reports presenting the financial condition and credit history of the Collateral Loan Obligor;

  j. Flood search and flood insurance, if applicable for the real property;

  k. OFAC searches for each Collateral Loan Obligor; and

  l. Any other documents in the loan file requested by Lender.

*[Different first page setting changed from off in original to on in modified.].*
*[Link-to-previous setting changed from off in original to on in modified.].*

*[Different first page setting changed from off in original to on in modified.].*
*[Different first page link-to-previous setting changed from on in original to off in modified.].*

## Schedule 2

### Ineligible Receivables

Without limitation, the following shall not be included in Eligible Receivables:

(a)(a)   Any Collateral Loan that is not secured by a Collateral Mortgage with a first (1st) lien priority on underlying real property collateral;

(b)(b)   Any Collateral Loan which has incomplete loan documentation or for which any loan documentation is not fully executed;

(c)(c)   Any Collateral Loan to any Affiliate or principal of Borrower, or to any other entities where any Affiliates of Borrower or principals of Borrower are the beneficial owners;

(d)(d)   Any Collateral Loan for which the Collateral Loan Documents do not provide for the creation of a perfected first priority lien upon and/or security interest in all Underlying Collateral and are not otherwise in form and substance satisfactory to Lender in its sole opinion and judgment;

(e)(e)   Any Collateral Loan for which any executory obligation(s) remain to be performed by Borrower or any subsequent holder or assignee of the Collateral Loan Documents;

(f)(f)   Any Collateral Loan for which any levy has been made on any Underlying Collateral therefor;

(g)(g)   Any Collateral Loan on a property type that is not listed in the Advance Rate Schedule in Exhibit D attached hereto;

(h)(h)   Any Collateral Loan that has been included in the Borrowing Base for a period extending beyond its applicable Dwell Time or Maturity Restriction, whichever first occurs, as set forth in Exhibit D attached hereto, unless an extension of such time is authorized in writing by Lender;

(i)(i)   Any Collateral Loan with required payments that are more than ninety (90) days past due;

(j)(j)   Any Collateral Loan that is in default or otherwise non-performing (unless the non-performance is a required payment default of less than ninety (90) days) for any reason;

(k)(k)   Any Collateral Loan, or with respect to the Collateral Mortgage securing such Collateral Loan, that are subject to a forbearance or where judicial or non-judicial foreclosure proceedings have been commenced;

(l)(l)   Any real estate owned by the Borrower;

*[Different first page setting changed from off in original to on in modified.].*
*[Different first page link-to-previous setting changed from on in original to off in modified.].*

*[Different first page setting changed from off in original to on in modified.].*
*[Link-to-previous setting changed from on in original to off in modified.].*

(m)(m) Any Collateral Loans that are subject to a participation agreement;

(n)(n) Any Collateral Loan for which the Collateral Loan Document Package is not delivered to Lender on or before the Document Delivery Deadline;

(o)(o) Any Collateral Loan which is deemed ineligible by Lender in its reasonable discretion;

(p)(p) Any Collateral Loan that is required to be removed as part of the Borrowing Base pursuant to the terms of this Agreement; or

(q)(q) Any Collateral Loan that is secured by a leasehold interest

*[Different first page setting changed from off in original to on in modified.].*
*[Different first page link-to-previous setting changed from on in original to off in modified.].*

## Schedule 6.7

### Financial Statements and Reports

6.7.1    As soon as practicable and in any event within ten (10) Business Days after Borrower knows of the commencement of any legal action against it, except actions seeking money judgment that are fully insured or bonded, a report of the commencement of such action containing a statement signed by an authorized representative of Borrower setting forth details of such legal action and any action Borrower proposes to take with respect thereto;

6.7.2    Within ten (10) Business Days after the occurrence of any Event of Default or event which, with the giving of notice or lapse of time, or both, would constitute an Event of Default, a report regarding such Event of Default or event setting forth details and describing any action which Borrower proposes to take with respect thereto, signed by an authorized representative of Borrower;

6.7.3    Any change in name of Borrower or use of any trade names or trade styles;

6.7.4    Borrower shall provide to Lender, no later than thirty (30) days following the end of each calendar quarter, commencing with the calendar quarter ending on September 30, 2024 complete and accurate interim consolidating and consolidated Financial Statements representing the financial condition of Borrower as of the end of the immediately preceding calendar quarter, including balance sheets, income statements, sources and uses of funds, and such other supplemental reports and schedules as Lender shall require, in its sole and absolute discretion. All such interim Financial Statements may be prepared by Borrower and shall contain a certification signed by any individual providing a Financial Statement or by one or more authorized representatives of any corporation, partnership, limited liability company or other entity providing a Financial Statement, certifying to the completeness and accuracy of all information, without exception. All such interim Financial Statements shall be prepared and presented in accordance with GAAP, consistently applied, or in such other form and content as Lender may permit, in its sole and absolute discretion;

6.7.5    Borrower shall provide to Lender, by no later than May 31 of each calendar year, commencing with the calendar year ending on December 31, 2024 complete and accurate annual consolidating and consolidated Financial Statements representing the financial condition of Borrower as of the end of the immediately preceding calendar year, including balance sheets, income statements, sources and uses of funds, and such other supplemental reports and schedules as Lender shall require, in its sole and absolute discretion. All such Financial Statements shall be prepared by an independent certified public accountant acceptable to Lender, and such Financial Statements shall be audited. Such Financial Statements shall contain a certification signed by any individual providing a Financial Statement or by one or more authorized representatives of any corporation, partnership, limited liability company or other entity providing a Financial Statement, certifying to the completeness and accuracy of all information, without exception. All such Financial Statements shall be prepared and presented in accordance with GAAP, consistently applied, or in such other form and content as Lender may permit, in its sole and absolute discretion.

*[Different first page setting changed from off in original to on in modified.].*

*[Different first page setting changed from off in original to on in modified.].*
*[Link-to-previous setting changed from on in original to off in modified.].*

6.7.6   Borrower shall cause Guarantor to provide to Lender, by no later than May 31 of each calendar year, commencing with the calendar year ending on December 31, 2024 complete and accurate Financial Statements representing the financial condition of Guarantor as of the date such Financial Statements are prepared and delivered to Lender, including balance sheets, income statements, sources and uses of funds, detailed schedule of real estate of Individual Guarantor, and such other supplemental reports and schedules as Lender shall require, in its reasonable discretion.

6.7.7   Borrower shall furnish to Lender, and Borrower shall cause Guarantor to furnish to Lender, copies of all signed income tax returns (with all forms K-1 attached) of such Person(s) within the earlier of (i) thirty (30) days after they are filed with the relevant taxing authorities, or (ii) thirty (30) days after they are due to be filed with the relevant taxing authorities;

6.7.8   As soon as available, and in any event no later than thirty (30) days following the end of each calendar month, Borrower shall deliver to Lender a monthly Borrowing Base Certificate, which Borrowing Base Certificate shall be duly certified by the authorized representative of Borrower as to the completeness and accuracy of all information contained therein, without exception, and which Borrowing Base Certificate shall be accompanied by any and all other supporting documentation requested by Lender in its sole and absolute discretion;

6.7.9   Promptly upon receipt thereof, one (1) copy of any report submitted to Borrower by independent accountants engaged in connection with any annual, interim or special audit made by them of the books of Borrower;

6.7.11  As soon as available, and in any event no later than thirty (30) days following the end of each calendar quarter, commencing with the calendar quarter ending on September 30, 2024, Borrower shall deliver to Lender a quarterly portfolio loan tape covering all Borrower Loans, and which shall be accompanied by any and all other supporting documentation requested by Lender;

6.7.12  Within ten (10) Business Days of Borrower obtaining actual knowledge of (i) any written notice from any Governmental Agency concerning the violation or alleged violation of any environmental protection Laws with respect to, including any written notice of any proceeding or inquiry with respect to the presence of any hazardous materials on, the Underlying Collateral or any Loan Collateral or the migration thereof from or to other property, (ii) any and all claims made or threatened in writing by any third party against or relating to said property concerning any loss or injury resulting from hazardous materials, or (iii) any occurrence or condition on any property adjoining or in the vicinity of said property that could cause said property, or any part thereof, to be subject to any restrictions on the ownership, occupancy, transferability, or loss of the property under any Law, Borrower shall deliver to Lender a report regarding the same and setting forth in detail and describing any action which Borrower proposes to take with respect thereto, signed by an authorized representative of Borrower;

~~6.7.12~~6.7.13   Within ten (10) Business Days following Lender's written request, Borrower will also deliver to Lender such additional financial statements and information

*[Different first page setting changed from off in original to on in modified.].*

*[Different first page setting changed from off in original to on in modified.].*
*[Link-to-previous setting changed from on in original to off in modified.].*

(financial or otherwise) regarding Borrower and/or Guarantor as Lender may reasonably request from time to time. Such information must be dated no earlier than ninety (90) days prior to date provided.

*[Different first page setting changed from off in original to on in modified.].*
*[Different first page link-to-previous setting changed from on in original to off in modified.].*

**Schedule 6.20**

Financial Covenants

Borrower shall at all times remain in compliance with the financial and performance-related covenants set forth below, and shall, in connection therewith, provide Lender a Compliance Certificate in the form of Exhibit F attached hereto when required to do so by Lender:

6.20.1 <u>TOTAL NET WORTH</u>. At all times during the term of the Loan, Borrower shall maintain minimum Total Net Worth of $50,000,000.00 measured on a quarterly basis as of March 31, June 30, September 30 and December 31 of each calendar year during the term of the Loan, commencing on September 30, 2024, based upon the Financial Statements delivered by Borrower to Lender in accordance with Schedule 6.7. Borrower shall deliver to Lender any other documentation and evidence as shall be satisfactory to Lender, in Lender's sole and absolute opinion and judgment, evidencing Borrower's compliance with the minimum requirement set forth in this Section 6.20.1.

6.20.2 <u>DEBT SERVICE COVERAGE RATIO</u>.

(a)      At all times during the term of the Loan, Borrower shall maintain a Debt Service Coverage Ratio of not less than 1.50x ("DSCR Requirement"), measured on a quarterly basis as of March 31, June 30, September 30 and December 31 of each calendar year during the term of the Loan, commencing on September 30, 2024, based upon the Financial Statements delivered by Borrower to Lender in accordance with Schedule 6.7.

(b)      Should Borrower fail to meet the DSCR Requirement for any Testing Period, Borrower shall promptly deposit with Lender an amount sufficient to increase the Debt Service Coverage Ratio to 1.50 to 1.00 (when added to the EBITDA for such period) to put it in compliance with the DSCR Requirement for the applicable Testing Period (the "Shortfall Deposit"). The Shortfall Deposit shall be made within thirty (30) Business Days of written demand by Lender to Borrower. The Shortfall Deposit shall be pledged to Lender in accordance with the Loan Agreement and a security agreement to be executed by Borrower in favor of Lender, in the form of Exhibit "A", hereto, as additional collateral for the Loan. Thereafter, provided no Event of Default has occurred and is ongoing (or would exist but for notice, lapse of time, or both), if Borrower satisfies the DSCR Requirement (when measured in accordance with this Section and not including the Shortfall Deposit), Lender shall, upon the written request of Borrower, release the Shortfall Deposit to Borrower.

6.20.3 <u>LOAN DELINQUENCY</u>. At all times during the term of the Loan, Borrower shall maintain a Loan Delinquency Rate for all Collateral Loans of less than or equal to 20.0%, measured on a quarterly basis as of March 31, June 30, September 30 and December 31 of each calendar year during the term of the Loan (each a "Delinquency Testing Date"), commencing on December 31, 2024, based upon the quarterly loan tape delivered by Borrower to Lender in accordance with Section 6.7.11. In the event Borrower fails to satisfy the Loan Delinquency Rate for any Delinquency Testing Date, Borrower shall have forty-five (45) days the date Borrower's most recent financial reporting is due under Schedule 6.7 to provide an updated loan portfolio tape and balance sheet to Lender to cure such failure, which loan portfolio

*[Different first page setting changed from off in original to on in modified.].*

*[Different first page setting changed from off in original to on in modified.].*
*[Link-to-previous setting changed from on in original to off in modified.].*

tape and balance sheet shall show a Loan Delinquency Rate of less than 20.0% as determined by Lender. If Borrower fails to cure such failure within the forty-five (45) day period provided herein, it shall constitute an Event of Default. Notwithstanding the foregoing, the Collateral Loan identified as "Loan #36, 1020 Bismark Way", which is included in the Borrower Base as of the date of this Agreement, shall be excluded by Lender from the calculation of the Loan Delinquency Rate.

"Debt" means with respect to Borrower, at any time (without duplication), (a) all obligations for borrowed money; (b) all obligations evidenced by bonds, notes, debentures, or other similar instruments; (c) all obligations to pay the deferred purchase price of property or services, except trade accounts payable arising in the ordinary course of business that are not past due by more than ninety (90) days; (d) all capital lease obligations; (e) all obligations of others guaranteed by Borrower; (f) all obligations secured by property owned by Borrower, whether or not the obligations secured thereby have been assumed by Borrower or are non recourse to the credit of Borrower; (g) any other obligation for borrowed money or other financial accommodations which in accordance with GAAP, or other method of accounting acceptable to Lender, would be shown as a liability on the balance sheet of Borrower; (h) any repurchase obligation or liability with respect to accounts, chattel paper or notes receivable sold by Borrower; (i) any liability under a sale and leaseback transaction that is not a capital lease obligation; (j) any obligation arising with respect to any other transaction that is the functional equivalent of borrowing but which does not constitute a liability on the balance sheets of Borrower; (k) all payment and reimbursement obligations (whether contingent or otherwise) in respect of letters of credit, bankers' acceptances, surety or other bonds and similar instruments; and (l) all obligations to purchase, redeem, retire, defease or otherwise make any payment in respect of any equity interests in Borrower or any other Person, valued, in the case of redeemable preferred stock interests, at the greater of its voluntary or involuntary liquidation preference plus all accrued and unpaid dividends.

"Debt Service" means, for the applicable measured period, all scheduled payments of principal and interest payable by Borrower on all of its Debt, for the period measured, including, without limitation, the Note.

"Debt Service Coverage Ratio" shall mean, as of any date of determination, the ratio of (a) EBITDA to (b) Debt Service.

"EBITDA" shall mean, for any given time, (a) the sum of (i) the Net Operating Income, (b) all depreciation and amortization expenses deducted in determining the Net Operating Income, (c) interest paid on all indebtedness and monetary obligations deducted in determining Net Operating Income, (d) the aggregate amount of federal and state income taxes on or measured by income of Borrower that are deducted in determining the Net Operating Income, (e) minus the sum of all non-cash gains, non-recurring gains, and extraordinary gains increasing EBITDA deemed by Lender to be extraordinary or non-recurring, all as determined in accordance with GAAP.

"Gross Income" means, for any given time, any and all revenues, income, receipts and money received by or on behalf of, and moneys due to, Borrower, solely from Borrower's use, operation, management and/or conduct of its businesses, including, without limitation, (a) gross

*[Different first page setting changed from off in original to on in modified.].*
*[Link-to-previous setting changed from on in original to off in modified.].*

revenues derived from Borrower's operation and possession of any real property, and (b) proceeds derived from (1) accounts receivable, (2) inventory and other tangible and intangible property, (3) contract rights and other rights and assets now or hereafter owned by Borrower in connection with its business.

"Loan Delinquency Rate" shall mean the sum of all delinquent Collateral Loans over 91days past due less loan loss reserves divided by the total outstanding number of Collateral Loans.

"Net Operating Income" means, at any given time, the amount by which Gross Income exceeds Operating Expenses.

"Operating Expenses" means, at any given time, the sum of the current expenses of operation, maintenance and conducting of the businesses of Borrower, including, without limitation, wages, salaries, benefits and bonuses to personnel, the cost of goods, materials and supplies used for current business operations and maintenance, security costs, utility expenses, all taxes and assessments, including, without limitation, bond assessments, insurance premiums, trash removal, advertising, insurance premiums, rental payments for real or personal property (other than capital lease payments), and charges for the accumulation of appropriate reserves for current expenses that are not recurrent monthly but may reasonably be expected to be incurred in accordance with GAAP; provided, however, Operating Expenses shall not include the principal portion of any Debt Service, or any allowance for depreciation, renewals or replacement of capital assets or any other noncash charges.

"Total Net Worth" means, with respect to Borrower on any date of determination, (A) the sum of all amounts that would be included under capital or shareholder's equity (or any like caption) on a balance sheet of Borrower and its consolidated subsidiaries, if any, at such date, minus (B) the sum of (i) amounts owing to Borrower from any Affiliate thereof, or from officers, employees, partners, members, directors, shareholders or other Persons similarly affiliated with Borrower or any Affiliate thereof, (ii) intangible assets of Borrower and its consolidated subsidiaries, if any, and (iii) prepaid taxes and/or expenses, all on or as of such date and all without duplication as determined in accordance with GAAP.

*[Different first page setting changed from off in original to on in modified.].*

5319636v6~~5319636v13~~ | 100775-0094         Schedule ~~6.18~~ 6.20-3

*[Different first page setting changed from off in original to on in modified.].*
*[Different first page link-to-previous setting changed from on in original to off in modified.].*

<u>**EXHIBIT A**</u>

**ALLONGE AND ENDORSEMENT**

Loan Number (if applicable): _____  _____

This Allonge and Endorsement is attached to and made a physical part of that certain Promissory Note dated _____, _____, in the principal amount of _____ ($_____ _____ ($_____), made by _____, _____ ("<u>Maker</u>") in favor of _____ (the "<u>Note</u>"). The undersigned is the holder and owner of the Note.

The Note is hereby endorsed as follows:

"Pay to the order of WESTERN ALLIANCE BANK, an Arizona corporation, pursuant to the Second Amended and Restated Business Loan and Security Agreement (Revolving Line of Credit), dated as of October 28, 2024 as the same may be modified, amended or supplemented from time to time."

Dated: _____  _____

CANTOR GROUP V LLC,
a Delaware limited liability company

By: Cantor Group Manager, LLC,
a Delaware limited liability company
Its: Managing Member:

~~By:~~ _____
By: _____
Name: Deba Shyam
Its:   Manager

~~Its:    Manager~~

*[Different first page setting changed from off in original to on in modified.].*
*[Different first page link-to-previous setting changed from on in original to off in modified.].*

EXHIBIT B

COLLATERAL ASSIGNMENT OF MORTGAGE [DEED OF TRUST]

[See attached]

RECORDING REQUESTED BY
AND WHEN RECORDED, MAIL TO:

WESTERN ALLIANCE BANK
2701 East Camelback Road, Suite 110
Phoenix, Arizona 85016
Attention: Note Finance Operations

Assessor's Parcel No(s).: _____
Loan Number (if applicable): _____

RECORDING REQUESTED BY
AND WHEN RECORDED, MAIL TO:

WESTERN ALLIANCE BANK
2701 East Camelback Road, Suite 110
Phoenix, Arizona 85016
Attention: Note Finance Operations


Assessor's Parcel No(s).:_____
Loan Number (if applicable):_____

## COLLATERAL ASSIGNMENT OF MORTGAGE [DEED OF TRUST] AND RELATED LOAN DOCUMENTS

THIS COLLATERAL ASSIGNMENT OF MORTGAGE [DEED OF TRUST[1]] AND RELATED LOAN DOCUMENTS (this "Assignment") is made as of _____, _____ _____,_____, by CANTOR FUND V LLC, a Delaware ("Assignor" or "Borrower"), to WESTERN ALLIANCE BANK, an Arizona corporation ("Assignee").

1.     Granting Clause.  For value received, Assignor hereby grants, conveys, assigns and transfers to Assignee, for security purposes only, all of Assignor's right, title and interest in and to all beneficial interest under that certain [mortgage OR deed of trust] dated _____, _____, by _____ _____, _____, by _____, as grantor ("Collateral Obligor"), [to _____, as trustee,] for the benefit of Assignor, as beneficiary, which was recorded on _____, ____ _____, as Instrument No. _____, in the Official Records of _____ County, _____, and any and all amendments, modifications, renewals, supplements, extension, or revisions thereof (the "Mortgage/Deed of Trust"), together with the promissory note and other agreements, instruments and documents relating thereto (collectively referred to hereinafter as the "Pledged Documents").

2.     Secured Obligations.  This Assignment is given for the purpose of securing payment and performance of the obligations of Assignor under that certain Second Amended and Restated Promissory Note executed by Assignor, among others, and payable to the order of Assignee dated as of October 28, 2024 in the current maximum stated principal sum of $100,000,000.00 (the "Note"), that certain Second Amended and Restated Business Loan and Security Agreement (Revolving Line of Credit) executed by Assignor and Assignee dated October 28, 2024 ("Loan Agreement"), and all other agreements, instruments and documents relating thereto and any and all restatements thereof (collectively referred to hereinafter as the "Loan Documents").

---

[1]     Revise if underlying security instrument is deed of trust.

3.      Enforcement.  Assignee may exercise its rights under the Loan Agreement and this Assignment in accordance with their terms, including, without limitation, the right to succeed to all of Assignor's right, title and interest in and to all beneficial interest under the Mortgage/Deed of Trust and the Pledged Documents.

4.      Property Encumbered.  The real property encumbered by the Mortgage/Deed of Trust is described in Exhibit A attached hereto and incorporated herein by this reference.

5.      Amendments.  This Assignment may not be amended, modified or waived except with the written consent of Assignor and Assignee.

6.      Termination.  This Assignment shall terminate upon (i) the indefeasible payment in full of the indebtedness owing to Assignee under the Note, the Loan Agreement and the Loan Documents, and (ii) the termination of any and all obligations of Assignee under the Note, the Loan Agreement or any Loan Documents to make any advances or disbursements of loan proceeds or other amounts to Assignor, unless prior to the termination of the Loan Agreement, Assignee has succeeded to beneficiary's interest under the Mortgage/Deed of Trust.

7.      Attorneys' Fees.   In the event of any dispute or litigation concerning the enforcement or validity of this Assignment, the losing party shall pay all charges, costs and expenses (including attorneys' fees) incurred by the prevailing party whether or not any action or proceeding is brought relative to such dispute and whether or not such litigation is prosecuted to judgment, and including post-judgment fees and costs.

8.      Successors and Assigns.  The terms of this Assignment shall bind and inure to the benefit of the respective successors and assigns of the parties hereto.

9.      Miscellaneous.  Assignor hereby authorizes Assignee to, and Lender hereby reserves the right to (a) revise the legal description set forth in Exhibit "A" attached hereto, if required in order to correctly describe the real property encumbered by the Mortgage/Deed of Trust and subject to this Assignment, (b) insert the date of this Assignment and the dates of the Loan Documents identified in this Assignment to conform to the closing of the Loan or pledge of the Pledged Documents, and (c) insert in this Assignment the name of the Mortgage/Deed of Trust, the date of the Mortgage/Deed of Trust, and any recording information to complete the references set forth in Section 1, above.

[SIGNATURE PAGE FOLLOWS]

IN WITNESS WHEREOF, Assignor has caused this Assignment to be duly executed and delivered by its officer thereunto duly authorized as of the date first above written.

ASSIGNOR:

CANTOR GROUP V LLC,
a Delaware limited liability company

By: Cantor Group Manager, LLC,
a Delaware limited liability company
Its: Managing Member:

By: _____

By: _____
Name: Deba Shyam
Its: Manager

Its:      Manager

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of _____ )
County of _____ )

On _____, before me, _____, a Notary Public, personally appeared _____, _____ who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of Arizona that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _____

*[Different first page setting changed from off in original to on in modified.].*
*[Different first page link-to-previous setting changed from on in original to off in modified.].*

EXHIBIT A

Legal Description

[Borrower to provide legal description here]

*[Different first page setting changed from off in original to on in modified.].*
*[Different first page link-to-previous setting changed from on in original to off in modified.].*

5319636v65319636v13 | 100775-0094                       Schedule 1 Exhibit B-7

*[Different first page setting changed from off in original to on in modified.]*.
*[Different first page link-to-previous setting changed from on in original to off in modified.]*.

<u>EXHIBIT C</u>

<u>REQUEST FOR ADVANCE AND BORROWING BASE CERTIFICATE</u>

*[Different first page setting changed from off in original to on in modified.]*.
*[Different first page link-to-previous setting changed from on in original to off in modified.]*.
~~5319636v6~~5319636v13 | 100775-0094                    ~~Schedule 1~~ Exhibit C-1

*[Different first page setting changed from off in original to on in modified.].*
*[Different first page link-to-previous setting changed from on in original to off in modified.].*

<u>EXHIBIT D</u>

<u>ADVANCE RATE SCHEDULE</u>

A.      Any Eligible Receivables previously pledged to Lender pursuant to the Prior Agreement and more particularly set forth in the schedule attached hereto as Exhibit G and incorporated herein
by this reference shall be subject to the following Advance Rates:

| Property Type Category | Advance Rate[1] | Sublimits (000's) | | |
|---|---|---|---|---|
| | | Bridge / Renovation | Ground-Up Construction | Dwell Time |
| SFR Owner Occupied | N/A | N/A | N/A | N/A |
| SFR Investor | 65% LTB / 50% LTV | $100,000 | $0 | 24 |
| SFR Developer | N/A | N/A | N/A | N/A |
| CRE Multi Family | 65% LTB / 50% LTV | $100,000 | $0 | 36 |
| CRE Mixed Use | 65% LTB / 50% LTV | $100,000 | $0 | 36 |
| CRE Office | 65% LTB / 50% LTV | $60,000 | $0 | 36 |
| CRE Retail | 60% LTB / 45% LTV | $60,000 | $0 | 36 |
| CRE Industrial | 65% LTB / 50% LTV | $100,000 | $0 | 36 |
| CRE Hospitality | 55% LTB / 45% LTV | $20,000 | $0 | 36 |
| CRE Special Purpose | 65% LTB / 50% LTV | $10,000 | $0 | 36 |
| Land | N/A | N/A | N/A | N/A |

[1]LTB based upon Note's Unpaid Principal Balance. LTV based upon valuation.

(Deleted)

| Property Type Category | Advance Rate[1] | Sublimits (000's) | | |
|---|---|---|---|---|
| | | Bridge / Renovation | Ground-Up Construction | Dwell Time |
| SFR Owner Occupied | N/A | N/A | N/A | N/A |
| SFR Investor | 65% LTB / 50% LTV | $100,000 | $0 | 24 |
| SFR Developer | N/A | N/A | N/A | N/A |
| CRE Multi Family | 65% LTB / 50% LTV | $100,000 | $0 | 36 |
| CRE Mixed Use | 65% LTB / 50% LTV | $100,000 | $0 | 36 |
| CRE Office | 65% LTB / 50% LTV | $60,000 | $0 | 36 |
| CRE Retail | 60% LTB / 45% LTV | $60,000 | $0 | 36 |
| CRE Industrial | 65% LTB / 50% LTV | $100,000 | $0 | 36 |
| CRE Hospitality | 55% LTB / 45% LTV | $20,000 | $0 | 36 |
| CRE Special Purpose | 65% LTB / 50% LTV | $10,000 | $0 | 36 |
| Land | N/A | N/A | N/A | N/A |

[1]LTB based upon Note's Unpaid Principal Balance.  LTV based upon valuation.

B.      Any Eligible Receivables pledged to Lender after the date of this Agreement shall be subject to the following Advance Rates:

| Property Type Category | Advance Rate[1] | Sublimits (000's) | | | |
|---|---|---|---|---|---|
| | | Bridge / Renovation | Ground-Up Construction | Dwell Time | Maturity Restriction |
| SFR Owner Occupied | N/A | N/A | N/A | N/A | N/A |
| SFR Investor | 75% LTB / 55% LTV | $100,000 | N/A | 24 | 36 |

*[Different first page setting changed from off in original to on in modified.].*
*[Different first page link-to-previous setting changed from on in original to off in modified.].*

*[Different first page setting changed from off in original to on in modified.].*
*[Link-to-previous setting changed from on in original to off in modified.].*

| SFR Developer | N/A | N/A | N/A | N/A | N/A |
|---|---|---|---|---|---|
| CRE Multi Family | 70% LTB / 50% LTV | $100,000 | N/A | 36 | 60 |
| CRE Mixed Use[3] | 65% LTB / 50% LTV | $100,000 | N/A | 36 | 60 |
| CRE Office[2] | 60% LTB / 45% LTV | $30,000 | N/A | 36 | 60 |
| CRE Retail | 65% LTB / 50% LTV | $100,000 | N/A | 36 | 60 |
| CRE Industrial | 65% LTB / 50% LTV | $100,000 | N/A | 36 | 60 |
| CRE Hospitality | 55% LTB / 45% LTV | $60,000 | N/A | 36 | 60 |
| CRE Special Purpose | 65% LTB / 50% LTV | | N/A | 36 | 60 |
| Land | N/A | N/A | N/A | N/A | N/A |

[1]LTB based upon Note's Unpaid Principal Balance. Appraisals required at time of pledge for Borrower originated notes.
[2]CRE Office advances rates apply to new collateral pledged post-close. Existing collateral to remain at current advance rates.
[3]CRE Mixed-Use must include a minimum 51% residential SF.
[4]Individual sponsor exposure limited to 20% of line size.

(Deleted)

| Property Type Category | Advance Rate[1] | Sublimits (000's) | | | |
|---|---|---|---|---|---|
| | | Bridge / Renovation | Ground-Up Construction | Dwell Time | Maturity Restriction |
| SFR Owner Occupied | N/A | N/A | N/A | N/A | N/A |
| SFR Investor | 75% LTB / 55% LTV | $100,000 | N/A | 24 | 36 |
| SFR Developer | N/A | N/A | N/A | N/A | N/A |
| CRE Multi Family | 70% LTB / 50% LTV | $100,000 | N/A | 36 | 60 |
| CRE Mixed Use[3] | 65% LTB / 50% LTV | $100,000 | N/A | 36 | 60 |
| CRE Office[2] | 60% LTB / 45% LTV | $30,000 | N/A | 36 | 60 |
| CRE Retail | 65% LTB / 50% LTV | $100,000 | N/A | 36 | 60 |
| CRE Industrial | 65% LTB / 50% LTV | $100,000 | N/A | 36 | 60 |
| CRE Hospitality | 55% LTB / 45% LTV | $60,000 | N/A | 36 | 60 |
| CRE Special Purpose | 65% LTB / 50% LTV | | N/A | 36 | 60 |
| Land | N/A | N/A | N/A | N/A | N/A |

[1]LTB based upon Note's Unpaid Principal Balance. Appraisals required at time of pledge for Borrower originated notes.
[2]CRE Office advances rates apply to new collateral pledged post-close. Existing collateral to remain at current advance rates.
[3]CRE Mixed-Use must include a minimum 51% residential SF.
[4]Individual sponsor exposure limited to 20% of line size.

Notwithstanding the foregoing, all Advances (including any Advances on Collateral Loans made pursuant to the Prior Agreement) are subject to the following additional limitations:

1. Advances on a single Collateral Loan where the Underlying Collateral is SFR Investor and located in California shall not exceed $5,000,000.00. Advances on a single Collateral Loan where the Underlying Collateral is SFR Investor and located outside of California shall not exceed $2,500,000.00. Notwithstanding the foregoing, Advances on any single Collateral Loan where the Underlying Collateral is SFR Investor greater than $2,500,000.00 require Lender's prior written approval, which approval may be granted or withheld in Lender's sole and absolute discretion.

2. Advances on a single Collateral Loan where the Underlying Collateral is commercial real estate (CRE) shall not exceed $15,000,000.00. Notwithstanding the foregoing, Advances on any single Collateral Loan where the Underlying Collateral is commercial Real Estate greater than $10,000,000.00 require Lender's

*[Different first page setting changed from off in original to on in modified.].*

*[Different first page setting changed from off in original to on in modified.].*
*[Link-to-previous setting changed from on in original to off in modified.].*

prior written approval, which approval may be granted or withheld in Lender's sole and absolute discretion.

3. 3.   The Underlying Collateral for any Collateral Loan may not be located outside of the following states: CA, AZ, NV, MI, TX, TN and FL.

4. 4.   The aggregate Advances on any Collateral Loans made to a single underlying sponsor of a Collateral Loan Obligor shall not exceed twenty percent (20%) of the Credit Limit. Calculation of aggregate Advances to an underlying sponsor shall be in Lender's sole and absolute discretion.

EXHIBIT E

FORM OF POWER OF ATTORNEY

SPECIAL POWER OF ATTORNEY

CANTOR GROUP V LLC, a Delaware limited liability company (the "Borrower") has entered into that certain Second Amended and Restated Business Loan and Security Agreement dated as of October 28, 2024 as the same may be amended or supplemented from time to time (the "Loan Agreement"), by and between Borrower and WESTERN ALLIANCE BANK, an Arizona corporation. All capitalized terms not defined herein shall have the meanings given them in the Loan Agreement.

Borrower hereby irrevocably constitutes and appoints Western Alliance Bank and any officer or agent thereof, with full power of substitution, as its true and lawful attorney-in-fact ("Attorney in Fact") with full irrevocable power and authority in the place and stead of Borrower and in the name of Borrower or in its own name, exercisable by the Attorney in Fact in each case, for the purpose of carrying out the terms of the Loan Agreement, including without limitation, to take any and all appropriate action and execute any and all documents and instruments which may be reasonably necessary or desirable to accomplish the purposes of the Loan Agreement, to file such financing statement or statements relating to the Collateral Loans as Attorney in Fact at its option may deem appropriate, and, without limiting the generality of the foregoing, Borrower hereby gives Attorney in Fact the power and right, on behalf of Borrower, without assent by, but with notice to, Borrower, to do the following:

in the name of Borrower, or in its own name, or otherwise, to take possession of and endorse and collect any checks, drafts, notes, acceptances or other instruments for the payment of moneys due with respect to any other Collateral Loans and to file any claim or to take any other action or proceeding in any court of law or equity or otherwise deemed appropriate by Attorney in Fact for the purpose of collecting any and all such moneys due with respect to any other Collateral Loans whenever payable;

to pay or discharge taxes and Liens levied or placed on or against the Collateral Loans;

to execute, in connection with any sale of Collateral Loans, any endorsements, assignments or other instruments of conveyance or transfer;

(A) to direct any party liable for any payment under any Collateral Loans to make payment of any and all moneys due or to become due thereunder directly to Attorney in Fact or as Attorney in Fact shall direct; (B) to ask or demand for, collect, receive payment of and receipt for, any and all moneys, claims and other amounts due or to become due at any time in respect of or arising out of any Collateral Loans; (C) to sign and endorse any invoices, assignments, verifications, notices and other documents in connection with any Collateral Loans; (D) to commence and prosecute any suits, actions or proceedings at law or in equity in any court of competent jurisdiction to collect the Collateral Loans or any proceeds

thereof and to enforce any other right in respect of any Collateral Loans; (E) to defend any suit, action or proceeding brought against Borrower with respect to any Collateral Loans; (F) to settle, compromise or adjust any suit, action or proceeding described in clause (E) above and, in connection therewith, to give such discharges or releases as Attorney in Fact may deem appropriate; (G) to send "goodbye" and "hello" letters on Borrower's or subservicer's behalf, and (H) generally, to sell, transfer, pledge and make any agreement with respect to or otherwise deal with any Collateral Loans as fully and completely as though Attorney in Fact were the absolute owner thereof for all purposes, and to do, at Attorney in Fact's option and Borrower's expense, at any time, and from time to time, all acts and things which Attorney in Fact deems necessary to protect, preserve or realize upon the Collateral Loans and Attorney in Fact's interests therein and to effect the intent of the Loan Agreement, all as fully and effectively as Borrower might do.

For value received, receipt of which is hereby acknowledged, Borrower has pledged as security, and will pledge as security, to Western Alliance Bank certain Collateral Loans pursuant to the Loan Agreement and by such transactions that this Special Power of Attorney be coupled with an interest, and Borrower does hereby make and declare this Special Power of Attorney to be irrevocable by Borrower or otherwise, renouncing all right to revoke this Special Power of Attorney or to appoint any other person to perform any of the acts enumerated herein.

Borrower does hereby ratify and confirm that the Attorney in Fact may exercise any power or authority granted hereunder, irrespective of whether or not a Default has occurred under the Loan Agreement. The rights and powers of Attorney in Fact hereunder are cumulative of all other rights, remedies, and recourse of Western Alliance Bank under the Loan Agreement.

The powers conferred on Attorney in Fact hereunder are solely to protect Attorney in Fact's interests in the Collateral Loans and shall not impose any duty upon it to exercise any such powers. Attorney in Fact shall be accountable only for amounts that it actually receives as a result of the exercise of such powers, and neither it nor any of its officers, directors, employees or agents shall be responsible to Borrower for any act or failure to act hereunder, except for its or their own gross negligence or willful misconduct. Borrower hereby covenants and agrees that it will indemnify, defend, and hold harmless the Attorney in Fact and its officers acting hereunder for, from and against any and all claims, demands, or causes of action, in any way associated with or related to the acts performed under this Special Power of Attorney, *excluding any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, claims, costs, expenses, and disbursements of any kind or nature whatsoever resulting, in whole or part, from the Attorney in Fact's own gross negligence or willful misconduct.* Borrower acknowledges that the power of attorney forms a part of a contract (being this Agreement) and is security for money or for the performance of a valuable act. Lender hereby discloses that it may exercise the power of attorney for Lender's benefit, and such authority need not be exercised for Borrower's best interest.

[Signature Page Follows]

IN WITNESS WHEREOF, this instrument is executed by Borrower on this 28th day of October, 2024.

**BORROWER**:

CANTOR GROUP V LLC,
a Delaware limited liability company

By: Cantor Group Manager, LLC,
a Delaware limited liability company
Its: Managing Member:

By: _____

By:_____
Name: Deba Shyam
Its: Manager

Its:      Manager

[Borrower's Signatures must be Notarized]

**Exhibit E-3**

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

~~State of~~ )
~~County of~~ _____ )

State of _____ )
County of _____ )

On _____, before me, _____ _____, a Notary Public, personally appeared _____ ,_____ _____ who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of ~~California~~ Arizona that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _____ _____

Exhibit E-4

*[Different first page setting changed from off in original to on in modified.].*
*[Different first page link-to-previous setting changed from on in original to off in modified.].*

ACKNOWLEDGED BY
ATTORNEY-IN-FACT:


Western          Alliance          Bank,          an          Arizona          corporation


By: _____
Name:  ~~Joshua Ormiston~~
Title:  ~~Senior Vice President~~


By: _____
Name:  ~~Glenn A. Smith~~
Title:  ~~NF Operations Manager~~
By: _____
Name: _____
Title: _____


By: _____
Name: _____
Title: _____


By: _____
Name:  ~~Aaron Maciel~~
Title:  ~~Note Finance Manager~~
By: _____
Name: _____
Title: _____


By: _____
Name: _____
Title: _____


By: _____
Name: _____
Title: _____


*[Different first page setting changed from off in original to on in modified.].*
*[Different first page link-to-previous setting changed from on in original to off in modified.].*

~~5319636v6~~5319636v13 | 100775-0094          ~~Schedule 1~~ Exhibit E-5

EXHIBIT F

FORM OF COMPLIANCE CERTIFICATE

COMPLIANCE CERTIFICATE

| BORROWER: | Cantor Group V, LLC |
|---|---|
| LENDER: | Western Alliance Bank, an Arizona corporation |
| TODAY'S ~~DATE~~DATE: | ___/___/20XX |
| ~~REPORTING~~REPORTING PERIOD ENDED: | 12/31/24 |

This certificate is delivered to Lender under the Second Amended and Restated Business Loan and Security Agreement dated effective as of October 28, 2024 with any and all subsequent Loan Modifications between Borrower and Western Alliance Bank, an Arizona corporation (the "Agreement"), all the defined terms of which have the same meanings when used herein.

I hereby certify that: (a) I am, and at all times mentioned herein have been, the duly elected, qualified, and acting officer of Borrower designated below; (b) to the best of my knowledge, the financial statements of Borrower from the period shown above (the "Reporting Period") and which accompany this certificate were prepared in accordance with GAAP and present fairly the financial condition of Borrower as of the end of the Reporting Period and the results of its operations for the Reporting Period; (c) all of the representations and warranties made by Borrower in Section 3 of the Agreement are true and correct in all material respects on the date of this certificate as if made on this date; (d) a review of the Agreement and of the activities of Borrower during the Reporting Period has been made under my supervision with a view to determining Borrower's compliance with the covenants, requirements, terms, and conditions of the Agreement, and such review has not disclosed the existence during or at the end of the Reporting Period (and I have no knowledge of the existence as of the date hereof) of any Default or Event of Default, except as disclosed herein (which specifies the nature and period of existence of each Default or Event of Default, if any, and what action Borrower has taken, is taking, and proposes to take with respect to each); and (e) the calculations described herein evidence that Borrower is in compliance with the requirements of the Agreement at the end of the Reporting Period (or if Borrower is not in compliance, showing the extent of non-compliance and specifying the period of non-compliance and what actions Borrower proposes to take with respect thereto).

| Borrower - Cantor Group V, LLC | |
|---|---|
| By: | |
| Name: | Cantor Group Manager, LLC |
| Title: | Managing Member |

*[Different first page setting changed from off in original to on in modified.].*
*[Different first page link-to-previous setting changed from on in original to off in modified.].*

All financial calculations set forth herein are as of the end of the Reporting Period.

**I. I.    TANGIBLE NET WORTH (The term was defined in the Agreement, dated October 28, 2024 and the covenant threshold was specified in Section 6.20.1.)**

| The Tangible Net Worth for Cantor Group V, LLC is: | |
|---|---|
| Total Assets | $ |
| Minus: Intangible Assets | $ |
| Minus: Total Liabilities | $ |
| TANGIBLE NET WORTH | $ |
| ***REQUIRED MINIMUM*** | ***$ 50,000,000.00*** |
| In compliance? | ☐Yes ☐ No |

**II. II.    DEBT SERVICE COVERAGE RATIO (The term was defined in the Agreement, dated October 28, 2024 and the covenant threshold was specified in Section 6.20.2.)**

| Debt Service Coverage Ratio for Cantor Group V, LLC is: | |
|---|---|
| EBITDA for the previous 3 calendar months ("Quarter") | $ |
| Divided by: Debt Service (Global) – all scheduled payments of principal and interest payable by the Borrower for the Quarter | $ |
| DEBT SERVICE COVERAGE RATIO | ____ :1.00 |
| ***MINIMUM REQUIRED*** | ***1.50:1.00*** |
| In compliance? | ☐Yes ☐Yes ☐☐No |

**III. III.    MAXIMUM LOAN DELINQUENCY RATIO (The term was defined in the Agreement, dated October 28, 2024 and the covenant threshold was specified in Section 6.20.3.)**

| Loan Delinquency Ratio for Cantor Group V, LLC is: | |
|---|---|
| Total Delinquent Loans | $ |
| Less: Loan Loss Reserves | $ |
| Divided by: Total Loan Receivables | $ |
| LOAN DELINQUENCY RATIO | % |
| ***MAXIMUM PERMITTED*** | ***20.0%*** |
| In compliance? | ☐Yes ☐Yes ☐☐No |

*[Different first page setting changed from off in original to on in modified.].*
*[Different first page link-to-previous setting changed from on in original to off in modified.].*

*[Different first page setting changed from off in original to on in modified.]*.
*[Link-to-previous setting changed from on in original to off in modified.]*.

*[Different first page setting changed from off in original to on in modified.].*
*[Link-to-previous setting changed from on in original to off in modified.].*

## IV. IV.DEFAULTS OR EVENTS OF DEFAULT

Disclose nature and period of existence and action being taken in connection therewith; if none, write                                  "None":⸺⸺⸺⸺⸺⸺⸺⸺⸺⸺⸺⸺

_____

_____

_____

_____

_____

*[Different first page setting changed from off in original to on in modified.].*

5319636v65319636v13 | 100775-0094                    Exhibit F-4

## EXHIBIT G

## SCHEDULE OF INITIAL LOAN

Exhibit G-1

## COLLATERAL

**(Added graphics)**

**Monthly Settlement Report**
**Cantor Group V LLC**
**As of June 11, 2025**
**Loan Tape Date as of: 06/05/25**

| | | |
|---|---|---|
| **I. Computation of Unpaid Principal Balance** | | |
| Unpaid Principal Balance of Pledged Assets | $ | 180,099,041.25 |
| Unpaid Principal Balance of Ineligible Pledged Assets | $ | - |
| Unpaid Principal Balance of Eligible Pledged Assets | $ | 180,099,041.25 |
| | | |
| **II. Computation of Real Estate Value** | | |
| Real Estate Value of Pledged Assets | $ | 299,475,000.00 |
| Real Estate Value of Ineligible Pledged Assets | $ | - |
| Real Estate Value of Eligible Pledged Assets | $ | 299,475,000.00 |
| | | |
| **III. Computation of Borrowing Limit** | | |
| Unrestricted Advance on Eligible Assets | $ | 109,812,424.75 |
| Over Collateralization due to Property Type Sublimit | $ | - |
| Over Collateralization due to Ground-up Construction Sublimit | $ | - |
| Over Collateralization due to Sponsor Sublimit | $ | - |
| Over Collateralization due to DCCO limit | $ | - |
| Over Collateralization due to Cost Basis limit | $ | - |
| Over Collateralization due to Single Loan Limits | $ | (6,919,424.75) |
| Over Collateralization due to Commitment Limitation | $ | (4,249,500.00) |
| Total Over Collateralization | $ | (11,168,924.75) |
| Borrowing Limit | $ | 98,643,500.00 |
| | | |
| **IV. Computation of Facility Availability** | | |
| Commitment | $ | 98,643,500.00 |
| Withheld Commitment | $ | - |
| Approved but not Active | $ | - |
| Adjusted Borrowing Limit | $ | 98,643,500.00 |
| | | |
| Facility Balance | $ | 98,643,500.00 |
| | | |
| Collateral Deficiency | $ | - |
| | | |
| WAB Loan Maximum Advance to Maximum Unpaid Principal Balance (LTB) | | 53.93% |
| WAB Loan Maximum Advance to Real Estate Value (LTV) | | 32.94% |
| Borrower Loan Maximum Advance to Real Estate Value | | 61.07% |

The undersigned represents and warrants that this Borrowing Base Certificate is true and correct statement of the Borrowing Base, and that the information contained herein is true and correct in all material respects. The undersigned further represents and warrants that (i) there is no Default or Event of Default occurring or continuing under any of the Facility Documents, (ii) all representations and warranties contained in the Facility Documents are true and correct in all material respects, and (iii) all amounts reflected herein have been determined and calculated in strict compliance with the provisions of the Facility Documents and the Exhibits and Schedules thereto. Capitalized terms used herein and not otherwise defined herein shall have the meanings specified in the Facility Documents.

| Cantor Group V LLC | WAB Reviewer |
|---|---|
| Signed: | Signed: |
| Title: | Title: |

| WAB Approval | WAB Additional Approval |
|---|---|
| Signed: | Signed: |
| Title: | Title: |

(Modified graphics)

**Quarterly Asset Analysis Report**
**Cantor Group V LLC**
**As of September 30, 2024**
**Loan Tape Date as of: 09/25/2024**

| I. Computation of Unpaid Principal Balance | | |
|---|---|---|
| Unpaid Principal Balance of Pledged Assets | $ | 180,605,857.17 |
| Unpaid Principal Balance of Ineligible Pledged Assets | $ | - |
| Unpaid Principal Balance of Eligible Pledged Assets | $ | 180,605,857.17 |

| II. Computation of Real Estate Value | | |
|---|---|---|
| Real Estate Value of Pledged Assets | $ | 286,955,000.00 |
| Real Estate Value of Ineligible Pledged Assets | $ | - |
| Real Estate Value of Eligible Pledged Assets | $ | 286,955,000.00 |

| III. Computation of Borrowing Limit | | |
|---|---|---|
| Unrestricted Advance on Eligible Assets | $ | 108,167,014.30 |
| Over Collateralization due to Property Type Sublimit | $ | (1,743,500.00) |
| Over Collateralization due to Ground-up Construction Sublimit | $ | - |
| Over Collateralization due to Non-Performing Loan Sublimit | $ | - |
| Over Collateralization due to Single Loan Limits | $ | (6,123,514.30) |
| Over Collateralization due to Commitment Limitation | $ | (300,000.00) |
| Total Over Collateralization | $ | (8,167,014.30) |
| Borrowing Limit | $ | 100,000,000.00 |

| IV. Computation of Facility Availability | | |
|---|---|---|
| Commitment | $ | 100,000,000.00 |
| Withheld Commitment | $ | - |
| Approved but not Active | $ | - |
| Adjusted Borrowing Limit | $ | 100,000,000.00 |
| | | |
| Facility Balance | $ | 100,000,000.00 |
| | | |
| Availability (Adjusted Borrowing Limit Less Facility Balance) | $ | - |

| | |
|---|---|
| WAB Loan Maximum Advance to Maximum Unpaid Principal Balance (LTB) | 54.67% |
| WAB Loan Maximum Advance to Real Estate Value (LTV) | 34.85% |
| Borrower Loan Maximum Advance to Real Estate Value | 63.74% |

The undersigned represents and warrants that this Borrowing Base Certificate is true and correct statement of the Borrowing Base, and that the information contained herein is true and correct in all material respects. The undersigned further represents and warrants that (i) there is no Default or Event of Default occurring or continuing under any of the Facility Documents, (ii) all representations and warranties contained in the Facility Documents are true and correct in all material respects, and (iii) all amounts reflected herein have been determined and calculated in strict compliance with the provisions of the Facility Documents and the Exhibits and Schedules thereto. Capitalized terms used herein and not otherwise defined herein shall have the meanings specified in the Facility Documents.

| Cantor Group V LLC | WAB Reviewer |
|---|---|
| Signed: | Signed: |
| Title: Authorized Agent | Title: |

| WAB Approval | WAB Additional Approval |
|---|---|
| Signed: Larissa Kemp | Signed: Kevin Chai |
| Title: AVP 10/17/24 | Title: VP - 10/18/24 |

5319636v13 | 100775-0094

Exhibit G-3

*[Different first page setting changed from off in original to on in modified.].*

# EXHIBIT H

## RELEASE PRICES FOR PLEDGED COLLATERAL LOANS

*[Different first page setting changed from off in original to on in modified.].*
*[Different first page link-to-previous setting changed from on in original to off in modified.].*
5319636v65319636v13 | 100775-0094        Schedule 1 Exhibit H-1

*[Different first page setting changed from off in original to on in modified.].*

| (Modified graphics) Collateral Loan Borrower Name | Property Street | Property City | Property State | Release Price |
|---|---|---|---|---|
| Conejo Riverside Group LLC | 2522 S Grove Ave | Ontario | CA | $10,282,725 |
| Alessandro Group, LLC | 23750 Alessandro Blvd, "Building G, H, I" | Moreno Valley | CA | $5,238,850 |
| Alessandro Group, LLC | 23750 Alessandro Blvd," Building A, B, O, N" | Moreno Valley | CA | $4,212,450 |
| Alessandro Group, LLC | 23750 Alessandro Blvd, "Building M, L" | Moreno Valley | CA | $4,435,000 |
| Conejo Riverside Group LLC | 2460 S. Grove Ave | Ontario | CA | $2,001,000 |
| Global Premier Regency Palms Oxnard, L9 | 1020 Bismark Way | Oxnard | CA | $11,500,000 |
| Galois Group LLC | 28207 Newhall Ranch Road | Valencia | CA | $11,500,000 |
| Galois Group LLC | 28251 Newhall Ranch Road | Valencia | CA | $5,692,500 |
| Galois Group LLC | 28301 Newhall Ranch Road | Valencia | CA | $4,312,500 |
| Plaza Continental, LLC | 3700 Inland Empire Blvd | Ontario | CA | $11,500,000 |
| Chino Central Group, LLC | 12233 Central Ave | Chino | CA | $11,730,000 |
| Cedar Street Group LLC | 9826 Cedar St | Bellflower | CA | $6,325,000 |
| Century Group, LLC | 2056-2118 W Century Blvd | Inglewood | CA | $12,190,000 |
| Pioneer Group, LLC | 5663-5703 Cherry Avenue | Long Beach | CA | $17,250,000 |

The undersigned represents and warrants that this Borrowing Base Certificate is true and correct statement of the Borrowing Base, and that the information contained herein is true and correct in all material respects. The undersigned further represents and warrants that (i) there is no Default or Event of Default occurring or continuing under any of the Facility Documents, (ii) all representations and warranties contained in the Facility Documents are true and correct in all material respects, and (iii) all amounts reflected herein have been determined and calculated in strict compliance with the provisions of the Facility Documents and the Exhibits and Schedules thereto. Capitalized terms used herein and not otherwise defined herein shall have the meanings specified in the Facility Documents.

Cantor Group V LLC
Signed:
Title:

WAB Reviewer
Signed: *Alexander Falco*
Title: AVP 10/18/24

WAB Approval
Signed: *Larissa Kemp*
Title: AVP 10/17/24

WAB Additional Approval
Signed: *Kevin Chai*
Title: VP - 10/18/24

*[Different first page setting changed from off in original to on in modified.].*

*[Different first page setting changed from off in original to on in modified.].*

# (Deleted)

# EXHIBIT B

## (Exhibit H to the Loan Agreement)

## RELEASE PRICES FOR PLEDGED COLLATERAL LOANS

| Collateral Loan Number | Collateral Loan Borrower Name | Property Street | Property City | Property State | Release Price |
|---|---|---|---|---|---|
| 26 | Conejo Riverside Group LLC | 2522 S Grove Ave | Ontario | CA | $10,282,725 |
| 32 | Alessandro Group, LLC | 23750 Alessandro Blvd, "Building G, H, I" | Moreno Valley | CA | $5,288,850 |
| 33 | Alessandro Group, LLC | 23750 Alessandro Blvd," Building A, B, O, N" | Moreno Valley | CA | $4,212,450 |
| 34 | Alessandro Group, LLC | 23750 Alessandro Blvd, "Building M, L" | Moreno Valley | CA | $4,485,000 |
| 35 | Conejo Riverside Group LLC | 2460 S. Grove Ave | Ontario | CA | $2,001,000 |
| 36 | Global Premier Regency Palms Oxnard, LP | 1020 Bismark Way | Oxnard | CA | $11,500,000 |
| 37 | Galois Group LLC | 28207 Newhall Ranch Road | Valencia | CA | $11,500,000 |
| 38 | Galois Group LLC | 28251 Newhall Ranch Road | Valencia | CA | $5,692,500 |
| 39 | Galois Group LLC | 28301 Newhall Ranch Road | Valencia | CA | $4,312,500 |
| 43 | Plaza Continental, LLC | 3700 Inland Empire Blvd | Ontario | CA | $11,500,000 |
| 44 | Chino Central Group, LLC | 12233 Central Ave | Chino | CA | $11,730,000 |
| 45 | Cedar Street Group LLC | 9826 Cedar St | Bellflower | CA | $6,325,000 |
| 48 | Century Group, LLC | 2056-2118 W Century Blvd | Inglewood | CA | $12,190,000 |
| 49 | Pioneer Group, LLC | 5663-5703 Cherry Avenue | Long Beach | CA | $17,250,000 |

5538798v10 | 100775-0094

12

**EXHIBIT C**

**(Form of Amended Note)**

**[see attached]**

**SECOND AMENDED AND RESTATED PROMISSORY NOTE**

**$~~100,000,000.00~~98,643,500.00**        PHOENIX, ARIZONA                        October 28, 2024, as amended July 18, 2025

FOR VALUE RECEIVED, CANTOR GROUP V LLC, a Delaware limited liability company ("Borrower"), promises to pay to WESTERN ALLIANCE BANK, an Arizona corporation ("Lender"), or to its order, at its office located at 2701 East Camelback Road, Suite #110, Phoenix, Arizona 85016, or at such other place as the holder hereof may designate, in lawful money of the United States of America, in cash or immediately available funds acceptable to the holder hereof, the principal sum of ~~ONE HUNDRED~~NINETY EIGHT MILLION, SIX HUNDRED FORTY THREE THOUSAND, FIVE HUNDRED AND NO/100 Dollars ($~~100,000,000.00~~98,643,500.00) or so much thereof as shall have been advanced and is outstanding together with interest, on the outstanding principal balance, until paid in full in accordance with the terms, conditions and provisions as hereinafter set forth in this Second Amended and Restated Promissory Note (this "Note").

**LOAN AGREEMENT**. This Note is the "Note" as defined in that certain Second Amended and Restated Business Loan and Security Agreement (Revolving Line of Credit) (the "Loan Agreement"), dated October 28, 2024, entered into by and between Borrower and Lender, as it may have been amended from time to time (including, without limitation, by First Amendment to Second Amended and Restated Business Loan and Security Agreement (Revolving Line of Credit) and Loan Documents and Limited Waiver, dated as of July 18, 2025 (the "Amendment No. 1 Effective Date"), and is subject to all of the terms and conditions thereof. All terms not defined herein shall have the same meaning as in the Loan Agreement. In the event of a conflict between the terms of this Note and the Loan Agreement, the terms of this Note shall prevail.

**ADVANCES**. Advances hereunder shall be made in accordance with the Loan Agreement and may be made by Lender at the written request of Borrower. Any such Advance shall be conclusively presumed to have been made to or for the benefit of Borrower when made in accordance with such requests and directions, or when said Advances are deposited into or credited to the account(s) of Borrower with Lender.

**INTEREST RATE**. Interest on the outstanding principal balance of this Note shall be computed and calculated based upon a three hundred sixty (360)-day year and actual days elapsed and shall accrue at the per annum rate (the "Note Rate") equal to the greater of (i) six and one-half of one percent (6.50%) (the "Floor") or (ii) the Prime Rate, as the same may change from time to time. Borrower acknowledges that it understands that the calculation of interest based on the foregoing method will result in a higher effective rate of interest than if calculated on a three hundred sixty-five (365)-day year.

"Prime Rate" means the rate of interest most recently quoted in The Wall Street Journal, Money Rates Section, as the "U.S. Prime Rate". Any change in the Prime Rate shall become effective as of the same date of any such change. The Prime Rate is not necessarily the lowest rate charged by Lender on its loans and is set by Lender in its sole and absolute discretion.

If Lender determines (which determination shall be conclusive absent manifest error) that the Prime Rate ceases to exist or is no longer available in the Money Rates Section of The Wall Street Journal, then commencing on the next reset date, the "Prime Rate" shall mean the rate of interest per annum announced by Lender as its prime rate in effect at its principal office in the State of Arizona (such Lender announced Prime Rate not being intended to be the lowest rate of interest charged by Lender on its loans and is set by Lender in its sole and absolute discretion).

Notwithstanding the foregoing, and pursuant to the terms of the Loan Agreement, should the Compensating Balance Requirement (as defined in the Loan Agreement) fail to be maintained on any date during any calendar quarter (i.e., calendar quarters ending March 31, June 30, September 30 and December 31) during the term of the Loan ("Quarter"), commencing with the Quarter ending September 30, 2024, and continuing through the Quarter ending December 31, 2024, the interest rate that is applicable on the Note during the next Quarter shall automatically be increased by one-quarter of one percent (0.25%) ("Initial Increased Spread") over the interest rate that would otherwise be applicable on the Note for such Quarter had the Compensating Balance Requirement been satisfied. Commencing with the Quarter ending March 31, 2025, and continuing through each Quarter thereafter during the term of the Loan, should the Compensating Balance Requirement fail to be maintained on any date during any Quarter, the interest rate that is applicable on the Note during the next Quarter shall automatically be increased by three-quarters of one percent (0.75%) ("Additional Increased Spread", and together with the Initial Increased Spread, individually and collectively, the "Increased Spread") over the interest rate that would otherwise be applicable on the Note for such Quarter had the Compensating Balance Requirement been satisfied. For the avoidance of doubt, in any Quarter that the Compensating Balance Requirement is satisfied, Borrower will not be charged the Increased Spread on the applicable Note Rate in the next succeeding Quarter. In any Quarter that the Compensating Balance Requirement is not satisfied, Borrower will be charged the Increased Spread on the applicable Note Rate for the next succeeding Quarter.

**PRINCIPAL AND INTEREST PAYMENTS.** Commencing on November 10, 2024, and continuing on the same day of each and every calendar month thereafter ~~(each a "Payment Date") until the Maturity Date (as defined hereinafter),~~through and including the payment due on August 10, 2025 (the "Interest-Only Period") Borrower shall pay to Lender interest ~~due~~only, in arrears, based upon the actual number of days elapsed for ~~that~~each applicable monthly period.

~~In the event the Loan is converted to a term loan pursuant to Section 4.13 of the Loan Agreement, then:~~

~~(a)~~    Commencing on the first ~~Payment Date~~payment date immediately following the ~~Conversion Date (as defined in the Loan Agreement)~~Interest-Only Period, and continuing on the same day of each and every calendar month thereafter until the Maturity Date (as ~~extended pursuant to Section 4.13 of the Loan Agreement~~defined hereinafter), Borrower shall pay to Lender monthly installment payments of principal and interest in an amount sufficient to fully amortize the outstanding principal balance of this Note over a one hundred twenty (120) month period (measured for a 120 month period commencing as of the Conversion Date), and calculated using the Note Rate; and

(b) ~~In addition to the monthly installment payments of principal and interest, as set forth in clause (a) above, on the first Payment Date following the first full three (3) month period after Conversion Date and continuing on the same day of each three (3) month period thereafter, Borrower shall pay to Lender quarterly installment payments of principal, each in an amount equal to the difference between the principal amount that has been paid to Lender during the three (3) month period prior to the required quarterly installment of principal and twelve and one half of one percent (12.50%) of the outstanding principal balance of this Note as of the Conversion Date.~~

Upon the Maturity Date, the entire unpaid obligation outstanding under this Note, the Loan Agreement and any other Loan Documents shall become due and payable in full.

All payments due hereunder, including payments of principal and/or interest, shall be made to Lender in United States Dollars and shall be in the form of immediately available funds acceptable to the holder of this Note.

**APPLICATION OF PAYMENTS.** All payments received by Lender from, or for the account of Borrower, due hereunder shall be applied by Lender, in the following manner, while a Default exists, or in any other order or manner as Lender chooses in its sole and absolute discretion:

First. To pay any and all interest due, owing and accrued;

Second. To pay any and all actual out of pocket third party costs, advances, expenses or fees, including, without limitation, reasonable attorney's fees, due, owing and payable to Lender, or paid or incurred by Lender, arising from or out of this Note, the Loan Agreement, and the other Loan Documents; and

Third. To pay the outstanding principal balance on this Note.

All records of payments received by Lender shall be maintained at Lender's office, and the records of Lender shall, absent manifest error, be binding and conclusive upon Borrower. The failure of Lender to record any payment or expense shall not limit or otherwise affect the obligations of Borrower under this Note.

**MATURITY DATE**. On ~~October 1~~May 16, 2026 ("Maturity Date"), the entire unpaid principal balance, and all unpaid accrued interest thereon, and all fees, costs, expenses, and other amounts, shall be due and payable without demand or notice, subject to acceleration as provided in this Note. In the event that Borrower does not pay this Note in full on the Maturity Date then, as of the Maturity Date and thereafter until paid in full, the interest accruing on the outstanding principal balance hereunder shall be computed, calculated and accrued on a daily basis at the Default Rate (as defined hereinafter). ~~The Maturity Date may be extended pursuant to Section 4.13 of the Loan Agreement.~~

**UNPAID INTEREST, CHARGES AND COSTS**. Interest, late charges, costs or expenses that are not received by Lender within ten (10) Business Days following written notice from Lender that such interest, late charges, costs, or expenses are due, shall, at the sole discretion of Lender,

~~5319503v5~~5319503v10 | 100775-0094                    3

be added to the principal balance and shall from the date of such notice bear interest at the Default Rate until paid.

**HOLIDAY**. Whenever any payment to be made under this Note shall be due on a day other than a Business Day, then the due date for such payment shall be automatically extended to the next succeeding Business Day, and such extension of time shall in such cases be included in the computation of the interest portion of any payment due hereunder.

**NO OFFSETS OR DEDUCTIONS**. All payments under this Note shall be made by Borrower without any offset, decrease, reduction or deduction of any kind or nature whatsoever, including, but not limited to, any decrease, reduction or deduction for, or on account of, any offset, present or future taxes, present or future reserves, imposts or duties of any kind or nature, that are imposed or levied by or on behalf of any government or taxing agency, body or authority by or for any municipality, state or country. If at any time, present or future, Lender shall be compelled, by any Law, rule, regulation or any other such requirement which on its face or by its application requires or establishes reserves, or payment, deduction or withholding of taxes, imposts or duties, to act such that it causes or results in a decrease, reduction or deduction (as described above) in payment received by Lender, then Borrower shall pay to Lender such additional amounts, as Lender shall deem necessary and appropriate, such that every payment received under this Note, after such decrease, reserve, reduction, deduction, payment or required withholding, shall not be reduced in any manner whatsoever.

**DEFAULT**. An Event of Default under the Loan Agreement shall constitute a default under this Note (hereinafter "Default").

**REMEDIES**. Upon, or at any time after, the occurrence of a Default, Lender may, in its sole and absolute discretion, declare the entire unpaid principal balance, together with all accrued and unpaid interest thereon, and all other amounts and payments due hereunder, immediately due and payable without notice or demand.

**DEFAULT RATE**. From and after a Default in this Note, and during the continuance thereof, whether by non-payment, maturity, acceleration, non-performance or otherwise, and until such Default has been cured, or waived by Lender in its sole and absolute discretion, all outstanding amounts under this Note (including, but not limited to, interest, actual out of pocket costs and late charges) shall bear interest at a per annum rate equal to five percent (5%) over the Note Rate ("Default Rate"). Borrower acknowledges and agrees that (i) the Default Rate is not a penalty; (ii) the Default Rate is intended to compensate Lender for the internal administrative costs and expenses incurred by Lender for a defaulted loan (including, for example, staff costs arising from internal and regulatory reporting of delinquencies, additional underwriting analysis, in-house legal review, and credit committee reviews) over and above the economic costs associated with the loss of use of money and out of pocket costs otherwise subject to reimbursement pursuant to this Note and the other Loan Documents; (iii) the amount of the Default Rate is a reasonable forecast of just compensation for the harm caused due to the Default; and (iv) the actual damage resulting from an Default is incapable or very difficult of accurate estimation.

**PREPAYMENT**. Borrower shall have the right at any time, and from time to time, following prior or contemporaneous written notice to Lender, to prepay all or any portion of the principal

amount outstanding on the Note, without premium or penalty. Any partial prepayment shall not result in a re-amortization, deferral, postponement, suspension, or waiver of any other payments due under this Note.

**LATE CHARGES**. Time is of the essence for all payments and other obligations due under this Note. Borrower acknowledges that if any regularly scheduled payment required under this Note (excluding the balloon payment due on the Maturity Date) is not received by Lender within ten (10) calendar days after the same becomes due and payable, Lender will incur extra administrative expenses (i.e., in addition to expenses incident to receipt of timely payment) and the loss of the use of funds in connection with the delinquency in payment. Because, from the nature of the case, the actual damages suffered by Lender by reason of such administrative expenses and loss of the use of funds would be impracticable or extremely difficult to ascertain, Borrower agrees that five percent (5%) of the amount of the delinquent payment, together with interest accruing on the entire principal balance of this Note at the Default Rate, as provided above, shall be the amount of damages which Lender is entitled to receive upon Borrower's failure to make a payment of principal or interest when due, in compensation therefor. Therefore, Borrower shall, in such event, within ten (10) Business Days following demand from Lender, pay to Lender, as Lender's monetary recovery for such extra administrative expenses and loss of use of funds, liquidated damages in the amount of five percent (5%) of the amount of the delinquent payment (in addition to interest at the Default Rate as provided above). The provisions of this paragraph are intended to govern only the determination of damages in the event of a breach in the performance of Borrower to make timely payments hereunder. Nothing in this Note shall be construed as in any way giving Borrower the right, express or implied, to fail to make timely payments hereunder, whether upon payment of such damages or otherwise. The right of Lender to receive payment of such liquidated and actual damages, and receipt thereof, are without prejudice to the right of Lender to collect such delinquent payments and any other amounts provided to be paid hereunder or under any of the Loan Documents, or to declare a default hereunder or under any of the Loan Documents.

**COSTS AND EXPENSES**. Borrower hereby agrees to pay any and all actual third party out of pocket costs or expenses paid or incurred by Lender by reason of, as a result of, or in connection with, the enforcement of this Note or any other Loan Documents, including, but not limited to, any and all actual and reasonable out of pocket attorneys' fees and related costs whether such costs or expenses are paid or incurred in connection with the enforcement of this Note and the other Loan Documents, or any of them, the protection or preservation of any collateral or security for this Note, or any other rights, remedies, or interests of Lender, whether or not suit is filed. Borrower's agreement to pay any and all such actual third party out of pocket costs and expenses includes, but is not limited to, actual out of pocket costs and expenses incurred in, or in connection with, any bankruptcy proceeding, in enforcing any judgment obtained by Lender, and in connection with any and all appeals therefrom, and in connection with the monitoring of any bankruptcy proceeding and its effect on Lender's rights and claims for recovery of the amounts due hereunder, any proceeding concerning relief from the automatic stay, use of cash collateral, proofs of claim, approval of a disclosure statement, or confirmation of, or objections to confirmation of, any plan of reorganization. All such actual out of pocket costs and expenses are due and payable to Lender by Borrower within ten (10) Business Days of demand.

**WAIVERS**. Borrower hereby waives grace, diligence, presentment, demand, notice of demand, dishonor, notice of dishonor, protest, notice of protest, any and all exemption rights against the indebtedness evidenced by this Note and the right to plead any statute of limitations as a defense to the repayment of all or any portion of this Note, and interest thereon, in each case to the fullest extent allowed by law, and all compensation of cross demands, to the fullest extent allowed by law. No delay, omission or failure on the part of Lender in exercising any right or remedy hereunder shall operate as a waiver of such right or remedy or any other right or remedy of Lender.

**MAXIMUM LEGAL RATE**. This Note is subject to the express condition that at no time shall Borrower be obligated, or required, to pay interest on the principal balance at a rate which could subject Lender to either civil or criminal liability as a result of such rate being in excess of the maximum rate which Lender is permitted to charge. If, by the terms of this Note, Borrower is, at any time, required or obligated to pay interest on the principal balance at a rate in excess of such maximum rate, then the rate of interest under this Note shall be deemed to be immediately reduced to such maximum rate and interest payable hereunder shall be computed at such maximum rate and any portion of all prior interest payments in excess of such maximum rate shall be applied, or shall retroactively be deemed to have been payments made, in reduction of the principal balance, as the case may be.

**AMENDMENT; GOVERNING LAW**. This Note may be amended, changed, modified, terminated or canceled only by a written agreement signed by the party against whom enforcement is sought for any such action. This Note shall be governed by, and construed under the Laws of the State of California

**AUTHORITY**. Borrower, and each person executing this Note on Borrower's behalf, hereby represents and warrants to Lender that, by its execution below, Borrower has the full power, authority and legal right to execute and deliver this Note and that the indebtedness evidenced hereby constitutes a valid and binding obligation of Borrower without exception or limitation. In the event that this Note is executed by more than one person or entity, the liability hereunder shall be joint and several. Any married person who is obligated on this Note, directly or indirectly, agrees that recourse may be had to such person's separate property in addition to any and all community property of such person.

**USA PATRIOT ACT NOTICE**. Federal law requires all financial institutions to obtain, verify and record information that identifies each person who opens an account or obtains a loan. Lender will ask for Borrower's legal name, address, tax ID number or social security number and other identifying information. Lender may also ask for additional information or documentation or take other actions reasonably necessary to verify the identity of Borrower, Guarantor or other related persons. Upon request from Lender, Borrower agrees to promptly provide all such information or documentation to Lender.

**AMENDED AND RESTATED NOTE**. This Note amends, restates, supersedes and replaces in its entirety that certain Promissory Note dated as of February 14, 2022 made in the original principal amount of ONE HUNDRED MILLION AND NO/100 Dollars ($100,000,000.00), by the undersigned payable to the Lender (the "Prior Note"); provided, however, (i) the execution and delivery by the undersigned of this Note shall not, in any manner or circumstance, be

5319503v5 5319503v10 | 100775-0094                                6

deemed to be a payment of, a novation of or to have terminated, extinguished or discharged any of the undersigned's indebtedness evidenced by the Prior Note, all of which indebtedness shall continue under and shall hereinafter be evidenced and governed by this Note, and (ii) any and all Collateral securing the Prior Note shall continue to secure this Note.

[SIGNATURE PAGE FOLLOWS]

IN WITNESS WHEREOF, Borrower has executed this Note as of the day and year first above written.

BORROWER:

CANTOR GROUP V LLC,
a Delaware limited liability company

By: Cantor Group Manager, LLC,
a Delaware limited liability company
Its: Managing Member

By: _____

Name: Deba Shyam

Its:     Manager

## SCHEDULE 10B

## (New Collateral Loans)

**[see attached]**

| Monthly Settlement Report<br>Cantor Group V LLC<br>As of June 11, 2025<br>Loan Tape Date as of: 06/05/25 | | |
|---|---|---|
| **I.    Computation of Unpaid Principal Balance** | | |
| Unpaid Principal Balance of Pledged Assets | $ | 180,099,041.25 |
| Unpaid Principal Balance of Ineligible Pledged Assets | $ | - |
| Unpaid Principal Balance of Eligible Pledged Assets | $ | 180,099,041.25 |
| | | |
| **II.    Computation of Real Estate Value** | | |
| Real Estate Value of Pledged Assets | $ | 299,475,000.00 |
| Real Estate Value of Ineligible Pledged Assets | $ | - |
| Real Estate Value of Eligible Pledged Assets | $ | 299,475,000.00 |
| | | |
| **III.    Computation of Borrowing Limit** | | |
| Unrestricted Advance on Eligible Assets | $ | 109,812,424.75 |
| Over Collateralization due to Property Type Sublimit | $ | - |
| Over Collateralization due to Ground-up Construction Sublimit | $ | - |
| Over Collateralization due to Sponsor Sublimit | $ | - |
| Over Collateralization due to DCCO limit | $ | - |
| Over Collateralization due to Cost Basis limit | $ | - |
| Over Collateralization due to Single Loan Limits | $ | (6,919,424.75) |
| Over Collateralization due to Commitment Limitation | $ | (4,249,500.00) |
| Total Over Collateralization | $ | (11,168,924.75) |
| Borrowing Limit | $ | 98,643,500.00 |
| | | |
| **IV.    Computation of Facility Availability** | | |
| Commitment | $ | 98,643,500.00 |
| Withheld Commitment | $ | - |
| Approved but not Active | $ | - |
| Adjusted Borrowing Limit | $ | 98,643,500.00 |
| | | |
| Facility Balance | $ | 98,643,500.00 |
| | | |
| Collateral Deficiency | $ | - |
| | | |
| WAB Loan Maximum Advance to Maximum Unpaid Principal Balance (LTB) | | 53.93% |
| WAB Loan Maximum Advance to Real Estate Value (LTV) | | 32.94% |
| Borrower Loan Maximum Advance to Real Estate Value | | 61.07% |

The undersigned represents and warrants that this Borrowing Base Certificate is true and correct statement of the Borrowing Base, and that the information contained herein is true and correct in all material respects. The undersigned further represents and warrants that (i) there is no Default or Event of Default occurring or continuing under any of the Facility Documents, (ii) all representations and warranties contained in the Facility Documents are true and correct in all material respects, and (iii) all amounts reflected herein have been determined and calculated in strict compliance with the provisions of the Facility Documents and the Exhibits and Schedules thereto. Capitalized terms used herein and not otherwise defined herein shall have the meanings specified in the Facility Documents.

| **Cantor Group V LLC**<br><br>Signed:<br><br>Title: | **WAB Reviewer**<br>Signed: *Kevin Chai*<br>VP - 06/12/25<br>Title: |
|---|---|
| **WAB Approval**<br>Signed: *MC Englert*<br><br>Title:    VP 06/13/25 | **WAB Additional Approval**<br>Signed:<br><br>Title:    SVP 6/13/25 |

| Monthly Settlement Report<br>Cantor Group V LLC<br>As of June 11, 2025<br>Loan Tape Date as of: 06/05/25 | | |
|---|---|---|
| **I.    Computation of Unpaid Principal Balance** | | |
| Unpaid Principal Balance of Pledged Assets | $ | 180,099,041.25 |
| Unpaid Principal Balance of Ineligible Pledged Assets | $ | - |
| Unpaid Principal Balance of Eligible Pledged Assets | $ | 180,099,041.25 |
| | | |
| **II.    Computation of Real Estate Value** | | |
| Real Estate Value of Pledged Assets | $ | 299,475,000.00 |
| Real Estate Value of Ineligible Pledged Assets | $ | - |
| Real Estate Value of Eligible Pledged Assets | $ | 299,475,000.00 |
| | | |
| **III.    Computation of Borrowing Limit** | | |
| Unrestricted Advance on Eligible Assets | $ | 109,812,424.75 |
| Over Collateralization due to Property Type Sublimit | $ | - |
| Over Collateralization due to Ground-up Construction Sublimit | $ | - |
| Over Collateralization due to Sponsor Sublimit | $ | - |
| Over Collateralization due to DCCO limit | $ | - |
| Over Collateralization due to Cost Basis limit | $ | - |
| Over Collateralization due to Single Loan Limits | $ | (6,919,424.75) |
| Over Collateralization due to Commitment Limitation | $ | (4,249,500.00) |
| Total Over Collateralization | $ | (11,168,924.75) |
| Borrowing Limit | $ | 98,643,500.00 |
| | | |
| **IV.    Computation of Facility Availability** | | |
| Commitment | $ | 98,643,500.00 |
| Withheld Commitment | $ | - |
| Approved but not Active | $ | - |
| Adjusted Borrowing Limit | $ | 98,643,500.00 |
| | | |
| Facility Balance | $ | 98,643,500.00 |
| | | |
| Collateral Deficiency | $ | - |
| | | |
| WAB Loan Maximum Advance to Maximum Unpaid Principal Balance (LTB) | | 53.93% |
| WAB Loan Maximum Advance to Real Estate Value (LTV) | | 32.94% |
| Borrower Loan Maximum Advance to Real Estate Value | | 61.07% |

The undersigned represents and warrants that this Borrowing Base Certificate is true and correct statement of the Borrowing Base, and that the information contained herein is true and correct in all material respects. The undersigned further represents and warrants that (i) there is no Default or Event of Default occurring or continuing under any of the Facility Documents, (ii) all representations and warranties contained in the Facility Documents are true and correct in all material respects, and (iii) all amounts reflected herein have been determined and calculated in strict compliance with the provisions of the Facility Documents and the Exhibits and Schedules thereto. Capitalized terms used herein and not otherwise defined herein shall have the meanings specified in the Facility Documents.

| Cantor Group V LLC<br><br>Signed:<br><br>Title: Authorized Agent | WAB Reviewer<br><br>Signed:<br><br>Title: |
|---|---|
| WAB Approval<br><br>Signed:<br><br>Title: | WAB Additional Approval<br><br>Signed:<br><br>Title: |

| Collateral Loan Number | Collateral Loan Borrower Name | Sponsor | Property Street | Property City | Property State | Property Type Category | Collateral Loan UPB | Collateral Loan Commitment | Collateral Loan Issuance Date | Collateral Loan Maturity Date | Collateral Loan Interest Rate | Lien Position | Days Past Due | Collateral Loan Performance Status | Dwell Time | Aggregate Eligible Property Value | LTB Advance Rate | LTV Advance Rate | LTB Advance | LTV Advance | Amount Eligible to be Advanced |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 26 | Conejo Riverside Group LLC | 4 | 2522 S Grove Ave | Ontario | CA | Commercial Retail | $ 16,500,000.00 | $ 16,500,000.00 | 6/8/2023 | 6/8/2025 | 12.99% | 1 | 0 | Performing | 682 | $ 19,870,000.00 | 60% | 45% | $ 9,900,000.00 | $ 8,941,500.00 | $ 8,941,500.00 |
| 32 | Alessandro Group, LLC | 5 | 23750 Alessandro Blvd, "Building G, H, I" | Moreno Valley | CA | Commercial Retail | $ 7,750,000.00 | $ 7,750,000.00 | 1/3/2024 | 6/3/2025 | 12.00% | 1 | 0 | Performing | 516 | $ 10,045,289.47 | 60% | 45% | $ 4,650,000.00 | $ 4,520,289.47 | $ 4,520,289.47 |
| 33 | Alessandro Group, LLC | 5 | 23750 Alessandro Blvd," Building A, B, O, N" | Moreno Valley | CA | Commercial Retail | $ 6,500,000.00 | $ 6,500,000.00 | 1/3/2024 | 6/3/2025 | 12.00% | 1 | 0 | Performing | 516 | $ 8,424,912.28 | 60% | 45% | $ 3,900,000.00 | $ 3,791,210.53 | $ 3,791,210.53 |
| 34 | Alessandro Group, LLC | 5 | 23750 Alessandro Blvd, "Building M, L" | Moreno Valley | CA | Commercial Retail | $ 6,500,000.00 | $ 6,500,000.00 | 1/3/2024 | 6/3/2025 | 12.00% | 1 | 0 | Performing | 516 | $ 8,820,000.00 | 60% | 45% | $ 3,900,000.00 | $ 3,969,000.00 | $ 3,900,000.00 |
| 35 | Conejo Riverside Group LLC | 6 | 2460 S. Grove Ave | Ontario | CA | Commercial Retail | $ 2,900,000.00 | $ 2,900,000.00 | 1/3/2024 | 6/3/2025 | 12.00% | 1 | 0 | Performing | 516 | $ 6,480,000.00 | 60% | 45% | $ 1,740,000.00 | $ 2,916,000.00 | $ 1,740,000.00 |
| 36 | Global Premier Regency Palms Oxnard, LP | 7 | 1020 Bismark Way | Oxnard | CA | Commercial Special Purpose | $ 22,699,041.25 | $ 25,500,000.00 | 3/20/2020 | 3/23/2030 | 10.92% | 1 | 30 | Performing | 433 | $ 44,165,000.00 | 60% | 45% | $ 13,619,424.75 | $ 19,874,250.00 | $ 10,000,000.00 |
| 37 | Galois Group LLC | 8 | 28207 Newhall Ranch Road | Valencia | CA | Commercial Retail | $ 20,000,000.00 | $ 20,000,000.00 | 4/25/2024 | 4/25/2025 | 12.99% | 1 | 0 | Performing | 371 | $ 41,600,000.00 | 60% | 45% | $ 12,000,000.00 | $ 18,720,000.00 | $ 10,000,000.00 |
| 38 | Galois Group LLC | 8 | 28251 Newhall Ranch Road | Valencia | CA | Commercial Retail | $ 8,250,000.00 | $ 8,250,000.00 | 4/25/2024 | 4/25/2025 | 12.99% | 1 | 0 | Performing | 371 | $ 13,000,000.00 | 60% | 45% | $ 4,950,000.00 | $ 5,850,000.00 | $ 4,950,000.00 |
| 39 | Galois Group LLC | 8 | 28301 Newhall Ranch Road | Valencia | CA | Commercial Retail | $ 6,250,000.00 | $ 6,250,000.00 | 4/25/2024 | 4/25/2025 | 12.99% | 1 | 0 | Performing | 371 | $ 10,300,000.00 | 60% | 45% | $ 3,750,000.00 | $ 4,635,000.00 | $ 3,750,000.00 |
| 43 | Plaza Continental, LLC | 11 | 3700 Inland Empire Blvd | Ontario | CA | Commercial Retail | $ 17,000,000.00 | $ 17,000,000.00 | 5/28/2024 | 5/28/2025 | 12.99% | 1 | 0 | Performing | 341 | $ 29,430,000.00 | 60% | 45% | $ 10,200,000.00 | $ 13,243,500.00 | $ 10,000,000.00 |
| 44 | Chino Central Group, LLC | 12 | 12233 Central Ave | Chino | CA | Commercial Retail | $ 17,000,000.00 | $ 17,000,000.00 | 5/28/2024 | 5/28/2025 | 10.00% | 1 | 0 | Performing | 341 | $ 35,640,000.00 | 60% | 45% | $ 10,200,000.00 | $ 16,038,000.00 | $ 10,200,000.00 |
| 45 | Cedar Street Group LLC | 13 | 9826 Cedar St | Bellflower | CA | Commercial Multi Family | $ 9,000,000.00 | $ 9,000,000.00 | 5/24/2023 | 5/24/2025 | 10.00% | 1 | 0 | Performing | 221 | $ 11,000,000.00 | 70% | 50% | $ 6,300,000.00 | $ 5,500,000.00 | $ 5,500,000.00 |
| 48 | Century Group, LLC | 14 | 2056-2118 W Century Blvd | Inglewood | CA | Commercial Multi Family | $ 16,750,000.00 | $ 16,750,000.00 | 2/24/2025 | 2/24/2026 | 12.99% | 1 | 0 | Performing | 55 | $ 21,200,000.00 | 70% | 50% | $ 11,725,000.00 | $ 10,600,000.00 | $ 10,600,000.00 |
| 49 | Pioneer Group, LLC | 15 | 5663-5703 Cherry Avenue | Long Beach | CA | Commercial Multi Family | $ 23,000,000.00 | $ 23,000,000.00 | 2/24/2025 | 2/24/2026 | 10.75% | 1 | 0 | Performing | 55 | $ 39,500,000.00 | 70% | 50% | $ 16,100,000.00 | $ 19,750,000.00 | $ 15,000,000.00 |
| Total Eligible | | | | | | | $ 180,099,041.25 | $ 182,900,000.00 | | | | | | | | $ 299,475,000.00 | | | $ 112,934,424.75 | $ 138,348,750.00 | $ 102,893,000.00 |
| Total Pledged (Both Eligible and Ineligible) | | | | | | | $ 180,099,041.25 | $ 182,900,000.00 | | | | | | | | $ 299,475,000.00 | | | $ 112,934,424.75 | $ 138,348,750.00 | $ 102,893,000.00 |

| Property Type Category | Advance Rate[1] | | Renovation Sublimits ($000's) | Amount Eligible to be Advanced | | Construction Sublimit ($000's) | Amount Eligible to be Advanced | | Total Amount Eligible to be Advanced | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | LTB | LTV | | ($000's) | (% Pledged) | | ($000's) | (% Pledged) | Property Type Category | ($000's) | (% Pledged) |
| SFR Owner Occupied | 0% | 0% | $ - | $ - | 0% | $ - | $ - | 0% | SFR Owner Occupied | $ - | 0% |
| SFR Investor | 75% | 55% | $ 100,000 | $ - | 0% | $ - | $ - | 0% | SFR Investor | $ - | 0% |
| SFR Developer | 0% | 0% | $ - | $ - | 0% | $ - | $ - | 0% | SFR Developer | $ - | 0% |
| Commercial Multi Family | 70% | 50% | $ 100,000 | $ 31,100 | 30% | $ - | $ - | 0% | Commercial Multi Family | $ 31,100 | 30% |
| Commercial Mixed Use | 65% | 50% | $ 100,000 | $ - | 0% | $ - | $ - | 0% | Commercial Mixed Use | $ - | 0% |
| Commercial Office | 60% | 45% | $ 30,000 | $ - | 0% | $ - | $ - | 0% | Commercial Office | $ - | 0% |
| Commercial Retail | 65% | 50% | $ 100,000 | $ 61,793 | 60% | $ - | $ - | 0% | Commercial Retail | $ 61,793 | 60% |
| Commercial Industrial | 65% | 50% | $ 100,000 | $ - | 0% | $ - | $ - | 0% | Commercial Industrial | $ - | 0% |
| Commercial Hospitality | 55% | 45% | $ 60,000 | $ - | 0% | $ - | $ - | 0% | Commercial Hospitality | $ - | 0% |
| Commercial Special Purpose | 65% | 50% | $ 60,000 | $ 10,000 | 10% | $ - | $ - | 0% | Commercial Special Purpose | $ 10,000 | 10% |
| Commercial Land | 0% | 0% | $ - | $ - | 0% | $ - | $ - | 0% | Commercial Land | $ - | 0% |
| Amount Eligible To Be Advanced | | | | $ 102,893 | 100% | Amount Eligible To Be Advanced | $ - | 0% | Total Amount Eligible To Be Advanced | $ 102,893 | 100% |
| | | | | | | | | | Over Collateralization Amount | $ 4,250 | |
| | | | | | | | | | Total Available Advance | $ 98,644 | |

## SCHEDULE 10C

### (Documentation Deficiencies to be Cured)

List of Outstanding Collateral Items (to be provided within 30 days post-close)

- Loan #44 – (Chino Central Group) - Insured Mortgage shows only a 65.91% interest (Chino Central Group, LLC) however, vesting is in both Chino Central Group, LLC (65.91%) and Vineyard Village Group, LLC (34.09%)

- Loan #45 – (9826 Cedar St) – Promissory Note currently matured. Missing maturity extension.

- Loan #48 (Century) – Missing title policies

- Loan #49 (Pioneer) – Missing title policies

Borrower to provide (ii) evidence reasonably satisfactory to Lender that the delinquent taxes have been paid for the below Collateral Loans, or (ii) if the underlying Collateral Loan Obligor on the below Collateral Loans is disputing or appealing any such taxes in good faith, Borrower will provide satisfactory evidence to Lender (x) of such dispute or appeal, and (y) that the underlying Collateral Loan Obligor is otherwise in compliance with the terms and conditions of such Collateral Loan.

- Loan #37 (28207 Newhall Ranch Road) – Delinquent Taxes

- Loan #38 (28251 Newhall Ranch Road) – Defaulted Taxes

- Loan #39 (28301 Newhall Ranch Road) – Defaulted Taxes

- Loan #43 (3700 Inland Empire Blvd) – Delinquent Taxes

- Loan #44 (12233 Central) – Delinquent Taxes